ACCEPTED
03-15-00242-CV
6919167
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/14/2015 4:56:31 PM
JEFFREY D. KYLE
CLERK

Case Number 03-15-00242-CV

IN THE THIRD DISTRICT COURT OF APPEALS

at Austin

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/14/2015 4:56:31 PM
JEFFREY D. KYLE
Clerk

GUILLERMO OCHOA-CRONFEL,

Appellant,

v.

PATRICK C. MURRAY,

Appellee.

From Cause No. D-1-GN-11-002136 in the 345th Judicial District Court
Of Travis County, Texas

## APPELLANT'S BRIEF

Paul T. Morin, P.C.
State Bar No. 14460550
503 W. 14th Street
Austin, Texas 78701
Telephone: (512) 499-8200
Facsimile: (512) 499-8203
PMorin@austin.rr.com

Guillermo Ochoa-Cronfel
State Bar No. 15175600
2700 Bee Caves Road, Suite 103
Austin, Texas 78746
Telephone: (512) 347-9600
Facsimile: (512) 347-9911
Guillermo@thecronfelfirm.com

ATTORNEYS FOR APPELLANT

**Oral Argument Requested**

**September 14, 2015**

# IDENTITY OF PARTIES AND COUNSEL

**Appellant and Plaintiff below:**

Guillermo Ochoa-Cronfel (hereafter, "Cronfel" and/or "Plaintiff").

**Trial Counsel for Plaintiff:**

Mr. Paul T. Morin
Texas Bar No. 14460550
Paul T. Morin, P.C.
503 West 14th Street
Austin, Texas 78701
Telephone:  (512) 499-8200
Facsimile:  (512) 499-8203

Mr. Chris Cagle
Texas Bar No. 24048905
The Cagle Law Firm, P.C.
4425 South Mopac Expressway
Building II, Suite 105
Austin, Texas 78735
Telephone:  (512) 371-6101
Facsimile:  (512) 597-3132

**Appellate Counsel for Plaintiff:**

Mr. Paul T. Morin (See Above)

Mr. Guillermo Ochoa-Cronfel
Texas Bar No. 15175600
2700 Bee Caves Road, Suite 103
Austin, Texas 78746
Telephone:  (512) 347-9600
Facsimile:  (512) 347-9911

**Appellee and Defendant below:**

Patrick C. Murray (hereafter, "Murray" and/or "Defendant").

**Trial Counsel for Defendant:**

Mr. Brett H. Payne
Texas Bar No. 00791417
Ms. Katherine L. "Katie" Sacra McLean
Texas Bar No. 24037971
Walters, Balido & Crain, L.L.P.
9020 N. Capital of Texas Highway
Building II, Suite 225
Austin, Texas 78759
Telephone:  (512) 472-9000
Facsimile:  (512) 472-9002

**Appellate Counsel for Defendant:**

Mr. Gregory R. Ave
Texas Bar No. 01448900
Walters, Balido & Crain, L.L.P.
10440 North Central Expressway
Meadow Park Tower, Suite 1500
Dallas, Texas 75231
Telephone:  (214) 347-8310
Facsimile:  (214) 347-8311

## Table of Contents

INDEX OF AUTHORITIES…………………………………………..…………5

STATEMENT OF THE CASE…………………………………………………11

STATEMENT REGARDING ORAL ARGUMENT……………….…..…………12

ISSUES PRESENTED.......................................................................…....13

STATEMENT OF FACTS…………………………………………………..16

SUMMARY OF THE ARGUMENT……………………………….………...…25

ARGUMENT AND AUTHORITIES…………………………………….…26

    1. The Jury's Finding in Question 1, That the Negligence of Guillermo
       Ochoa-Cronfel Proximately Caused the Injury in Question, is Not
       Supported by Legally and/or Factually Sufficient Evidence…………..26

    2. The Jury's Finding in Question 2, That Guillermo Ochoa-Cronfel was
       45% Responsible for Causing the Injury in Question, is Not Supported by
       Legally and/or Factually Sufficient Evidence…………………….…27

    3. The Jury's Finding in Question 3(1), That the damages for the physical
       pain and mental anguish sustained in the past by Guillermo Ochoa-
       Cronfel as a result of the injury was only $2,500.00, is Not Supported by
       Legally and/or Factually Sufficient Evidence……………….………40

    4. The Jury's Finding in Question 3(2), That the damages for the physical
       pain and mental anguish that, in reasonable probability, Guillermo
       Ochoa-Cronfel will sustain in the future as a result of the injury was only
       $1,000.00, is Not Supported by Legally and/or Factually Sufficient
       Evidence……………………………………………………….…..50

    5. The Jury's Finding in Question 3(3), That the damages for the physical
       impairment Guillermo Ochoa-Cronfel sustained in the past as a result of
       the injury was only $500.00, is Not Supported by Legally and/or
       Factually Sufficient Evidence…………………………………..52

[3]

6. The Jury's Finding in Question 3(4), That the damages for the physical impairment that, in reasonable probability, Guillermo Ochoa-Cronfel will sustain in the future as a result of the injury was only $2,000.00, is Not Supported by Legally and/or Factually Sufficient Evidence…………...…53

7. The Jury's Finding in Question 3(5), That the medical care expenses Guillermo Ochoa-Cronfel incurred in the past as a result of the injury was only $9,345.00, is Not Supported by Legally and/or Factually Sufficient Evidence………………………………………………….…..55

8. The Jury's Finding in Question 3(6), That the medical care expenses that, in reasonable probability, Guillermo Ochoa-Cronfel will incur in the future as a result of the injury was only $3,000.00, is Not Supported by Legally and/or Factually Sufficient Evidence..…………………………56

9. The Jury's Finding in Question 3(7), That the disfigurement sustained in the past by Guillermo Ochoa-Cronfel as a result of the injury was subject to a ZERO damage award, is Not Supported by Legally and/or Factually Sufficient Evidence…………………………………………………57-58

10. The Jury's Finding in Question 3(8), That the disfigurement that, in reasonable probability, Guillermo Ochoa-Cronfel will sustain in the future as a result of the injury was subject to a ZERO damage award, is Not Supported by Legally and/or Factually Sufficient Evidence………59

11. The trial court's sanctions order against Cronfel was an abuse of discretion as Cronfel did not violate the spirit of the prior order complained of in Defendant's Motion that led to the sanctions order.....62

PRAYER…...................................................................................................66

Certificate of Compliance.........................................................................68

Certificate of Service.................................................................................68

Appendix....................................................................................................69

[4]

**Page(s)**

**Cases**

*Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Research Corp.*,
     299 S.W.3d 106 (Tex. 2009)……………………………………………..34

*Aguilar v. Morales*,
     162 S.W.3d 825 (Tex.App.-El Paso 2005, pet. denied)…………………….62

*Blake v. Dorado*,
     211 S.W.3d 429 (Tex.App.-El Paso 2006, no pet.)…………………………62

*Cain v. Bain*,
     709 S.W.2d 175 (Tex. 1986)…………………………………………….....28

*Carney v. Roberts Inv. Co.*,
     837 S.W.2d 206 (Tex.App.-Tyler 1992, writ denied)……………….27, 28, 32

*Ciguero v. Lara*,
     455 S.W.3d 744 (Tex.App.-El Paso 2015, no pet.)………………..29, 36, 37

*Cire v. Cummings*,
     134 S.W.3d 835 (Tex. 2004)…………………………………………….....62

*City of Keller v. Wilson*,
     168 S.W.3d 802 (Tex. 2005)…………………………………………….....27

*Clone Component Distribs. Of Am., Inc. v. State*,
     819 S.W.2d 593 (Tex.App.-Dallas 1991, no writ)………………………….64

*Coates v. Whittington*,
     758 S.W.2d 749 (Tex. 1988)…………………………………………….....46

*Doctor v. Pardue*,
     186 S.W.3d 4 (Tex.App.-Houston [1st Dist.]
     2005, pet. denied)……………………………………...41, 50, 52, 53, 55, 58, 59

*Doe v. Boys Clubs of Greater Dallas, Inc.*,
907 S.W.2d 472 (Tex. 1995)……………………………………………..36

*Downer v. Aquamarine Operators, Inc.*,
701 S.W.2d 238 (Tex. 1985)……………………………………………..62

*Electronic Data Sys. Corp. v. Tyson*,
862 S.W.2d 728 (Tex.App.-Dallas 1993, no writ)…………………………65

*Ford Motor Co. v. Ridgway*,
135 S.W.3d 598 (Tex. 2004)……………………………………………..28

*Ford Motor Company v. Tyson*,
943 S.W.2d 527 (Tex.App.-Dallas 1997, orig. proceeding).........................66

*Golden Eagle Archery, Inc. v. Jackson*,
116 S.W.3d 757 (Tex. 2003)……………………………………………..52

*Goldman v. Torres*,
341 S.W.2d 154 (Tex. 1960)……………………………………………..58

*Hammerly Oaks, Inc. v. Edwards*,
958 S.W.2d 387 (Tex. 1997)……………………………………………..33

*Hicks v. Ricardo*,
834 S.W.2d 587 (Tex.App.-Houston [1st Dist.] 1992, no writ)……………..50

*Hill v. Clayton*,
827 S.W.2d 570 (Tex.App.-Corpus Christi 1992, no writ.)…………………56

*Hurst v. Kress & Company, et. al.*,
489 F.2d 168 (5th Cir. 1974)……………………………………………29, 32-33

*IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*,
938 S.W.2d 440 (Tex. 1997)..............................................................64-65

*In re Doe*,
22 S.W.3d 601 (Tex.App.-Austin 2000, orig. proceeding)…………………46

[6]

*In re Nance*,
143 S.W.3d 506 (Tex.App.-Austin 2004, orig. proceeding)…………..………46

*Jack B. Anglin Co., Inc. v. Tipps*,
842 S.W.2d 266 (Tex. 1992)................................................................64-65

*Jones v. Wal-Mart Stores, Inc.*,
870 F.2d 982 (5th Cir. 1989)…………………………………….………..50

*Jordan v. City of Lubbock*,
88 S.W.2d 560 (Tex.App.-Amarillo 1935, writ dism'd)…………….29, 32-33

*Kahng v. Verity*,
No. 01-07-00695-CV, 2008 WL 2930195 (Tex.App.-Houston [1st Dist.]
July 31, 2008, no pet.)(mem.op)……………………………………………37

*Karagounis v. Property of Co. of America*,
970 S.W.2d 761 (Tex.App.-Amarillo 1998, pet. denied)…………………..65

*Kindred v. Con/Chem, Inc.*,
650 S.W.2d 61 (Tex. 1983)…………………………………………………28

*Koslow's v. Mackie*,
796 S.W.2d 700 (Tex. 1990)………………………………………………..62

*Kroger Co. v. Elwood*,
197 S.W.3d 793 (Tex. 2006)(per curiam)………………………………..29

*Kroger Co. v. Keng*,
23 S.W.3d 347 (Tex. 2000)…………………………………………………29

*Kugle v. DaimlerChrysler Corp.*,
88 S.W.3d 355 (Tex.App.-San Antonio 2002, pet. denied)…………….64-65

*Lopez v. La Madeleine of Texas, Inc.*,
200 S.W.3d 854 (Tex.App.-Dallas 2006, no pet.)…………….…….…….64

*Lozano v. Lozano*,
52 S.W.3d 141 (Tex. 2001)…………………………………………………33

*McDonald v. Dankworth,*
212 S.W.3d 336 (Tex.App.-Austin 2006, no pet.)………………27, 28-29, 33

*Montes v. Pendergrass,*
61 S.W.3d 505 (Tex.App.-San Antonio 2001, no pet.)......................29-30, 32

*Nat'l Union Fire Ins. Co. v. Wyar,*
821 S.W.2d 291 (Tex.App.-Houston [1st Dist.] 1991, no writ.)…………….55

*Parker v. Highland Park, Inc.,*
565 S.W.2d 512 (Tex. 1978)…………………………………………......29

*Parkway Co. v. Woodruff,*
901 S.W.2d 434 (Tex. 1995)……………………………………….…41

*Plas-Tex, Inc. v. U.S. Steel Corp.,*
772 S.W.2d 442 (Tex. 1989)………………………………………..28

*Pool v. Ford Motor Co.,*
715 S.W.2d 629 (Tex. 1986)………………………………………..28

*Prescott v. Kroger Co.,*
877 S.W.2d 373 (Tex.App.-Houston [1st Dist.] 1994, writ denied)…………49

*R.K. v. Ramirez,*
887 S.W.2d 836 (Tex. 1994)……………………………………………46, 63

*Randolph v. Walker,*
29 S.W.3d 271 (Tex.App.-Houston [14th Dist.] 2000, pet. denied)…………65

*Richards v. Allen*, 402 S.W.2d 158 (Tex. 1966)……………….…………64-65

*Rosenboom Mach. & Tool, Inc. v. Machala,*
995 S.W.2d 817 (Tex.App.-Houston [1st Dist.] 1999, pet. denied)…………50

*Salter v. Galveston, H. & S.A. Ry. Co.,*
285 S.W. 1112 (Tex.Civ.App. 1926)……………………………..29, 32-33

*Standard Fire Ins. Co. v. Morgan,*
745 S.W.2d 310 (Tex. 1987)………………………………………..26

[8]

*Stromburger v. Turley Law Firm*,
251 S.W.3d 225 (Tex.App.-Dallas 2008, no pet.)…………………………65-66

*Sunbridge Healthcare Corp. v. Penny*,
160 S.W.3d 230 (Tex.App.-Texarkana 2005, no pet.)………………………58

*Texas & N.O.R. Co. v. Blake*,
175 S.W.2d 683 (Tex.Civ.App.-Fort Worth 1943, writ ref'd)……….…..29

*TransAmerican Natural Gas v. Powell*,
811 S.W. 2d 913 (Tex. 1991)………………………………………………….66

*Transit Mgmt. Co. of Laredo v. Sanchez*,
886 S.W.2d 823 (Tex.App.-San Antonio 1994, no writ)……………………58

*Turner v. Cruz*,
No. 04-10-00313-CV, 2010 WL 5545392 (Tex.App.-San Antonio
Dec. 29, 2010, no pet.)(mem.op.)…………………………………………...37

*United Parcel Service, Inc. and Leal v. Rankin*,
No. 04-14-00494-CV, -- S.W.3d ----, ----, 2015 WL 3503814 (Tex.App.-
San Antonio June 3, 2015)........................................................................34

*Vicknair v. Peters*,
No. 12-13-00034-CV, 2014 WL 357082 (Tex.App.-Tyler
Jan. 31, 2014, no pet.)(mem.op.)…………………………………………37

*W.C. LaRock, D.C., P.C. v. Smith*,
310 S.W.3d 48 (Tex.App.-El Paso 2010, no pet.)…………………………..36

*Walgreen-Texas Co. v. Shivers*,
154 S.W.2d 625 (Tex. 1941)…………………………………………………..29

*Williamson Co. v. Voss*,
284 S.W.3d 897 (Tex.App.-Austin 2009, no pet.)………………………29-30

## Statutes, Rules and Other Authorities

Tex. Civ. Prac. & Rem. Code §18.001………………………………….……56

[9]

Tex. R. Civ. P. 215…………......……………………………………......…..64-65

Robert W. Calvert, *"No Evidence"* & *"Insufficient Evidence"* Points of Error,
38 Tex. L. Rev. 361, 362-363 (1960)…………………………………27-28

# STATEMENT OF THE CASE

*Nature of the case:* Plaintiff and Appellant Guillermo Ochoa-Cronfel ("Cronfel") was injured when Defendant and Appellee Patrick C. Murray ("Murray") lost control of his dog (neither of whom Cronfel saw until after his collision with the dog) while Cronfel was riding his bicycle on a roadway in his neighborhood, and the dog took off running and smashed into Cronfel's bicycle, sending Cronfel crashing into the hard pavement of the road. Cronfel brought suit against Murray alleging that Murray was negligent (and *negligent per se*) because he lost control of his dog which then smashed into Cronfel, causing serious injuries to his right elbow, forearm, wrist, and hand.

*The course of the proceedings below:* The jury was instructed that 'negligence' means failure to use ordinary care, that 'ordinary care' means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances, and that 'proximate cause' means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. The jury found that: (1) The negligence of both Cronfel and Murray were proximate causes of Cronfel's injuries; (2) The percentage of responsibility of Cronfel and Murray was 45% and 55%, respectively; and, (3) awarded Plaintiff actual damages totaling $18,345.00.

*The trial court's disposition of the case:* On January 28, 2015, the trial court signed a judgment on the jury's verdict that awarded compensatory damages, prejudgment interest, and costs of $14,699.22. On February 24, 2015, Plaintiff filed a motion for new trial and to disregard the jury's findings, which was denied on April 1, 2015. Plaintiff perfected this appeal by timely filing a notice of appeal on April 24, 2015.

[11]

**STATEMENT REGARDING ORAL ARGUMENT**

This appeal involves the interplay of Plaintiff's claims for negligence in a personal injury matter and Defendant's defensive claim of contributory negligence. The Court should grant oral argument because in the instant case the trial court's error in failing to grant Plaintiff's Motion for Judgment Notwithstanding the Verdict, particularly with respect to the jury's findings on contributory negligence, which were based on legally and/or factually insufficient evidence of same, could have a negative impact on the well-established standards for findings of contributory negligence, inadvertently lowering the burden of proof facing a defendant claiming contributory negligence as an affirmative defense.

# ISSUES PRESENTED

Appellant presents the following issues for review:

ISSUE 1:    The evidence is legally and/or factually insufficient to support the jury's answer to Question 1, and its finding that the negligence of Guillermo Ochoa-Cronfel proximately caused the injury in question. The answer was against the great weight and preponderance of the evidence, is manifestly unjust, and was inadequate based on the greater weight and preponderance of the evidence presented at trial. As a result, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

ISSUE 2:    The evidence is legally and/or factually insufficient to support the jury's answer to Question 2(1) and its finding that Patrick Murray was only 55% responsible for the injury and the jury's answer to Question 2(2) and its finding that Guillermo Ochoa-Cronfel was 45% responsible for the occurrence. These answers were against the great weight and preponderance of the evidence, are manifestly unjust, and were inadequate based on the greater weight and preponderance of the evidence presented at trial. As a result, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

ISSUE 3:    The evidence is legally and/or factually insufficient to support the jury's answer to Question 3(1) and its finding that the damages for the physical pain and mental anguish sustained in the past by Guillermo Ochoa-Cronfel as a result of the injury was only $2,500.00. The answer was against the great weight and preponderance of the evidence, is manifestly unjust, and was inadequate based on the greater weight and preponderance of the evidence presented at trial. As a result, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial. Further, the trial court erred in overruling Plaintiff's objection to the introduction of evidence regarding his past surgeries as to this damage claim, on relevance grounds.

ISSUE 4:    The evidence is legally and/or factually insufficient to support the jury's answer to Question 3(2) and its finding that the damages for the physical pain and mental anguish that, in reasonable probability, will be sustained by Guillermo Ochoa-Cronfel in the future was only $1,000.00. The answer was against the great weight and preponderance of the evidence, is manifestly unjust, and was inadequate based on the greater weight and preponderance of the evidence presented at trial. As a result, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

[13]

ISSUE 5: The evidence is legally and/or factually insufficient to support the jury's answer to Question 3(3) and its finding that the damages for physical impairment sustained in the past was only $500.00. The answer was against the great weight and preponderance of the evidence, is manifestly unjust, and was inadequate based on the greater weight and preponderance of the evidence presented at trial. As a result, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

ISSUE 6: The evidence is legally and/or factually insufficient to support the jury's answer to Question 3(4) and its finding that the damages for physical impairment that, in reasonable probability, Guillermo Ochoa-Cronfel will sustain in the future was only $2,000.00. The answer was against the great weight and preponderance of the evidence, is manifestly unjust, and was inadequate based on the greater weight and preponderance of the evidence presented at trial. As a result, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

ISSUE 7: The evidence is legally and/or factually insufficient to support the jury's answer to Question 3(5) and its finding that the damages for medical care expenses incurred in the past was only $9,345.00. The answer was against the great weight and preponderance of the evidence, is manifestly unjust, and was inadequate based on the greater weight and preponderance of the evidence presented at trial. As a result, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

ISSUE 8: The evidence is legally and/or factually insufficient to support the jury's answer to Question 3(6) and its finding that the damages for medical care expenses that, in reasonable probability, Guillermo Ochoa-Cronfel will incur in the future was only $3,000.00. The answer was against the great weight and preponderance of the evidence, is manifestly unjust, and was inadequate based on the greater weight and preponderance of the evidence presented at trial. As a result, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

ISSUE 9: The evidence is legally and/or factually insufficient to support the jury's answer to Question 3(7) and its finding that the damages for disfigurement sustained in the past was $0.00. The answer was against the great weight and preponderance of the evidence, is manifestly unjust, and was inadequate based on the greater weight and preponderance of the evidence presented at trial. As a result,

[14]

the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

ISSUE 10:   The evidence is legally and/or factually insufficient to support the jury's answer to Question 3(8) and its finding that the damages for disfigurement that, in reasonable probability, Guillermo Ochoa-Cronfel will sustain in the future was only $0.00.  The answer was against the great weight and preponderance of the evidence, is manifestly unjust, and was inadequate based on the greater weight and preponderance of the evidence presented at trial.  As a result, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

ISSUE 11:   The trial court's monetary sanctions order against Cronfel was an abuse of discretion and should be vacated, or in the alternative, reduced.

## STATEMENT OF FACTS

On the evening of July 23, 2009, around 6:30 P.M., Appellant, Guillermo Ochoa-Cronfel ("Cronfel") was enjoying a bike ride on the roads of his neighborhood in Travis Country, a subdivision off of Southwest Parkway in South Austin. IV RR 122-23. At or around that same time, Appellee, Patrick Murray ("Murray") went for a walk with his dog, Magnum. IV RR 202. Sometime between 6:30 P.M. and 7:30 P.M., the paths of Cronfel and Magnum crossed, arising in the incident and injury that were the subject of the underlying lawsuit. IV RR 125-28 (Cronfel), and IV RR 208-213 (Murray). The picture below shows the roadway in the neighborhood where the incident took place.[1]



---

[1] VII RR 7, Plaintiff's Ex. 1.

However, at the time of the incident at issue, there were two or more cars parked along the right side of the roadway, and Cronfel was riding his road bike in the direction the cars were parked, approximately 3-4 feet to the left of the cars, to avoid the possibility of being hit by an open (or opening) car door. IV RR 125. Prior to that July, 2009 evening, Cronfel estimated that he had ridden that very route, one of his "usual" and "familiar" routes, hundreds of times from 1995 to the time of the incident. IV RR 123.

As Cronfel was riding up the roadway, Murray was walking Magnum along the sidewalk, until Magnum led him at least twenty feet off of the sidewalk into a neighbor's yard, past a number of trees, and behind a large rock, where the dog relieved itself. IV RR 202-07. Up until that time, Murray had been holding Magnum's leash in his hand during their walk. IV RR 209-10. However, after the dog had relieved itself, Murray dropped the leash and stepped on it while picking up his dog's waste. IV RR 209. It was at that time that Magnum barked and took off from his control, with Murray not seeing what he was barking at or where he was going, and doing nothing to try and stop him. IV RR 212.

Contemporaneous with Magnum's nature stop, Cronfel approached that same area of the neighborhood on the adjacent roadway. IV RR 125. Cronfel did not see Murray or Magnum, as he was focused on his bike ride, being careful to avoid obstructions to the side of the road, and what he was doing, and he began to ramp up

[17]

(pick up speed) in order to get in his exercise. IV RR 125-27. It was then that Cronfel passed by the edge of one of the cars parked along the side of the road, and Magnum shot out from behind the car, colliding with the front wheel of his bike. IV RR 126. This collision resulted in Cronfel being thrown from his bike, at speed, and into the pavement. IV RR 126-28.

Cronfel was wearing his cycling helmet at the time of the incident. IV RR 127. Notwithstanding same, Cronfel put his right arm up in front of his face as he was thrown toward the road surface. IV RR 126. As a result, Cronfel's right arm, and specifically in order; his right wrist, his right forearm, his right elbow, and then his right shoulder, bore the brunt of his impact with the pavement. IV RR 126-27. After hitting the pavement and sliding along the surface, Cronfel came to rest laying in the street, in great pain, scared, and dazed. IV RR 127-28.

By that time, Murray had made his way over to the scene of the accident, and while what *exactly* transpired between Murray and Cronfel at that point is in some dispute, what is clear is that their interaction (such as it was) was brief, and then Murray left the area to find and tend to his dog, leaving Cronfel to his own devices, and the good will of his neighbors.[2] IV RR 128-29. Fortunately for Cronfel, his

---

[2] Cronfel testified that Murray tried to help him up by pulling on his then-injured arm, letting him go when Cronfel yelped in pain, and saying something to him (though Cronfel didn't know what it was) then leaving. IV RR 128-29. Murray testified that he asked Cronfel how he was doing, asked him if he wanted to move, and then left to go after his dog as he was concerned about the dog having been through a traumatic event. IV RR 214-15.

[18]

other neighbors did, in fact, exhibit a generous good will towards him. A number of people gathered around him, trying to assist him as he sought to regain his bearings. IV RR 129. A man and his wife assisted Cronfel into their nearby house, where they got him some water, ice, and Ibuprofen, and the lady, who turned out to be a nurse, suggested to Cronfel that he would need to go see a doctor for his injuries. IV RR 129-30. These neighbors took care of Cronfel for a while, and eventually loaded Cronfel's bike into their truck, took him home, and assisted him into his house. IV RR 130.

After enduring an extremely restless night, in which he was in pain for the duration, Cronfel visited his general practitioner, Dr. Paul Keinarth, the next day to get a doctor's assessment of his injuries. IV RR 132. Cronfel presented to Dr. Keinarth with pain in his right shoulder, elbow, wrist, and hand, with swelling in his wrist and hand as well as a limited range of movement.[3] Dr. Keinarth sent Cronfel to Austin Radiological Association to get x-rays of his injured arm that very day, and those x-rays demonstrated a fracture in the radial bone of Cronfel's forearm, near the elbow. IV RR 133-34, and VII RR 21-22, Plaintiff's Ex. 2. Dr. Keinarth then referred Cronfel to Dr. Carey Windler at Austin Sports Medicine for further evaluation. IV RR 134.

---

[3] IV RR 132-33, and VII RR 17-20, Plaintiff's Ex. 2.

[19]

Cronfel saw Dr. Windler for the first time, regarding the injuries suffered in the incident concerned herein, within a week of having seen Dr. Keinarth, on July 29, 2009. IV RR 135. At that time, Dr. Windler informed Cronfel that there was a possibility the fracture near the elbow would require extensive surgery, including sawing off the head of the radius bone and replacing it with "a fake one". IV RR 135. However prior to choosing that course of action, Dr. Windler put Cronfel in a sling for a couple of weeks, pending a decision on whether or not the described extensive surgery would be necessary. IV RR 135-36. After a couple of weeks in the sling, Mr. Cronfel went back to Dr. Windler and was informed that he would not need the surgery that had been discussed on the radial fracture, but his arm did have to be fit with a plastic cast (similar to a fiberglass or plaster cast), which he was in for something like four to six weeks. IV RR 136. Over the course of the next few months, leading up to another visit with Dr. Windler in late October, 2009, Cronfel's radial fracture improved, but all the while the pain in his right wrist continued, unabated.[4]

Subsequently, Cronfel began trying to resume his normal activities with pain as a guide to what he should (or should not) engage in, but the right wrist continued to bother him, and on June 14, 2010 he returned to Dr. Windler, who took that opportunity to review the July, 2009 x-rays of Cronfel's wrist. IV RR 140-41. In

_____

[4] IV RR 136-40, and VII RR 24-36, Dr. Windler's records, admitted as Plaintiff's Ex. 3.

[20]

that review, and corresponding examination, Dr. Windler observed widening of the scapholunate interval with a possible fracture of the lunate in Cronfel's right wrist as another aspect of his July, 2009 injuries.[5] Dr. Windler then set Cronfel up for additional imaging (specifically, an MR arthrogram) at River Ranch Radiology, which took place on June 22, 2010. IV RR 142-43. This additional imaging confirmed a large tear of the scapholunate ligament, degenerative changes in the scaphoid, and a possible fracture off of the triquetrum. IV RR 144-46, and VII RR 25 & 30-34. At that point, Dr. Windler sent Cronfel to a hand specialist, Dr. Robert Walters. IV RR 146.

On August 4, 2010, Dr. Walters examined Cronfel and discussed ulna impact syndrome and its related surgical treatment with him, as a potential solution to the pain and problems Cronfel continued to have with his right hand. IV RR 146-47. Dr. Walters explained that the procedure would involve breaking Cronfel's ulna, sawing off a piece of it to shorten it in order to make it equal to the radius, and putting two metal plates with screws into the arm. IV RR 147-48. Unfortunately, Dr. Walters passed away during the time he was treating Cronfel in 2010. IV RR 157-58. At that point Dr. Windler's office referred Cronfel to Orthopaedic Specialists of Austin and Dr. Gregg Vagner. IV RR 158. After seeing Dr. Vagner for a brief time Cronfel sought another referral, and was sent to Dr. Ira Lown. IV RR 159-60.

_____

[5] IV RR 141-42, and VII RR 26.

[21]

Cronfel first visited Dr. Lown on August 11, 2011. IV RR 160. After reviewing Cronfel's medical records from prior providers, and examining and treating Cronfel himself, it was Dr. Lown's medical opinion that Cronfel's injuries, including the ulna impact syndrome and tear of the scapholunate ligament were a result of the July 23, 2009 incident with Murray's dog, Magnum.[6] Dr. Lown counseled a course of physical therapy, medication, and medical treatments as a means to put off the extreme surgical approach described above for as long as possible.[7] Cronfel continued with this treatment approach for over two years. VII RR 106-218. Finally, on September 11, 2014 Cronfel underwent the ulna shortening procedure, recommended and performed by Dr. Lown.[8] The picture at the top of the next page shows the scar left on Cronfel's forearm after the procedure.[9]

---

[6] IV RR 35-46 (Dr. Lown).
[7] IV RR 45-46 (Dr. Lown), IV RR 160 (Cronfel), and VII RR 103-05, Plaintiff's Ex. 6.
[8] IV RR 67 (Dr. Lown), IV RR 163 (Cronfel), and VII RR 267-369, Plaintiff's Ex. 8.
[9] VII RR 8, Plaintiff's Ex. 1.



Unfortunately, the pain and impairment the injuries have caused Cronfel were not completely resolved by the ulna shortening surgery, and he still faces a four-corner fusion surgery on his wrist at some point in the future that will hopefully alleviate some (if not all) of the pain, but which will still leave him with some level of impairment in his right wrist and hand for the rest of his life.[10]

This negligence case was tried to a Travis County jury over three days. CR 495-503, and Supp. CR 3-6. Throughout the trial – including both the opening statement (IV RR 27) and closing argument (V RR 26 & 36) – Defendant's counsel

---

[10] IV RR 68-74 & 82-86 (Dr. Lown), and IV RR 168-69 (Cronfel).

[23]

argued, regarding Cronfel's own alleged negligence having contributed to his injuries, that he was "revving up" in his bike ride at the time of the incident. Defendant's counsel further argued (incorrectly) that as a bicycle rider, Cronfel actually had a "heightened duty" of proper lookout to the general public, as he was "up on two wheels", i.e., *higher.* V RR 36.

The jury ultimately returned a verdict that concluded; (1) the negligence of both Murray and Cronfel were a proximate cause of the incident; and, (2) the percentage of responsibility of Murray and Cronfel was 55% and 45%, respectively. CR 498-99. The jury awarded Cronfel actual damages totaling $18,345.00. CR 500-01. Judgment was entered on the verdict, taking into account the proportionate responsibilities found by the jury, despite the fact that Cronfel filed a Motion for JNOV and a Motion for New Trial, and this appeal followed.[11]

Finally, Appellant also complains herein of an Order granting Defendant's Motion for Sanctions against Cronfel. On October 28, 2014, prior to trial, the Honorable District Judge Gus J. Strauss heard Defendant's Motion for Sanctions (and its Supplement) requesting sanctions against Cronfel for an alleged violation of a prior Order from the Court, dated September 18, 2014, requiring Cronfel to

---

[11] Supp CR 3-6, CR 519-21, and CR 527-34.

[24]

produce a signed authorization releasing Dr. Lown's complete medical chart for Cronfel by September 19, 2014.[12] [13]

## SUMMARY OF THE ARGUMENT

Under the uncontroverted facts of the incident concerned herein, no reasonable jury could conclude that Cronfel's actions were negligent, that such actions proximately caused this incident and/or his attendant injuries, or that Cronfel was 45% responsible for the incident. These facts include that Cronfel was focused on what he was doing (i.e., riding his bicycle on the roadway, being careful to avoid obstructions to the side of the road), that he did not see Murray or his dog until seeing the dog at the instant he was slamming into Cronfel's bicycle, and that he could have done nothing to have avoided the incident. IV RR 126-27 & 183-85. Thus, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

Further, under the uncontroverted facts of the injuries sustained by Cronfel as a result of the incident, and the medical treatment related to such injuries (both past and future), no reasonable jury could conclude that as a result of his injuries; (i) $2,500.00 would fairly and reasonably compensate Cronfel for physical pain and

---

[12] Judge Strauss was sitting as a Visiting Judge and heard this matter as part of the Travis County District Court's rotating central docket.

[13] II RR 1-26 (Transcript of Hearing on Sanctions), CR 176-364 (Defendant's Motion & Supplement), CR 384-408 (Plaintiff's Brief Against Sanctions), CR 409-12 (Defendant's Objections to Plaintiff's Brief), and CR 413 (Order).

mental anguish sustained in the past; (ii) $1,000.00 would fairly and reasonably compensate Cronfel for physical pain and mental anguish that, in reasonable probability, he would sustain in the future; (iii) $500.00 would fairly and reasonably compensate Cronfel for physical impairment sustained in the past; (iv) $2,000.00 would fairly and reasonably compensate Cronfel for physical impairment that, in reasonable probability, he will sustain in the future; (v) $9,345.00 would fairly and reasonably compensate Cronfel for medical care expenses incurred in the past; (vi) $3,000.00 would fairly and reasonably compensate Cronfel for medical care expenses that, in reasonable probability, he would incur in the future; (vii) $0.00 would fairly and reasonably compensate Cronfel for disfigurement sustained in the past; and, (viii) $0.00 would fairly and reasonably compensate Cronfel for disfigurement that, in reasonable probability, he will sustain in the future. These facts include Cronfel's medical bills admitted into evidence, as well as the testimony of both Cronfel and Dr. Lown. Thus, the trial court erred in denying Plaintiff's Motion for Judgment Notwithstanding Verdict and his Motion for New Trial.

Finally, the trial court abused its discretion when it sanctioned Cronfel for violating a prior discovery order.

## ARGUMENT AND AUTHORITIES

1. **The Jury's Finding in Question 1, That the Negligence of Guillermo Ochoa-Cronfel Proximately Caused the Injury in Question, is Not Supported by Legally and/or Factually Sufficient Evidence.**

[26]

**2. The Jury's Finding in Question 2, That Guillermo Ochoa-Cronfel was 45% Responsible for Causing the Injury in Question, is Not Supported by Legally and/or Factually Sufficient Evidence.**

The evidence is legally and factually insufficient to support the jury's finding in Question 1 that the *negligence* of Guillermo Ochoa-Cronfel *proximately caused* the injury in question, and such finding is against the great weight of the evidence and is manifestly unjust. I CR 498.

A legal sufficiency challenge is also known as a 'no evidence' challenge and, "In deciding a 'no evidence' point, an appellate court considers only the evidence, and reasonable inferences therefrom, which, when viewed in the most favorable light, support the jury's answers, rejecting and disregarding all other evidence and reasonable inferences therefrom." *Carney v. Roberts Inv. Co.*, 837 S.W.2d 206, 208 (Tex.App.-Tyler 1992, writ denied), citing *Standard Fire Ins. Co. v. Morgan*, 745 S.W.2d 310, 311 (Tex. 1987). A legal sufficiency challenge should be sustained, "…if the record reveals: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact." *McDonald v. Dankworth*, 212 S.W.3d 336, 340 (Tex.App.-Austin 2006, no pet.), citing *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, *"No Evidence" & "Insufficient Evidence"* Points of Error, 38 Tex. L. Rev.

361, 362-363 (1960)).  Moreover, "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence."  *McDonald*, 212 S.W.3d at 339, citing *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

A factual sufficiency, or "insufficient evidence" challenge, requires the reviewing court to, "…consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside."  *McDonald,* 212 S.W.3d at 339, citing *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); See also, *Carney*, 837 S.W.2d at 208.  A factual sufficiency challenge should be sustained, "…only if the evidence that supports the jury finding is so weak as to be clearly wrong and manifestly unjust."  *McDonald,* 212 S.W.3d at 339, citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); See also, *Carney*, 837 S.W.2d at 208 ("A reversal is required if this court concludes that the verdict is so against the great weight and preponderance of evidence as to be manifestly unjust.")

Under Texas law, " '[t]he standards and tests for determining contributory negligence ordinarily are the same as those for determining negligence,' and when contributory negligence is submitted, 'the burden of proof is on the defendant to prove the defense by a preponderance of the evidence.' " *McDonald,* 212 S.W.3d at

340, citing *Carney,* 837 S.W.2d at 208. Further, "…contributory negligence is not established by evidence which is equally consistent with the exercise of the care by the plaintiff, or where the inference of due care is just as reasonable as is the inference of the absence thereof." *Jordan v. City of Lubbock*, 88 S.W.2d 560, 563 (Tex.App.-Amarillo 1935, writ dism'd), citing *Salter v. Galveston, H. & S.A. Ry. Co.*, 285 S.W. 1112 (Tex.Civ.App. 1926); See also, *Hurst v. Kress & Company, et. al.*, 489 F.2d 168, 171-72 (5th Cir. 1974). That is, "Contributory negligence contemplates an injured person's failure to use ordinary care in regard to his or her own safety." *Kroger Co. v. Keng*, 23 S.W.3d 347, 351 (Tex. 2000), citing *Parker v. Highland Park, Inc.*, 565 S.W.2d 512, 520 (Tex. 1978); *Walgreen-Texas Co. v. Shivers*, 154 S.W.2d 625, 630 (Tex. 1941); *Texas & N.O.R. Co. v. Blake*, 175 S.W.2d 683, 685 (Tex.Civ.App.-Fort Worth 1943, writ ref'd).

In order to establish negligence (and thus, *contributory* negligence), "…a party must establish a duty, a breach of that duty, and damages proximately caused by the breach." *Ciguero v. Lara*, 455 S.W.3d 744, 748 (Tex.App.-El Paso 2015, no pet.), citing *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex. 2006)(per curiam). In the instant case, the duty(ies) that could reasonably be ascribed to Appellant, which Appellee was required to prove Appellant breached by a preponderance of the evidence, were; (i) the general duty to exercise ordinary care; and, (ii) the general duty to keep a proper lookout. See *Williamson Co. v. Voss*, 284 S.W.3d 897, 902

[29]

(Tex.App.-Austin 2009, no pet.), and *Montes v. Pendergrass*, 61 S.W.3d 505, 509 (Tex.App.-San Antonio 2001, no pet.).

The evidence presented at trial in this matter regarding the incident that led to Appellant's injury, and the negligence (or lack thereof) of Appellant and/or Appellee was simple and straightforward. The only factual testimony regarding the incident came from Mr. Ochoa-Cronfel and Mr. Murray. Both men testified that the incident took place on the evening of July 23, 2009, somewhere between 6:00 and 7:30 P.M. IV RR 122-23 (Ochoa-Cronfel) & IV RR 202 & 208 (Murray).

A review of the record demonstrates only the following evidence, and reasonable inferences therefrom, which, when viewed in the most favorable light, could remotely support the jury's answers to Questions Nos. 1 and/or 2:

1. Cronfel was "revving up", i.e., picking up speed on his bicycle ride in an attempt to get a good workout in, at or immediately before the collision with Murray's dog;[14]

2. Cronfel was focused on what he was doing, i.e., riding his bicycle on the roadway, being careful to avoid obstructions to the side of the road;[15] and,

---

[14] IV RR 126-27, 180, 182, and 185;
[15] IV RR 126.

[30]

3. Cronfel did not see Murray or his dog standing twenty or more feet off of the roadway, past a number of trees and a big, big rock, and through two or more cars lining the side of the road, before the collision with Murray's dog.[16]

The foregoing evidence, even when viewed in the light most favorable to the jury's finding of contributory negligence against Cronfel, falls well short of meeting the standard. Moreover, **no one** testified that Cronfel was doing anything wrong or riding his bicycle negligently. In fact, Murray testified that he knew next to nothing about the circumstances of the incident:

> Q:    Okay. So it's your testimony that you didn't see Mr. Cronfel biking down the street?
>
> A:    Not at all, no, sir.
> --IV RR 208.
>
>
> Q:    So the next thing you know your dog barks and takes off; is that right?
>
> A:    I don't know if he barked or not.
>
> Q:    You don't know if he barked? Didn't you say in your deposition that he barked and then he took off?
>
> A:    I don't know.
>
> Q:    Did you – did you see your dog take off?
>
> A:    I did not.
>
> Q:    All right. And since you read your deposition on Sunday, the question was asked of you, But you didn't see him take off? You answered, No,

---

[16] IV RR 124-26, 180-182 (Cronfel); IV RR 203-06 (Murray); and, VII RR 7, Plaintiff's Ex. 1.

[31]

I mean, I just heard him take off. I mean that – that's kind of a bark and takeoff type – type – type of action. Do you recall that?

A: If that's what it says right there, then I don't disagree.

Q: All right. Did – did you know what the dog was barking at?

A: No, sir.

Q: When he immediately takes off, what action do you do to try and stop him?

A: I didn't – I didn't do anything. I mean, when I turned around is when the accident occurred.

--IV RR 211-12.

Q: Now, do you have any knowledge of any facts that Mr. Cronfel did anything wrong in this collision with your dog?

A: I don't know what he did because I did not see him.

Q: Okay. So you don't have any facts to base on that –

A: I don't know. I did not see what he was doing.

--IV RR 217.

The duty to keep a proper lookout, "…encompasses the duty to observe, in a careful and intelligent manner, traffic and the general situation in the vicinity, including speed and proximity of other vehicles as well as rules of the road and common experience." *Montes*, 61 S.W.3d at 509, citing *Carney*, 837 S.W.2d at 211. Further, "…contributory negligence is not established by evidence which is equally consistent with the exercise of care by plaintiff, or where the inference of due care is just as reasonable as is the inference of the absence thereof." *Jordan*, 88 S.W.2d,

[32]

at 563, citing *Salter,* 285 S.W., at 1112; see also, *Hurst,* 489 F.2d, at 172. This demonstrates the application of the 'equal inference rule', to cases involving negligence and/or contributory negligence circumstances. The 'equal inference rule' states, "…a jury may not reasonably infer an ultimate fact from meager circumstantial evidence, 'which could give rise to any number of inferences, none more probable than another.'" *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001), citing *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997). Here, even when reviewing the evidence of Cronfel's "negligence" in the light most favorable to the jury's findings, it is just as reasonable (if not more so) to infer that Cronfel was keeping a proper lookout than that he was not.

There is no evidence, or no more than a scintilla of evidence, that Cronfel was not keeping a proper lookout. Again, a mere surmise or suspicion or speculation of evidence of Cronfel's negligence, is less than a scintilla, and is really no evidence at all. *McDonald*, 212 S.W.3d at 339 (internal citations omitted). And here, the evidence of Cronfel's negligence was so threadbare that Defendant's counsel actually *invited* the jury to do just that…to surmise, or speculate, as to what the evidence could have or should have shown, not what it actually did show:

> Mr. Payne: And so we have to ask ourselves, what – could Mr. Cronfel have done something to have avoided this? Could he have not revved up? Could he have applied his brakes? Could he have swerved? Did he, in fact, have an opportunity to have avoided this accident?
> --V RR 26.

[33]

"Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists." *United Parcel Service, Inc. and Leal v. Rankin*, No. 04-14-00494-CV, -- S.W.3d ----, ----, 2015 WL 3503814, at *3 (Tex.App.-San Antonio June 3, 2015), citing *Akin, Gump, Strauss, Hauer & Feld, LLP v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex. 2009).

There was no **evidence** presented that Cronfel did, or could have done, any of those things, so the finding that he was contributorily negligent was founded on mere speculation, was supported by no more than a scintilla of evidence, or, in fact, the opposite (that Cronfel was *not* negligent in any respect) was conclusively established by the evidence presented. That is, there was not legally sufficient evidence from which a jury could reasonably have found that Cronfel violated any duty, such that he could be found contributorily negligent.

Assuming *arguendo* one thought it were reasonable to infer that Cronfel had breached a duty such that he could be found contributorily negligent, there is likewise a lack of **any** evidence that such negligence was a *proximate cause* of the incident concerned herein. As noted above, Murray testified that he never saw Cronfel until after the collision between Cronfel and Murray's dog, and that he didn't see what happened. IV RR 208, 211-212 & 217. Cronfel testified on direct examination that there was nothing he could have done to have avoided the incident:

[34]

Q: As you approached these cars over by the curb, did you see the defendant or his dog at all?

A: No, I didn't see either of them.

…

Q: And you didn't see the defendant or his dog on the sidewalk or anything like that?

A: No, I – I never saw them.
--IV RR 125.

Q: Looking back at – at the scene of – of this incident, were the cars obscuring your view of the defendant and his dog, do you think?

A: I did not see them. I think that that would be the case.

Q: Did you have any time to react or avoid the dog?

A: I was – the dog was on top of me. I had no time to react, no.
--IV RR 126-27.

And under cross-examination, Cronfel maintained this testimony:

Q: Do you know the distance separating you and Magnum, the dog, as you noticed that something may occur?

A: He was on top of me when I noticed. It was already – he was already on top of me practically.

Q: Now, when you say on top of you, you don't literally mean on you?

A: No. He was – he came out from behind a car, or, you know, he was coming out from behind a car. When I noticed him, he was already almost making contact with the bike. It was a very short distance.
--IV RR 183-84.

[35]

Q:	Okay.  As you're going pretty fast and revving up, the dog has an opportunity to travel four feet into the side of your wheel, three feet out from a parked car as you traveled up this roadway?

A:	You know, you can come up with numbers.  All I can tell you is that he came into my bike from the side, and I had no chance to react or avoid him.

Q:	And you agree you did not react; you did not shift to the left or the right; brake; do anything to avoid the accident/

A:	I had no chance.

Q:	I'm sorry?

A:	I had no chance.
--IV RR 185.

"Proximate cause consists of two substantive elements – cause in fact and foreseeability.  *W.C. LaRock, D.C., P.C. v. Smith*, 310 S.W.3d 48, 55-56 (Tex.App.-El Paso 2010, no pet.).  'Cause in fact is not shown if the defendant's negligence did no more than furnish a condition which made the injury possible.'  *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).  'The evidence must go further, and show that such negligence was the proximate, and not the remote, cause of resulting injuries and justify the conclusion that such injury was the natural and probable result thereof.'  *Id*."
-- *Ciguero*, 455 S.W.3d, at 748.

While *Ciguero* dealt with an adverse no-evidence summary judgment, the only evidence presented as to the "motorist's" negligence being a *proximate cause* of the incident in question, was the motorist's own testimony that he could not have avoided the incident, just like the testimony of Cronfel in the instant case.  The *Ciguero* court examined three other, similar cases involving motorists' duty to keep a lookout and proximate cause.  In each of those cases, the only evidence that a

[36]

motorist's negligence was subsequently the proximate cause of the incident complained of, was the motorist's testimony that he did not have time to react and/or could not have avoided the incident in question. About this circumstance the *Ciguero* court held, "A driver's testimony that a collision occurred concurrent with or immediately preceding his recognition of a road hazard, standing alone, constitutes no evidence on the issue of proximate cause because it does not raise a fact issue on whether the accident could have been avoided." *Ciguero*, 455 S.W.3d, at 749. See also, *Kahng v. Verity*, No. 01-07-00695-CV, 2008 WL 2930195, at *1, 5 (Tex.App.-Houston [1st Dist.] July 31, 2008, no pet.)(mem.op); *Vicknair v. Peters*, No. 12-13-00034-CV, 2014 WL 357082, at *4 (Tex.App.-Tyler Jan. 31, 2014, no pet.)(mem.op.); and, *Turner v. Cruz*, No. 04-10-00313-CV, 2010 WL 5545392, at *4 (Tex.App.-San Antonio Dec. 29, 2010, no pet.)(mem.op.). As in *Ciguero*, in the instant case, Cronfel's testimony alone, "…creates no more than a surmise or suspicion that any breach of the duty to…keep a proper lookout was a proximate cause of the collision." *Ciguero*, 455 S.W.3d, at 749.

There was no **evidence** presented that Cronfel could have done anything to have avoided the incident, so the finding that any of Cronfel's alleged contributory negligence was a *proximate cause* of the incident was founded on mere speculation, was supported by no more than a scintilla of evidence, or, in fact, the opposite (that Cronfel was *not* negligent in any respect) was conclusively established by the

[37]

evidence presented. That is, Murray did not even *attempt* to prove, much less prove, that his dog would not have collided with Cronfel had Cronfel done something, anything differently. Thus, there was not legally sufficient evidence from which a jury could reasonably have found that Cronfel's alleged contributory negligence, if any, could have been a proximate cause of the incident and injuries concerned herein.

If Appellant's *legal* sufficiency challenge to the jury's findings of his contributory negligence and/or its proximate cause of the incident/injuries in question demonstrates that there is not even a scintilla (and certainly, no more than a scintilla) of evidence to support those findings, then Appellant's *factual* sufficiency challenge surely shows that these findings were clearly wrong and manifestly unjust. As noted above, the **only** evidence from which the jury could have inferred Cronfel's alleged contributory negligence, or its proximate cause of the incident and injuries, was Cronfel's own testimony that he was "revving up", focused on what he was doing, and did not see Murray or his dog until at (or immediately preceding) the collision.[17] The additional evidence regarding the incident, consisting of Murray's testimony, affirmatively shows that the incident was caused solely by Murray's losing control of his dog, and failure (or inability) to do anything to regain control of his dog prior to its violent collision with Cronfel. IV RR 210-13. That is, there was not factually sufficient evidence from which a jury could reasonably have found

---

[17] See FNs 14-16, *supra*.

[38]

that Cronfel's alleged contributory negligence, if any, proximately caused the incident and injuries concerned herein.

This case is very like the *Carney* case, noted above, where the Tyler Court of Appeals properly considered the lack of evidence after a jury finding of contributory negligence and reversed and remanded. Here, no one testified that Cronfel was doing anything wrong or riding his bike negligently. The only evidence remotely related to negligence was Murray's own testimony that he lost (or in fact, relinquished) control of his dog, which then took off so fast that by the time Murray had stood up and turned to look, it had collided violently with Cronfel, sending him crashing at speed into the hot July pavement. There is no evidence and/or insufficient evidence to support the jury's answers to questions 1, 2(1) and 2(2), thus the jury's answers to those questions were based on nothing more than pure speculation, surmises, or suspicions, and not on the evidence. Further, the trial court erred when it denied Plaintiff's Motion for Judgment Notwithstanding the Verdict on his own negligence/contributory negligence, and this Court should do as the *Carney* court did. These issues should be sustained, the judgment should be reversed, and this Court should remand the cause to the trial court for a new trial. To do otherwise would lower the burden on defendants claiming contributory negligence as an affirmative defense, to well below the required preponderance of the evidence.

**3. The Jury's Finding in Question 3(1), That the damages for the physical pain and mental anguish sustained in the past by Guillermo Ochoa-Cronfel as a result of the injury was only $2,500.00, is Not Supported by Legally and/or Factually Sufficient Evidence. Further, the trial court erred in overruling Plaintiff's objection to the introduction of evidence regarding his past surgeries as to this damage claim, on relevance grounds.**

The legal and factual sufficiency standards of review noted above, with respect to Appellant's points of error on contributory negligence, apply with equal force to Appellant's points of error regarding the insufficiency of the damages found by the jury in this case.

The court's charge asked the jury what sum of money would fairly and reasonably compensate Cronfel for his injuries that resulted from the incident in question, for the following elements of damages; (i) physical pain and mental anguish sustained in the past; (ii) physical pain and mental anguish that, in reasonable probability, Cronfel will sustain in the future; (iii) physical impairment sustained in the past; (iv) physical impairment that, in reasonable probability, Cronfel will sustain in the future; (v) medical care expenses incurred in the past; (vi) medical care expenses that, in reasonable probability, Cronfel will incur in the future; (vii) disfigurement sustained in the past; and, (viii) disfigurement that, in reasonable probability, Cronfel will sustain in the future. CR 500-01. Further, the charge asked the jury to not award any sum of money on any element if it had otherwise, under some other element, awarded a sum of money for the same loss, to avoid compensating Cronfel twice for the same loss. CR 500.

[40]

"In order to recover mental anguish damages, a plaintiff must establish 'a high degree of mental pain and distress' that is 'more than mere worry, anxiety, vexation, embarrassment, or anger.'" *Doctor v. Pardue*, 186 S.W.3d 4, 18 (Tex.App.-Houston [1st Dist.] 2005, pet. denied), citing *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995).  While this may be a nebulous standard, direct evidence of the nature, duration, and severity of a claimant's mental anguish, "…whether in the form of the claimants' own testimony, that of third parties, or that of experts, is more likely to provide the fact finder with adequate details to assess mental anguish claims." *Parkway Co.*, 901 S.W.2d, at 444.

In the instant case, Cronfel testified at length regarding the physical pain and mental anguish the incident and its attendant injuries had caused him up to the time of trial, and presented medical records that demonstrated same:

- The collision with Murray's dog caused Cronfel to impact the roadway violently, causing him to feel "great pain" as soon as he hit the pavement, and slid along the granular road surface that was burning hot from the intense July sun, and the pain was severe enough that Cronfel feared that something was "really wrong".  IV RR 127-28.

- Cronfel continued to feel pain throughout the night of the incident, and could not sleep well as a result.  The pain continued the next day, so Cronfel went to see his general practitioner, Dr. Paul Keinarth.  IV RR 131-132.

- Dr. Keinarth's records from Cronfel's above-referenced visit document the pain that Cronfel continued to feel in his right shoulder, elbow, wrist, and hand.  VII RR 18-22, Plaintiff's Exh. 2.

- Within less than a week of his visit to Dr. Keinarth, Cronfel had been referred to Dr. Carey Windler of Austin Sports Medicine by Dr. Keinarth for further

[41]

evaluation. Dr. Windler's records from this initial visit document that Cronfel continued to present with pain in his right arm. VII RR 29, Plaintiff's Exh. 3.

- Dr. Windler explained to Cronfel that he may be facing an extensive surgery on his elbow, which would include sawing off the head of the radius. This caused Cronfel anxiety and stress, manifesting itself in panicked thoughts, sleepless nights, and nausea over the couple of weeks following his first visit to Dr. Windler, as he contemplated the proposed surgery. IV RR 135-36.

- After that initial visit with Dr. Windler, Cronfel returned for further evaluation. Dr. Windler's records from this second visit document that Cronfel continued to present with pain in his right arm. VII RR 28, Plaintiff's Exh. 3.

- At that time, Cronfel was fitted with a plastic cast on his right arm that he would wear for another four to six weeks. Over the ensuing weeks, the arm continued to cause Cronfel great pain on a daily basis, again causing him great difficulty in sleeping. Cronfel described the pain at this time as a "10" on a scale of 1 to 10. IV RR 136-37.

- Cronfel also described the difficulties he had during this time with everyday activities such as writing, cooking, and even going to the bathroom. IV RR 138.

- In October, 2009, just less than three months after the incident, Cronfel again returned to Dr. Windler for evaluation. While by this time the pain in his elbow had finally begun to subside, the pain in his wrist continued, unabated. IV RR 139 & VII RR 27, Plaintiff's Exh. 3.

- After the October, 2009, visit, at the recommendation of Dr. Windler, Cronfel attempted to go back to his normal, daily activities, with pain as his guide. But the pain in his wrist didn't go away, and in June, 2010, Cronfel paid Dr. Windler another visit. IV RR 140-41.

- At that time, after reviewing the July, 2009 x-rays that were contemporaneous with Cronfel's injuries, Dr. Windler suggested he undergo an MR arthrogram, in order to determine the extent of the damage to his right wrist. Cronfel in fact undertook this additional procedure, which subjected him to additional

physical pain in the form of an anesthetizing shot as well as an even more painful shot of dye, right into the joint of his wrist. IV RR 143-44.

- After the above-referenced arthrogram procedure, Cronfel was sent to a hand specialist, Dr. Robert Walters, and he saw Dr. Walters for the first time on August 4, 2010. At that appointment, Dr. Walters explained to Cronfel that he had a condition known as ulnar impact syndrome, and that it would need to be treated surgically, via a procedure in which they would break Cronfel's ulna, saw off a piece of it, and put two plates and screws into his arm. Understandably, Dr. Walters' explanation of this new, extreme-sounding surgery caused Cronfel to revisit all the shock, anxiety, and nausea that he'd previously experienced when discussing the similar proposed surgery on his elbow. IV RR 147-48 & VII RR 66-67, Plaintiff's Exhibit 4.

- Unfortunately, Dr. Walters passed away while treating Cronfel during 2010, and prior to performing the ulnar impact surgery described above. Subsequently, Cronfel was referred to another hand specialist, Dr. Gregg Vagner. While Cronfel only had one appointment with Dr. Vagner, in March, 2011, he again presented with continued, worsened pain in his right wrist. IV RR 158-59 & VII RR 89-91, Plaintiff's Exhibit 5.

- Cronfel's final referral was to Dr. Ira Lown, another hand specialist, who would ultimately perform the ulnar impact surgery described above. Cronfel began seeing Dr. Lown in August, 2011. At his first appointment with Dr. Lown, Cronfel learned he would indeed have to undergo the ulnar impact surgery. IV RR 160.

- At that first meeting, Dr. Lown advised Cronfel to put off the surgery as long as possible and undergo regime of physical therapy and constant pain management that ultimately lasted approximately three years. IV RR 161-163.

- In September, 2014, Cronfel finally underwent the ulnar impact surgery, and in the weeks leading up to the surgery, Cronfel again experienced the anxiety, panic, sleeplessness, nausea, and concern that went along with the prospect of this highly invasive procedure. IV RR 165.

- Immediately after the surgery, Cronfel experience terrible pain had had to undergo a nerve block to manage that pain, which continued for about twenty-

[43]

four hours after surgery. And even after that, prior to the trial held in this matter in November, 2014, Cronfel continued to experience the pain in his wrist. IV RR 166-67.

- Dr. Lown's extensive medical records on Cronfel further document the pain that he continued to endure throughout Dr. Lown's treatment of him. VII RR 94-223, Plaintiff's Exhibit 6. In fact, Dr. Lown further testified that the ulnar impact surgery that he performed on Cronfel is, in his experience, "one of the more painful" surgeries to deal with from a post-operative pain level. IV RR 77.

Tellingly, Defendant did not present an expert of his own (or indeed, any witness) to attempt to controvert any of the medical records, the expert medical testimony of Dr. Lown, or Cronfel's testimony as to the past physical pain and mental anguish he sustained as a result of the incident and his attendant injuries. In fact, Defendant's only attempt to address these issues came in his cross-examinations of Cronfel and Dr. Lown. With respect to Cronfel, this was limited to a brief discussion of his daily activities post-incident, and past surgeries:

Q: Okay. Now you agree that – at least when I took your deposition, in October, about a year ago, as of a year ago, you were still doing push-ups, correct?

A: Yes, sir.

Q: And about a year ago, you were still doing pull-ups, correct?

A: Under the supervision of a therapist and a trainer, yes, sir.

Q: Any you continued to ride your road bike and your mountain bike, correct?

A: Yes, sir.

Q: And you continued to lift weights, correct?

[44]

A:    Reduced reps and amounts of weights, yes, sir.

Q:    And you continued to water ski?

A:    I water skied once.
--IV RR 186-87.

Q:    Mr. Cronfel, in the past you have had several procedures – other surgical procedures done to your knees, correct?

A:    Yes, sir, over the last 30 years I've had several procedures.

Q:    You have had a total knee replacement performed to your right knee in August of 2010, correct?

A:    Yes, sir.

Q:    You have hardware present in your body in terms of a new knee, correct?

A:    Yes, sir.

Q:    And you have had multiple injections to your knees in the past, correct?

A:    Yes, sir.
--IV RR 191-92.

At trial, Defendant's counsel argued that he should be able to question Cronfel regarding the above-described other surgeries he had gone through because Cronfel had testified about the fear, anxiety, pain, etc…associated with the instant injuries, and the prospects of surgery(ies) related to those instant injuries. Cronfel's counsel objected, as to the relevance of unrelated surgeries that Cronfel had undergone. Initially, the trial court sustained Cronfel's objection, but after reconsidering,

[45]

changed its mind. Cronfel's counsel renewed his objection, the trial court overruled same, and the question-answer noted above then ensued. IV RR 187-91.

The trial court's admission of evidence of these past injuries insofar as they allegedly related to Cronfel's claims for pain and mental anguish associated with the *present* injury was clear error. "Whether a plaintiff's condition is a 'part' of a claim is determined from the pleadings…" *In re Nance*, 143 S.W.3d 506, 511 (Tex.App.-Austin 2004, orig. proceeding), citing *R.K. v. Ramirez*, 887 S.W.2d 836, 840 (Tex. 1994); see also, *In re Doe*, 22 S.W.3d 601, 609 (Tex.App.-Austin 2000, orig. proceeding). Here Cronfel's pleadings allege only facts and circumstances surrounding the 2009 injury arising from his collision with Murray's dog and the damages suffered as a result thereof. CR 12-18. Moreover, Murray's pleadings also did not plead any defensive theory related to preexisting condition. CR 10-11 & 19-20. And even if they had, "…that defensive theory is in the nature of an inferential rebuttal, not an ultimate issue of fact that alone has legal significance." *Nance*, 143 S.W.3d, at 512-13, citing *R.K.*, 887 S.W.2d, at 843. It is well settled that a tortfeasor takes a plaintiff as he finds him. *Coates v. Whittington*, 758 S.W.2d 749, 753 (Tex. 1988); See also *Nance*, 143 S.W.3d, at 512; *In re Doe*, 22 S.W 3d, at 606. That is, regardless of Cronfel's past surgeries (or lack thereof) he is entitled to recover damages resulting from the collision with Murray's dog, conditioned as he was at the time of the incident. See *Coates*, 758 S.W.2d, at 753 (internal citations omitted).

[46]

Absent a showing of some connection to Cronfel's pain and mental anguish arising from this incident, a showing that Murray did not even attempt to make, Cronfel's past surgeries have **zero** relevance to the damages attributable to his collision with Murray's dog, and their introduction was both harmful and prejudicial to Cronfel when it came time for the jury to decide on this element of damages.

With respect to Dr. Lown, Defendant's attempts to controvert Cronfel's evidence of past physical pain and mental anguish were similarly limited to a brief discussion of Cronfel's daily activities post-incident, and other injuries that Cronfel had suffered. Dr. Lown testified (like Cronfel) that post-injury, Cronfel continued to try and maintain his exercise and fitness regime, also with the guidance and assistance of Dr. Lown's physical therapist. IV RR 96-99. Dr. Lown also testified that during his treatment of Cronfel (and post-incident), that Cronfel had an injury in August, 2012 to his *left* wrist that required surgery. IV RR 99. On re-direct, in summing up his opinions on Cronfel's injuries, Dr. Lown testified as follows:

Q:   Doctor, hi. I – you just answered a lot of questions about stuff that happened in August of 2012 and all throughout the year 2012. Do you recall that line of questioning?

A:   Yes, I do.

Q:   Well, I want to look through your notes. In looking at the very first page of your records when you – when you very first saw Mr. Cronfel on August 11th, 2011 – I mean, I went to A&M, but that's a whole year before August 2012, right?

A:   That's correct.

Q: And can you tell me, under Plan, from August 11th, 2011, did you have an opinion at that time after putting your hands on Mr. Cronfel and examining his medical records, his chart notes, and doing your physical examination, what medical procedures on August 11th, 2011, did you think were appropriate for Mr. Cronfel?

A: We discussed the ulnar shortening and the four-corner fusion.

Q: So wait – so – oh, so you did discuss the four-corner wrist fusion in August 2011?

A: Yes, we did.

Q: And that was well before any of these notes that you just got all these questions about in August 2012?

A: That's correct.

Q: Do you have an opinion, Doctor, as to whether or not Guillermo was a surgical candidate for the wrist fusion surgery in August 2011, regardless what happened after that?

A: Yes. At that time he was.

Q: And I mentioned earlier today that, you know, Mr. Cronfel could have been a participant in the world's strongest man competition even, but it wouldn't have mattered if it was after August 2011, would it, to you?

A: The damage was already done.

Q: And the damage was already done, and the surgery was already going to have to be had. Is that true?

A: Yes.

--IV RR 114-15.

Q: I just want to make clear. And after answering Mr. Payne's questions, have your opinions changed at all as Mr. Cronfel's treating physician that, other than this July 23rd, 2009 injury, would Mr. Cronfel need this ulnar shortening surgery or would he need the wrist fusion?

[48]

A:     No, he would not.

Q:     And that's based on your skills, experience, training, and reasonable medical probability?

A:     That's correct.
--IV RR 117-18.

No evidence was presented that Cronfel did not suffer the past physical pain and mental anguish he claimed, nor was any evidence presented that Cronfel's past physical pain and mental anguish was minimal. Defendant's "controverting" position seemed to be that other physical ailments, perhaps associated with previous (or other) injuries, contributed to Cronfel's complaints. A similar attack was deemed insufficient to support an award of zero damages for past pain and suffering by the Houston 1st District Court of Appeals:

> "Appellees argue other physical ailments not attributable to this injury contributed to appellant's complaints, and therefore a zero award is not against the great weight and preponderance of the evidence. However, the jury did award appellant damages for past medical expenses attributable to the Kroger incident. Therefore, the testimony shows the surgery and other medical treatment were a result of the accident at issue, rather than his previous injuries. Other injuries could not have been responsible for any pain associated with procedures directly attributable to this injury. Further, appellees offered no medical testimony linking any previous injuries to present evidence of pain."
> --*Prescott v. Kroger Co.*, 877 S.W.2d 373, 375 (Tex.App.-Houston [1st Dist.] 1994, writ denied).

While the jury in the instant case did not award zero damages for Cronfel's past physical pain and mental anguish, given the extensive testimony and medical record

evidence presented in support thereof and the lack of any real controverting evidence, the jury's award of $2,500.00 in answer to question 3(1) is supported by no evidence and/or insufficient evidence, is so against the great weight and preponderance of the evidence as to be manifestly unjust, and the court should reverse and remand for a new trial as a result.

**4. The Jury's Finding in Question 3(2), That the damages for the physical pain and mental anguish that, in reasonable probability, Guillermo Ochoa-Cronfel will sustain in the future as a result of the injury was only $1,000.00, is Not Supported by Legally and/or Factually Sufficient Evidence.**

"Texas follows the 'reasonable probability rule' for future damages for personal injuries." *Doctor*, 186 S.W.3d, at 20, citing *Rosenboom Mach. & Tool, Inc. v. Machala*, 995 S.W.2d 817, 828 (Tex.App.-Houston [1st Dist.] 1999, pet. denied). As such, to recover damages for future physical pain and mental anguish, Cronfel must show there is a reasonable probability of his sustaining same as a result of the injuries concerned herein. Moreover, while matters of pain and mental anguish are speculative, "…once it has been proved by objective evidence that an injury will continue adversely to affect plaintiff, the jury may not give a take-nothing verdict for future pain, suffering, and mental anguish." *Hicks v. Ricardo*, 834 S.W.2d 587, 591 (Tex.App.-Houston [1st Dist.] 1992, no writ), citing *Jones v. Wal-Mart Stores, Inc.*, 870 F.2d 982, 988 (5th Cir. 1989). Here, we are not dealing with a zero damage award, but the findings are still inconsistent. The record shows objective evidence that Cronfel's injuries as a result of the collision with Murray's dog will continue to

[50]

adversely affect him in the future, in a similar way to the effect it has had on him from the time of the incident to the present. Nevertheless, the jury actually awarded less than half of the amount for future damages for pain and anguish than it did for past pain and anguish, despite the fact that in reasonable probability Cronfel's future pain and anguish will extend far beyond the approximately five and a half years that had elapsed between the incident and trial.

With respect to the probable future physical pain and mental anguish he would suffer as a result of his injuries, Cronfel testified that he was scared about his future given the years of pain and problems he has already endured, and the prospect of an additional future surgery that would leave him permanently impaired, and might still not relieve the pain he feels on a daily basis. IV RR 174. Dr. Lown then further testified regarding the wrist fusion surgery that Cronfel still faces, and the fact that successful or not he faces the real possibility of continued pain in his wrist into the future. IV RR 84-86.

Defendant offered no evidence, testimony or otherwise, to controvert Cronfel's evidence as to his probable future physical pain and mental anguish. Again, while the jury in the instant case did not award *zero* damages for Cronfel's probable future physical pain and mental anguish, given the testimony and medical record evidence presented in support thereof and the lack of any controverting evidence, the jury's award of $1,000.00 in answer to question 3(2) is supported by

[51]

no evidence and/or insufficient evidence, is so against the great weight and preponderance of the evidence as to be manifestly unjust, and the court should reverse and remand for a new trial as a result.

**5. The Jury's Finding in Question 3(3), That the damages for the physical impairment Guillermo Ochoa-Cronfel sustained in the past as a result of the injury was only $500.00, is Not Supported by Legally and/or Factually Sufficient Evidence.**

"In order to recover damages for physical impairment, 'the effect of any physical impairment must be substantial and extend beyond any pain, suffering, mental anguish, lost wages or diminished earning capacity,' [and the] 'loss of enjoyment of life' may be considered as a factor in assessing damages for physical impairment." *Doctor*, 186 S.W.3d, at 18, citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 772 (Tex. 2003).

Again, Cronfel testified at length regarding the past physical impairment that the injuries resulted in:

- Immediately following the incident, Cronfel experienced swelling and a limited range of motion with his right wrist. IV RR 133. Dr. Keinarth's contemporaneous medical records confirm this. VII RR 18-20, Plaintiff's Exh. 2.

- In fact, impairments in the range of motion in his wrist were noted in the medical records of all of his subsequent medical providers as well. VII RR 26-27 & 30-31, Plaintiff's Exh. 3 (Dr. Windler); VII RR 66-67, Plaintiff's Exhibit 4 (Dr. Walters); VII RR 89-91, Plaintiff's Exhibit 5 (Dr. Vagner); and, VII RR 94-96, 103-77 & 190-223, Plaintiff's Exhibit 6.

- The repetition and intensity of Cronfel's exercise programs had to adjust to account for the impairment caused by his injuries. This also included

[52]

his removing certain activities, e.g., bowling, from the list of activities he could still engage in.  IV RR 172.

As with Cronfel's past physical pain and mental anguish, the only controverting evidence Defendant adduced with respect to his past physical impairment was Cronfel's above-referenced testimony that he continued to try and live his life.  There was no evidence presented that Cronfel was not, in fact, suffering the levels of physical impairment to which he testified, or which was documented by the medical records.  Again, while the jury in the instant case did not award *zero* damages for Cronfel's past physical impairment, given the testimony and medical record evidence presented in support thereof and the lack of any controverting evidence, the jury's award of $500.00 in answer to question 3(3) is supported by no evidence and/or insufficient evidence, is so against the great weight and preponderance of the evidence as to be manifestly unjust, and the court should reverse and remand for a new trial as a result.

**6. The Jury's Finding in Question 3(4), That the damages for the physical impairment that, in reasonable probability, Guillermo Ochoa-Cronfel will sustain in the future as a result of the injury was only $2,000.00, is Not Supported by Legally and/or Factually Sufficient Evidence.**

As with future pain and mental anguish, the standard for future physical impairment is that of "reasonable probability".  *Doctor*, 186 S.W.3d, at 20.  And once again, here the evidence presented was in the form of the testimony of Cronfel's treating physician, Dr. Lown.  In describing the sort of impairment that Cronfel

[53]

would face in the future, after undergoing the additional, wrist fusion surgery that would be necessary, Dr. Lown testified as follows:

Q:    I think you can sit down now for the final time.  After this wrist fusion surgery that you just described to us is completed, will Guillermo ever have normal range of motion in his right wrist?

A:    No, he won't.

Q:    Can Guillermo expect at least 50 percent impairment in range of motion of that wrist?

A:    Yes, he can.

Q:    And just so the folks on the jury are clear, even if the surgery goes 100 percent perfectly well, Guillermo can still expect at least 50 percent impairment in his range of motion?

A:    That's correct.  I usually tell patients they're going to have about half of the motion that they come in with.  It's usually not that – it can be better than that, but that's what I tell people.

Q:    And could it be worse than that?

A:    It could be.

--IV RR 82.

Q:    The surgery – the wrist fusion surgery, is that Guillermo's best medical treatment option now?

A:    Yes.

Q:    And are there any guarantees for that surgery?

A:    No, there are not.

Q:    Even if the fusion surgery in his wrist goes 100 percent perfectly, is it possible that Guillermo may still experience pain?

A:    Yes.

[54]

Q:   And even if the fusion surgery goes perfectly, we know with medical certainty he's going to be impaired, right?

A:   That's correct.
--IV RR 84-85.

As with future physical pain and mental anguish, Defendant offered no evidence, testimony or otherwise, to controvert Cronfel's evidence as to his probable future physical impairment. Again, while the jury in the instant case did not award *zero* damages for Cronfel's probable future physical impairment, given the testimony and medical record evidence presented in support thereof (demonstrating that after the wrist fusion surgery, Cronfel would be physically impaired to some degree for the rest of his life) and the lack of any controverting evidence, the jury's award of $2,000.00 in answer to question 3(4) is supported by no evidence and/or insufficient evidence, is so against the great weight and preponderance of the evidence as to be manifestly unjust, and the court should reverse and remand for a new trial as a result.

**7. The Jury's Finding in Question 3(5), That the medical care expenses Guillermo Ochoa-Cronfel incurred in the past as a result of the injury was only $9,345.00, is Not Supported by Legally and/or Factually Sufficient Evidence.**

Past medical expenses are recoverable when a claimant demonstrates they were reasonable and necessary. *Doctor*, 186 S.W.3d, at 20, citing *Nat'l Union Fire Ins. Co. v. Wyar*, 821 S.W.2d 291, 297 (Tex.App.-Houston [1st Dist.] 1991, no writ.)

[55]

This can be demonstrated via medical records supported by affidavits pursuant to Tex. Civ. Prac. & Rem. Code §18.001. In the instant case, Cronfel presented medical billing records supported by affidavit, as well as a breakdown of the expenses by provider that in total demonstrated past medical expenses of $11,067.59.[18]

Defendant offered no evidence, testimony or otherwise, to controvert Cronfel's evidence as to his past medical expenses. While the amount of damages to be awarded is generally left to the sound discretion of the jury, when a claimant shows, without contradiction, reasonable and necessary medical expenses arising from the incident that is the subject of the claim, a jury cannot arbitrarily assess an amount that is not authorized or supported by the evidence. See *Hill v. Clayton*, 827 S.W.2d 570, 574 (Tex.App.-Corpus Christi 1992, no writ.) Again, while the jury in the instant case did not award *zero* damages for Cronfel's past medical expenses, given the testimony and medical record evidence presented in support thereof, and the lack of any controverting evidence, the jury's award of $9,345.00 in answer to question 3(5) is supported by no evidence and/or insufficient evidence, is so against the great weight and preponderance of the evidence as to be manifestly unjust, and the court should reverse and remand for a new trial as a result.

8. **The Jury's Finding in Question 3(6), That the medical care expenses that, in reasonable probability, Guillermo Ochoa-Cronfel will incur in the future as a result of the injury was only $3,000.00, is Not Supported by Legally and/or Factually Sufficient Evidence.**

[18] See VII RR 17-265, Plaintiff's Exhs. 2-7; and, VII RR 380, Plaintiff's Exh. 11.

As with future pain and mental anguish, and future physical impairment, the standard for future medical expenses is that of "reasonable probability". *Doctor*, 186 S.W.3d, at 20. And once again, here the evidence presented was in the form of the testimony of Cronfel's treating physician, Dr. Lown that Cronfel would still have to undergo a wrist fusion surgery. IV RR 80-86. In describing the sort of medical expenses that Cronfel could expect in the future for the wrist fusion surgery that would be necessary, Dr. Lown testified to four, separate line items of expected expenses, including his services, the surgery center's services, anesthesiology, and medical implants, that would total approximately $14,690.00. IV RR 82-84.

Defendant offered no evidence, testimony or otherwise, to controvert Cronfel's evidence as to his future medical expenses, yet the jury awarded only $3,000.00 for future medical expenses…less than one-fourth of that suggested by the only evidence it heard. Again, while the jury in the instant case did not award *zero* damages for Cronfel's future medical expenses, given the expert testimony presented in support thereof, and the lack of any controverting evidence, the jury's award of $3,000.00 in answer to question 3(6) is supported by no evidence and/or insufficient evidence, is so against the great weight and preponderance of the evidence as to be manifestly unjust, and the court should reverse and remand for a new trial as a result.

**9. The Jury's Finding in Question 3(7), That the disfigurement sustained in the**

**past by Guillermo Ochoa-Cronfel as a result of the injury was subject to a ZERO damage award, is Not Supported by Legally and/or Factually Sufficient Evidence.**

"Disfigurement has been defined as 'that which impairs or injures the beauty, symmetry, or appearance of a person or thing; that which renders unsightly, misshapen or imperfect, or deforms in some manner.'" *Sunbridge Healthcare Corp. v. Penny*, 160 S.W.3d 230, 252 (Tex.App.-Texarkana 2005, no pet.), citing *Goldman v. Torres*, 341 S.W.2d 154, 160 (Tex. 1960); see also, *Doctor*, 186 S.W.3d, at 18. Moreover, "Expert testimony is not a prerequisite to the award of damages for disfigurement." *Sunbridge Healthcare*, 160 S.W.3d, at 252, citing *Transit Mgmt. Co. of Laredo v. Sanchez*, 886 S.W.2d 823, 826 (Tex.App.-San Antonio 1994, no writ).

In the instant case there was no evidence other than that introduced by Plaintiff demonstrating the disfigurement caused by the incident and his subsequent ulnar impact surgery. Dr. Lown testified that his review of Cronfel's diagnostic films from the July, 2009 incident, along with his examination of Cronfel, led to his determination that the incident had caused a shortening of Cronfel's ulna relative to his radius in his right arm. IV RR 65-67. That is, the symmetry of Cronfel's ulna was affected by the incident, rendering it misshapen, imperfect, or deformed in some manner. Dr. Lown further testified that this disfigurement of Cronfel's ulna led to the necessity of the ulnar impact surgery he ultimately performed on Cronfel. IV

[58]

RR 67. Dr. Lown then went on to describe the ulnar impact surgery itself, detailing the 8-10 cm (approx. 3-4 in.) incision required, the sawing of bone required, and the insertion of plates and screws required. IV RR 75-78.[19]

Once again, Defendant offered no evidence, testimony or otherwise, to controvert Cronfel's evidence as to his past disfigurement (as there was none to offer), yet the jury awarded **zero** damages for past disfigurement. Given the expert medical testimony presented in support of past disfigurement, the photographic evidence presented, and the lack of any controverting evidence, the jury's award of **zero** damages in answer to question 3(7) is supported by no evidence and/or insufficient evidence, is so against the great weight and preponderance of the evidence as to be manifestly unjust, and the court should reverse and remand for a new trial as a result.

**10. The Jury's Finding in Question 3(8), That the disfigurement that, in reasonable probability, Guillermo Ochoa-Cronfel will sustain in the future as a result of the injury was subject to a ZERO damage award, is Not Supported by Legally and/or Factually Sufficient Evidence.**

As with future pain and mental anguish, future physical impairment, and future medical expenses, the standard for future disfigurement is that of "reasonable probability". *Doctor*, 186 S.W.3d, at 20. Once again, the *only* evidence presented on this point was the expert medical testimony of Dr. Lown. As noted above, Dr.

---

[19] See also FN 9, *supra*, and the accompanying post-surgical picture.

Lown testified that while there were no guarantees that the wrist fusion surgery he proposed for Cronfel's future would alleviate all the pain he felt in his wrist, and that it would certainly leave him with some level of impairment, it would be his best medical treatment option. IV RR 84-85. Dr. Lown testified as to the nature of the wrist fusion surgery as follows:

Q: Thank you. If you could, Doctor, please just show us what that wrist fusion procedure entails.

A: Sure. So this is the disruption between like the scaphoid and lunate. So the procedure is to take out the scaphoid. Then we fuse the lunate to the capitate, to these other – these other bones, so that the wrist moves as one unit from here without this.

Q: Okay. And then how – how are those bones fused? Can you explain that to us?

A: I use – there's several different ways to do it, but you take off the cartilage. There's cartilage between these bones. Take all of that out and you get the bones so you get down to – down to good bone and then I usually put pins or stainless steel wires to hold the bones together to pin them in the position I want them in. And then the pins or wires come out after the bones heal in about four to six weeks.

Q: So even after the surgery is performed, four to six weeks later the patient has to come in and have the pins removed?

A: That's correct.

Q: How long are the wrist bones fused to the forearm bones? Is that –

A: They're not.

Q: Okay. So that's not the four corner –

A: Four corners, one, two, three, four. That's what's fused.

[60]

Q: And how is that supposed to help with the pain?

A: Because this bone is removed, and this is what's kind of rubbing up on the radius and moving and not moving in line with the lunate. The lunate – just the way we're built, it's a deeper – this is the radius. It's a deeper – deeper cup on the radius, so there's a very predictable pattern of – of arthritis that develops. It usually starts here at the radial styloid, and it works its way around and can work its way between the capitate and the lunate. But what's always preserved or usually preserved is the space between the – the lunate and the radius, so that's a good area to run the wrist off of.

Q: And that's what you plan on doing for Guillermo?

A: Yes.
--IV RR 80-81.

That is, Cronfel's wrist was affected by the incident, rendering his best future option for medical treatment another surgery that would entail removal of a bone, removal of cartilage, and essentially tying the remaining bones together with pins and wires in order to fuse them over time. Clearly, this would affect the symmetry of Cronfel's right wrist causing him further imperfection or deformity.

Once again, Defendant offered no evidence, testimony or otherwise, to controvert Cronfel's evidence as to his reasonably probable future disfigurement (as there was none to offer), yet the jury awarded **zero** damages for reasonably probable future disfigurement. Given the expert medical testimony presented in support of past disfigurement, and the lack of any controverting evidence, the jury's award of **zero** damages in answer to question 3(8) is supported by no evidence and/or

[61]

insufficient evidence, is so against the great weight and preponderance of the evidence as to be manifestly unjust, and the court should reverse and remand for a new trial as a result.

**11. The trial court's monetary sanctions order against Cronfel was an abuse of discretion and should be vacated, or in the alternative, reduced.**

A trial court's order of sanctions is reviewed for an abuse of discretion. *Blake v. Dorado*, 211 S.W.3d 429, 434 (Tex.App.-El Paso 2006, no pet.), citing *Koslow's v. Mackie*, 796 S.W.2d 700, 704 (Tex. 1990); *Aguilar v. Morales*, 162 S.W.3d 825, 834 (Tex.App.-El Paso 2005, pet. denied). A trial court abuses its discretion when it acts without reference to any guiding rules and principles, and a trial court's ruling should be reversed only if its action is arbitrary or unreasonable. *Cire v. Cummings*, 134 S.W.3d 835, 838-39 (Tex. 2004), citing *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985).

Here the trial court was asked to sanction Cronfel, pursuant to Tex. R. Civ. Proc. 215.2(b)(5) & (8), for his alleged violation of a prior order requiring him to execute a medical authorization on behalf of Defendant for the production of his medical file from Dr. Lown's office. CR 176-354 & 355-364, Defendant's Motion and Supplement thereto. The prior order required Cronfel to provide the referenced medical authorization on or before September 19, 2014. CR 187-88. On September 19, 2014, Cronfel provided a medical authorization that restricted the release only of medical records from Dr. Lown's office that related to his mental health

[62]

prescriptions, behavioral or mental health services, sexually transmitted diseases, and/or AIDS or HIV. CR 190. Prior to the hearing on Defendant's Motion for Sanctions, Cronfel also provided a medical authorization without the above-referenced restrictions. CR 364. After a hearing on Defendant's Motion for Sanctions the Honorable District Judge Gus Strauss entered the Order complained of herein, sanctioning Cronfel monetary sanctions in the amount of $5,000.00, "…in part to cover the attorney's fees that Defendant incurred in response to this motion and all prior underlying hearings on prior motions to compel, and in part as sanctions for objectionable conduct…" CR 413.

In his Brief in Support of his Argument Against Defendant's Motion for Sanctions, and attendant Affidavit of Guillermo Ochoa-Cronfel, Cronfel explained that his understanding of the hearing and Order on which the Motion for Sanctions was based, was that the court had ordered a medical authorization for his complete medical file from Dr. Lown, excepting mental health records. CR 394-408. At the hearing on Defendant's Motion for Sanctions Defendant's counsel even stated that Defendant was not even seeking medical records related to Cronfel's mental health. II CR 19-20. This makes sense as mental health records are privileged from discovery when they are not part of a party's claims or defenses, as here, even if they may be relevant, because they are not at *issue*. See *R.K.*, 887 S.W.2d, at 843. Defendant was asking the court to sanction Cronfel for seeking to protect records he

[63]

believed the court had expressed were protected, that *both* parties believed were protected, and that relevant case law expressly describes as protected. And, at the end of the day, not only was Cronfel sanctioned, but his mental health records were not protected from disclosure to Defendant.

Additionally, and/or alternatively, the monetary sanctions ordered were improper under Tex. R. Civ. P. 215. "Any monetary sanctions available for abuse of discovery are limited to reasonable expenses, including attorney's fees, caused by the abuse." *Lopez v. La Madeleine of Texas, Inc.*, 200 S.W.3d 854, 865 (Tex.App.-Dallas 2006, no pet.), citing *Clone Component Distribs. Of Am., Inc. v. State*, 819 S.W.2d 593, 597 (Tex.App.-Dallas 1991, no writ)(applying former Rule 215(2)(b)(2) and (8)). Here, Defendant did not *offer* any evidence as to his reasonable expenses and/or fees. While Defendant did attach the conclusory affidavit of his counsel, to the original motion for sanctions, claiming at least $3,500.00 in attorney's fees (CR 197-98), such is not an offer of evidence as is required to support an award of sanctions under Rule 215:

> "With regard to rule 215.6, appellants liken a sanctions hearing to a summary judgment hearing and argue that since the sanctions rule contemplates the use of affidavits as exhibits to a response to a sanctions motion, the affidavits are admissible at the sanctions hearing in the same manner as such exhibits are admissible at a summary judgment hearing. However, unlike a sanctions hearing, a summary judgment hearing is 'an exception to the usual and traditional form of procedure wherein witnesses are heard in open court and documentary evidence is offered and received in evidence.' *IKB Indus. (Nigeria) Ltd. v. Pro-Line Corp.*, 938 S.W.2d 440, 441 (Tex. 1997) (quoting

[64]

*Richards v. Allen*, 402 S.W.2d 158, 160 (Tex. 1966)); see also *Jack B. Anglin Co., Inc. v. Tipps*, 842 S.W.2d 266, 269 (Tex. 1992) (noting summary judgment exception to requirement of hearing at which witnesses present sworn testimony in person or by deposition rather than by affidavit). In order to assess sanctions in this case, the trial court was required to conduct an *evidentiary* hearing to which the rules of evidence necessarily apply. See *Randolph v. Walker*, 29 S.W.3d 271, 277 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Karagounis v. Property of Co. of America*, 970 S.W.2d 761, 765 (Tex.App.-Amarillo 1998, pet. denied); *Electronic Data Sys. Corp. v. Tyson*, 862 S.W.2d 728, 739 (Tex.App.-Dallas 1993, no writ). Therefore, although rule 215.6 allows affidavits to be attached to a response to a sanctions motion, in order for the trial court to consider such affidavits, they must be admitted in compliance with the rules of evidence at the evidentiary hearing."
--*Kugle v. DaimlerChrysler Corp.*, 88 S.W.3d 355, 363-64 (Tex.App.-San Antonio 2002, pet. denied).

Nevertheless, assuming *arguendo* that the above-referenced attorney's fees affidavit attached to Defendant's Motion for Sanctions did constitute evidence in support of a sanctions award, the Court's order explicitly stated that the $5,000.00 in attorney's fees it was awarding as sanctions was partly for fees incurred and partly for objectionable conduct, but it gave no insight into how it arrived at the number it arrived at, or what portion(s) of the sanction related to fees and what portion did not. CR 413. To the extent the court's monetary sanctions order sought to punish "objectionable conduct", such is not authorized by Tex. R. Civ. P. 215.2(b)(8), as described above. Further, the court failed to explain the basis for its calculating the amount of the monetary sanction. As such, the monetary sanction constitutes an impermissible, arbitrary fine that is not susceptible to meaningful review. See

[65]

*Stromburger v. Turley Law Firm*, 251 S.W.3d 225, 226-27 (Tex.App.-Dallas 2008, no pet.). As a result, this court cannot properly determine whether the sanction is "just", as is required in order to uphold same. *Ford Motor Company v. Tyson*, 943 S.W.2d 527, 535 (Tex.App.-Dallas 1997, orig. proceeding); See also, *TransAmerican Natural Gas v. Powell*, 811 S.W. 2d 913, 917 (Tex. 1991). For all of the foregoing reasons, this court should vacate the trial court's order of monetary sanctions against Cronfel.

## PRAYER

Appellant requests that the Court of Appeals reverse the judgment below, and remand the case for a new trial because of the lack of legally and/or factually sufficient evidence to support the jury's findings on; (i) Plaintiff's negligence/contributory negligence; (ii) $2,500.00 in damages awarded to Cronfel for physical pain and mental anguish sustained in the past; (ii) $1,000.00 in damages awarded to Cronfel for physical pain and mental anguish that, in reasonable probability, he would sustain in the future; (iii) $500.00 in damages awarded to Cronfel for physical impairment sustained in the past; (iv) $2,000.00 in damages awarded to Cronfel for physical impairment that, in reasonable probability, he will sustain in the future; (v) $9,345.00 in damages awarded to Cronfel for medical care expenses incurred in the past; (vi) $3,000.00 in damages awarded to Cronfel for medical care expenses that, in reasonable probability, he would incur in the future;

[66]

(vii) **$0.00** in damages awarded to Cronfel for disfigurement sustained in the past; and/or, (viii) **$0.00** in damages awarded to Cronfel for disfigurement that, in reasonable probability, he will sustain in the future.  Further, Appellant requests that the Court of Appeals vacate the trial court's order assessing monetary sanctions in the amount of $5,000.00 against Cronfel as an abuse of discretion.

Respectfully submitted,

/s/ Paul T. Morin
Mr. Paul T. Morin
Texas Bar No. 14460550
Paul T. Morin, P.C.
503 West 14th Street
Austin, Texas 78701
Telephone:  (512) 499-8200
Facsimile:  (512) 499-8203
pmorin@austin.rr.com

Guillermo Ochoa-Cronfel
Texas Bar No. 15175600
The Cronfel Firm
2700 Bee Caves Road, Suite 103
Austin, Texas 78746
Telephone:  (512) 347-9600
Facsimile:  (512) 347-9911
Guillermo@thecronfelfirm.com

**Counsel for Appellant,
Guillermo Ochoa-Cronfel**

[67]

## Certificate of Compliance

I certify that on September 14, 2015, this Appellant's Brief was produced on a computer and contains 13,120 words, excluding the caption, identity of parties and counsel, statement regarding oral argument, table of contents, index of authorities, statement of the case, and statement of the issues presented, and thus does not exceed the 15,000 word limit provided for by Tex. R. App. P. 9.4(i).

/s/ Paul T. Morin
Paul T. Morin


## Certificate of Filing and Service

I certify that on September 14, 2015, I used the Court's electronic case filing system to file this Appellant's Brief and to serve this document on the counsel for Appellee:

Mr. Gregory R. Ave
Texas Bar No. 01448900
Walters, Balido & Crain, L.L.P.
10440 North Central Expressway
Meadow Park Tower, Suite 1500
Dallas, Texas 75231
Telephone: (214) 347-8310
Facsimile: (214) 347-8311
Greg.Ave@wbclawfirm.com

/s/ Paul T. Morin
Paul T. Morin

# APPENDIX

**Tab**

1) Final Judgment dated January 28, 2015 (Supp. CR 3-6).

2) Order on Defendant's Motion for Sanctions dated October 31, 2015 (CR 413).

3) Jury Charge dated November 19, 2014 (CR 495-503).

4) Tex. Civ. Prac. & Rem. Code §18.001.

5) Tex. R. Civ. P. 215.2.

6) Trial Testimony of Guillermo Ochoa-Cronfel (IV RR 119-193).

7) Trial Testimony of Dr. Ira Lown (IV RR 31-119).

8) Trial Testimony of Patrick C. Murray (IV RR 199-224).

9) Plaintiff's Brief in Support of his Argument Against Defendant's Motion for Sanctions (CR 384-408).

Filed in The District Court
of Travis County, Texas

**JAN 2 8 2015**

At _____ 4:77 _ **M.**
Velva L. Price, District Clerk

CAUSE NO. D-1-GN-11-002136

| | | |
|---|---|---|
| GUILLERMO OCHOA-CRONFEL | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| vs. | § | 345TH JUDICIAL DISTRICT |
| | § | |
| PATRICK C. MURRAY | § | |
| Defendant. | § | TRAVIS COUNTY, TEXAS |

## FINAL JUDGMENT

BE IT REMEMBERED, that on the 17th day of November, 2014, came on to be heard the above entitled and numbered cause, wherein **Guillermo Ochoa-Cronfel** is Plaintiff and **Patrick C. Murray** is Defendant, and came the Plaintiff and Defendant in person and by and through their respective attorneys of record and announced ready for trial. Thereupon came a jury of twelve good lawful men and women, and the jury having been duly impaneled and sworn, said cause was tried before the jury and court on November 17, November 18, and November 19, and after hearing the evidence and argument of counsel and having received the Charge of the Court, the jury retired to consider its verdict, and after a reasonable time returned in open court its verdict, which said verdict was as follows:

**Question No. 1**

1. Patrick Murray                    Yes
2. Guillermo Ochoa-Cronfel           Yes

**Question No. 2**

1. Patrick Murray                    55 %
2. Guillermo Ochoa-Cronfel           45 %

**Question No. 3**

1. $2,500
2. $1,000
3. $500
4. $2,000

---

5. $9,345
6. $3,000
7. $0
8. $0

Which findings were duly signed by ten members of the jury as a non-unanimous verdict, the same was accepted by the Court on the 19th day of November, 2014, and was duly filed by the Court and the Court being of the opinion that based upon the above and foregoing answers given in response to the questions submitted to the jury that Plaintiff is entitled to recover $10,089.75 against Defendant, and that the incurred pre-judgment interest is $1,696.86; and the Court being of the opinion that the judgment should be entered as set forth hereinafter; and all requisites of law having been met;

The Court, after hearing and considering the evidence and arguments of counsel, is of the opinion that Guillermo Ochoa-Cronfel is entitled to recover from Patrick C. Murray the following:

It is therefore **ORDERED, ADJUDGED** and **DECREED** that Plaintiff recover $10,089.75 by reason of his action herein against Defendant.

It is further **ORDERED, ADJUDGED, and DECREED** that Plaintiff is entitled to recover prejudgment interest in the amount of $1,696.86.

It is further **ORDERED, ADJUDGED, and DECREED** that Plaintiff is entitled to recover taxable court costs in the amount of $2,912.61.

All relief not specifically granted or denied herein is hereby denied.

This judgment finally disposes of all parties and all claims and is appealable

SIGNED this the _____28th_____ day of ___January_____, 2015.

_____
**JUDGE PRESIDING**

Agreed as to form:

_____
Brett H. Payne

Attorney for Defendant

_____
Paul Morin
Chris Cagle

Attorneys for Plaintiff

SIGNED this the _____ day of _____, 2015.


_____
**JUDGE PRESIDING**


Agreed as to form:


_____                      _____
Brett H. Payne                                         Paul Morin
                                                       Chris Cagle

Attorney for Defendant                                 Attorneys for Plaintiff

**CAUSE NO. D-1-GN-11-002136**

| | | |
|---|---|---|
| GUILLERMO OCHOA-CRONFEL, | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| | § | |
| v. | § | 345th JUDICIAL DISTRICT |
| | § | |
| PATRICK C. MURRAY | § | |
| Defendant. | § | TRAVIS COUNTY, TEXAS |

**ORDER ON DEFENDANT'S MOTION FOR SANCTIONS**

On October 28, 2014, Defendant's Motion for Sanctions was presented to the Court for consideration in the above-referenced cause. After considering the motion and the evidence offered in the hearing, the Court will find as follows:

IT IS ORDERED that the portion of Defendant's motion seeking death penalty sanctions is denied at this time, and the Court will instead award lesser monetary sanctions, in part to cover the attorney's fees that Defendant incurred in response to this motion and all prior underlying hearings on prior motions to compel, and in part as sanctions for objectionable conduct, including but not limited to Plaintiff's altering the authorization form attached to the Order of the Court, signed and filed on September 18, 2014;

IT IS THEREFORE ORDERED that Plaintiff GUILLERMO OCHOA-CRONFEL pay the sum of $5,000.00 (Five Thousand Dollars) in attorney's fees and sanctions to Walters, Balido and Crain, L.L.P. by the date of November 10, 2014, and that all discovery that Plaintiff seeks in the above-referenced cause shall cease, except for mandatory supplementation under the Rules;

IT IS FURTHER ORDERED that Plaintiff's Motion for Protection Regarding Discovery to Protect Privileged Medical Records is DENIED, and Plaintiff's Notice of Hearing for Plaintiff's Motion to Exclude the Testimony of Dr. James Robinson is abated until the attorney's fees, as herein ordered, are paid in full;

IT IS FURTHER ORDERED that in the event that the ordered Sanctions herein ordered are not paid as ordered Defendant shall, upon request, receive a continuance of the present trial setting and no trial setting shall be obtained until Plaintiff complies with this order and all prior orders of the Court regarding discovery.

SIGNED on the **31**<sup>st</sup> day of October, 2014.

GUS J. STRAUSS
Presiding Judge
Travis County, Texas



## CAUSE NO. D-1-GN-11-002136

| | | |
|---|---|---|
| **GUILLERMO OCHOA-CRONFEL**<br>**Plaintiff** | §<br>§<br>§ | **IN THE DISTRICT COURT OF** |
| **v.** | §<br>§<br>§ | **TRAVIS COUNTY, TEXAS** |
| **PATRICK C. MURRAY**<br>**Defendant** | §<br>§ | **345TH JUDICIAL DISTRICT** |

## CHARGE OF THE COURT

**LADIES AND GENTLEMEN OF THE JURY:**

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember your previous instructions: Do not discuss the case with anyone else, either in person or by other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will give your notes to me promptly after collecting them from you. I will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberation, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions:

1. Do not let bias, prejudice or sympathy play any part in your decision.

2. Base your answers only on the evidence admitted in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not presented in the courtroom.

Filed in The District Court
of Travis County, Texas

**NOV 19 2014** **MC**
At 10:25 A. M.
Amalia Rodriguez-Mendoza, Clerk

Filed in The District Court
of Travis County, Texas

**NOV 19 2014** **MC**
At 12:16 P. M.
Amalia Rodriguez-Mendoza, Clerk

3. You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4. If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5. All the questions and answers are important. No one should say that any question or answer is not important.

6. Answer "yes" or "no" to all questions unless otherwise instructed. A "yes" answer must be based on a preponderance of the evidence. Whenever a question requires an answer other than "yes" or "no," your answer must be based on a preponderance of the evidence.

The term "preponderance of the evidence" means the greater weight of credible evidence admitted in this case. If you do not find that a preponderance of the evidence supports a "yes," then answer "no." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

A fact may be established by direct evidence or by circumstantial evidence or both. A fact is established by direct evidence when proved by documentary evidence or by witnesses who saw the act done or heard the words spoken. A fact is established by circumstantial evidence when it may be fairly and reasonably inferred from other facts proved.

7. Do not decide who you think should win before you answer the question and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8. Do not answer questions by drawing straws or by any method of chance.

9. Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

10. The answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

As I have said before, if you do not follow these instructions, you will be guilty of jury misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

# INSTRUCTIONS AND DEFINITIONS

"**Negligence**" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"**Ordinary care**" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"**Proximate cause**" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

497

## QUESTION 1

Did the negligence, if any, of those named below proximately cause the injury in question?

Answer "Yes" or "No" for each of the following:

1.    Patrick Murray                                     YES

2.    Guillermo Ochoa-Cronfel                       YES

498

If you have answered "Yes" to Question 1 for more than one of those named below, then answer the following question. Otherwise, do not answer the following question.

Assign percentages of responsibility only to those you found caused or contributed to cause the injury. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

## QUESTION 2

For each of those named below that you found caused or contributed to cause the injury, find the percentage of responsibility attributable to each:

1.    Patrick Murray                          _____55_____ %

2.    Guillermo Ochoa-Cronfel                 _____45_____ %

       Total                                   ___100_____ %

499

Answer Question 3, if you answered "Yes" for Patrick Murray to Question 1 and then answered:

1.     "No" for Guillermo Ochoa-Cronfel to Question 1, or

2.     50 percent or less for Guillermo Ochoa-Cronfel to Question 2.

Otherwise, do not answer Question 3.

## QUESTION 3

What sum of money, if paid now in cash, would fairly and reasonably compensate Guillermo Ochoa-Cronfel for his injuries, if any, that resulted from the injury in question?

Consider the elements of damages listed below and none other. Consider each element separately. Do not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not include interest on any amount of damages you find.

Answer separately, in dollars and cents, for damages, if any. Do not reduce the amounts, if any, in your answers because of the negligence, if any, of Guillermo Ochoa-Cronfel. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

1. Physical pain and mental anguish sustained in the past.

Answer: $ 2,500.00

2. Physical pain and mental anguish that, in reasonable probability, Guillermo Ochoa-Cronfel will sustain in the future.

Answer: $ 1,000.00

3. Physical impairment sustained in the past.

Answer: $ 500.00

4. Physical impairment that, in reasonable probability, Guillermo Ochoa-Cronfel will sustain in the future.
Answer: $ 2,000.00

5. Medical care expenses incurred in the past.

Answer: $ 9345.00

500

6. Medical care expenses that, in reasonable probability, Guillermo Ochoa-Cronfel will incur in the future.

Answer: $ *3000.00*

7.      Disfigurement sustained in the past.

Answer: $ *0*

8.      Disfigurement that, in reasonable probability, Guillermo Ochoa-Cronfel will sustain the future.

Answer: $ *0*

**Presiding Juror:**

1.  When you go into the jury room to answer the questions, the first thing you will need to do is choose a presiding juror.

2.  The presiding juror has these duties:

    a.  have the complete charge read aloud if it will be helpful to your deliberations;
    b.  preside during your deliberations, meaning manage the discussions, and see that you follow these instructions;
    c.  give written questions or comments to the bailiff who will give them to the judge;
    d.  write down the answers you agree on;
    e.  get the signatures for the verdict certificate; and
    f.  notify the bailiff that you have reached a verdict.

**Instructions for Signing the Verdict Certificate:**

1.  You may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another answer.

2.  If 10 jurors agree on every answer, those 10 jurors sign the verdict.

    If 11 jurors agree on every answer, those 11 jurors sign the verdict.

    If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.  All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

Submitted to the jury the 19th day of November, 2014, at 10 : 25 A m.

_Amy Clark Meachum_
Amy Clark Meachum
Presiding Judge
201st District Court

# VERDICT CERTIFICATE

Check one:

_____ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_____          _____
Signature of Presiding Juror          Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

___✓___ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

|  | Signatures | Printed Name |
|---|---|---|
| 1. | | Jason Casey |
| 2. | | MARK E. SANCHEZ |
| 3. | | Donna Pigg |
| 4. | | Teri Goldstein |
| 5. | | Dalia Salazar |
| 6. | | Addison Willis |
| 7. | | Charisa Cain |
| 8. | | Dave Joiner |
| 9. | | NATHAN HICKMAN |
| 10. | | FREDERICK EPPRIGHT |
| 11. | | |

Received from the jury this 19th day of November, 2014, at 12:16 o'clock P.m., accepted and filed.

_____
Amy Clark Meachum
Presiding Judge
201st District Court

Charge of Court                    Page 9

503

Vernon's Texas Statutes and Codes Annotated
    Civil Practice and Remedies Code (Refs & Annos)
        Title 2. Trial, Judgment, and Appeal
            Subtitle B. Trial Matters
                Chapter 18. Evidence
                    Subchapter A. Documentary Evidence

V.T.C.A., Civil Practice & Remedies Code § 18.001

§ 18.001. Affidavit Concerning Cost and Necessity of Services

Effective: September 1, 2013
Currentness

(a) This section applies to civil actions only, but not to an action on a sworn account.

(b) Unless a controverting affidavit is served as provided by this section, an affidavit that the amount a person charged for a service was reasonable at the time and place that the service was provided and that the service was necessary is sufficient evidence to support a finding of fact by judge or jury that the amount charged was reasonable or that the service was necessary.

(c) The affidavit must:

   (1) be taken before an officer with authority to administer oaths;

   (2) be made by:

      (A) the person who provided the service; or

      (B) the person in charge of records showing the service provided and charge made; and

   (3) include an itemized statement of the service and charge.

(d) The party offering the affidavit in evidence or the party's attorney must serve a copy of the affidavit on each other party to the case at least 30 days before the day on which evidence is first presented at the trial of the case. Except as provided by the Texas Rules of Evidence, the records attached to the affidavit are not required to be filed with the clerk of the court before the trial commences.

(e) A party intending to controvert a claim reflected by the affidavit must serve a copy of the counteraffidavit on each other party or the party's attorney of record:

   (1) not later than:

(A) 30 days after the day the party receives a copy of the affidavit; and

(B) at least 14 days before the day on which evidence is first presented at the trial of the case; or

(2) with leave of the court, at any time before the commencement of evidence at trial.

(f) The counteraffidavit must give reasonable notice of the basis on which the party serving it intends at trial to controvert the claim reflected by the initial affidavit and must be taken before a person authorized to administer oaths. The counteraffidavit must be made by a person who is qualified, by knowledge, skill, experience, training, education, or other expertise, to testify in contravention of all or part of any of the matters contained in the initial affidavit.

**Credits**
Acts 1985, 69th Leg., ch. 959, § 1, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., ch. 167, § 3.04(a), eff. Sept. 1, 1987; Acts 2007, 80th Leg., ch. 978, § 1, eff. Sept. 1, 2007; Acts 2013, 83rd Leg., ch. 560 (S.B. 679), § 1, eff. Sept. 1, 2013.

Notes of Decisions (61)

V. T. C. A., Civil Practice & Remedies Code § 18.001, TX CIV PRAC & REM § 18.001
Current through the end of the 2015 Regular Session of the 84th Legislature

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

> Vernon's Texas Rules Annotated
>   Texas Rules of Civil Procedure
>     Part II. Rules of Practice in District and County Courts
>       Section 9. Evidence and Discovery (Refs & Annos)
>         B. Discovery
>           Rule 215. Abuse of Discovery; Sanctions (Refs & Annos)

TX Rules of Civil Procedure, Rule 215.2

215.2. Failure to Comply with Order or with Discovery Request

Currentness

(a) *Sanctions by Court in District Where Deposition is Taken.* If a deponent fails to appear or to be sworn or to answer a question after being directed to do so by a district court in the district in which the deposition is being taken, the failure may be considered a contempt of that court.

(b) *Sanctions by Court in Which Action is Pending.* If a party or an officer, director, or managing agent of a party or a person designated under Rules 199.2(b)(1) or 200.1(b) to testify on behalf of a party fails to comply with proper discovery requests or to obey an order to provide or permit discovery, including an order made under Rules 204 [1] or 215.1, the court in which the action is pending may, after notice and hearing, make such orders in regard to the failure as are just, and among others the following:

(1) an order disallowing any further discovery of any kind or of a particular kind by the disobedient party;

(2) an order charging all or any portion of the expenses of discovery or taxable court costs or both against the disobedient party or the attorney advising him;

(3) an order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order;

(4) an order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting him from introducing designated matters in evidence;

(5) an order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing with or without prejudice the action or proceedings or any part thereof, or rendering a judgment by default against the disobedient party;

(6) in lieu of any of the foregoing orders or in addition thereto, an order treating as a contempt of court the failure to obey any orders except an order to submit to a physical or mental examination;

(7) when a party has failed to comply with an order under Rule 204 requiring him to appear or produce another for examination, such orders as are listed in paragraphs (1), (2), (3), (4) or (5) of this subdivision, unless the person failing to comply shows that he is unable to appear or to produce such person for examination.

(8) In lieu of any of the foregoing orders or in addition thereto, the court shall require the party failing to obey the order or the attorney advising him, or both, to pay, at such time as ordered by the court, the reasonable expenses, including attorney fees, caused by the failure, unless the court finds that the failure was substantially justified or that other circumstances make an award of expenses unjust. Such an order shall be subject to review on appeal from the final judgment.

(c) *Sanction Against Nonparty For Violation of Rules 196.7 or 205.3.* If a nonparty fails to comply with an order under Rules 196.7 or 205.3, the court which made the order may treat the failure to obey as contempt of court.

**Credits**

Oct. 29, 1940, eff. Sept. 1, 1941. Amended by orders of Aug. 5, 1998, and Nov. 9, 1998, eff. Jan. 1, 1999.

Notes of Decisions (175)

Footnotes

1        Vernon's Ann.Rules Civ.Proc., rule 204.1 et seq.

Vernon's Ann. Texas Rules Civ. Proc., Rule 215.2, TX R RCP Rule 215.2

Current with amendments received through 6/1/2015

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

what your office staff tells you to some degree about these estimates?

A.    That's correct.

Q.    And not your personal expertise?

A.    True.

MR. PAYNE:  Nothing further.  Thank you, Dr. Lown.

THE COURT:  Anything?

MR. CAGLE:  Nothing further.

THE COURT:  Okay.  Thank you, Dr. Lown. You may step down, and you're excused as a witness. It's a natural breaking point.  Even though we're a little earlier than noon, I'm going to go ahead and we'll take our lunch break.

What that means is, when we come back at 1:15, we'll have a little bit longer of an afternoon, so just make sure you come back well fed and ready to go until five o'clock.  But at this time, it's 11:45. I'll see you all at 1:15.

(*Lunch recess was taken.*)

THE COURT:  Plaintiff, you may call your next witness.

MR. CAGLE:  Thank you, Your Honor.  We call the plaintiff, Guillermo Ochoa-Cronfel.

THE COURT:  Mr. Ochoa-Cronfel, please

raise your right hand.

(Witness was sworn in.)

THE COURT:  Thank you.  Please have a seat.

**GUILLERMO OCHOA-CRONFEL,**

having been first duly sworn, testified as follows:

**DIRECT EXAMINATION**

BY MR. CAGLE:

Q.   Mr. Cronfel, will you introduce yourself to the folks of the jury?

A.   My name is Guillermo Ochoa-Cronfel.  My friends call me Memo.

Q.   Tell us a little bit about yourself, Mr. Cronfel.  Where are you from?

A.   I was born in Houston, was raised down on the border in Laredo.  Then left there and went to college, put myself through college, and then came here to Austin and put myself through graduate school here in Austin, and I've been living here since then.

Q.   Did you graduate from graduate school in 1988?

A.   Yes, I did.

Q.   You've lived in Austin since that time, you said?

A.   Yes, I do.

Q.   Have you practiced law in Austin since 1988?

A.    Yes, I have.

Q.    And what area of law do you focus on?

A.    I'm a business lawyer.

Q.    And before this case, have you and I ever met?

A.    No.

Q.    When you're not practicing business law, Mr. Cronfel, what do you like to do in your spare time?

A.    I love the outdoors.  I love to exercise.  I like to ride bikes, and I like to go to the gym.

Q.    Where do you normally bike?

A.    In my neighborhood.  I live in a neighborhood off Southwest Parkway.  It's called Travis Country. I've lived there since 1995, and so I bike a lot in my neighborhood.  It's safe, or at least I thought it was, but -- and I also bike in the greenbelt area right next to there.  I can drop down in there and do that.

Q.    And how often would you bike in your neighborhood, Mr. Cronfel, would you say on a weekly basis?

A.    If it's nice weather, like we have most of the time here in Austin, I'll bike four to six times a week, you know.  During the rainy, cold times of the month -- of the year, I don't bike as much, but I try to get out as much as I can.  I enjoy biking.

Q.    In addition to biking, do you try to exercise

regularly?

A. Yes. I -- I go to the gym three to five times a week. I really enjoy exercising.

Q. Do you exercise by yourself, or do you have a personal trainer?

A. No. I have a trainer. I've had a trainer since -- for about 12 years now, who oversees what I do and makes up plans for me.

Q. Have you had the same personal trainer since 2004?

A. Yes, I have. His name is Shane Selberg, and he's trained me for that long.

Q. When you exercise at the gym, do you do it under the supervision of Mr. Selberg?

A. Yes, I do it under the supervision of the trainer. He makes up plans for me. He watches how I'm doing and tries to make plans that relate to what my physical condition is at the time.

Q. I want to ask you about July 23rd, 2009, the day of the incident that we're all here to talk about. Okay?

A. Yes, sir.

Q. What -- excuse me. What were you doing that day?

A. I had just gotten home from work. It was

about 6:00, 6:30 in the evening.  It was a hot day, as it usually is in July, and I wanted to go for a bike ride.  So I got on my bike and left my house and went riding on my road bike.

Q.   Was it still light out when you left your house?

A.   It was very -- very much so, yes.

Q.   And where were you going?

A.   I was going on one of my usual routes.  I have two or three routes that I take in the neighborhood that I'm very familiar with, and I picked one of those.  So I was just headed down one of those familiar routes.

Q.   On this particular route you were taking, how many times do you think you've ever ridden that route?

A.   Hundreds of times.  I've been living in that neighborhood since 1995.

Q.   And since 1995, you've ridden your bike through the neighborhood?

A.   Many, many, many times.

Q.   When you're riding your bicycle through the neighborhood at Travis Country, you see folks out there walking their dogs?

A.   Yes, I do.  It's almost invariably I see folks walking their dogs when I'm coming home from work in my car or leaving.

Q.   Is it a neighborhood that, in your experience, is fairly active with bike riders and dog walkers and the like?

A.   Yes.  There's a lot of people walking their dogs.  There's a lot of bike riders.  Since the greenbelt is there, people are always coming in and out of it, and it's very active.

Q.   When you see folks out walking their dogs in the Travis Country neighborhood, are they normally holding onto a leash?

A.   Invariably, yes.  They're normally doing that, yes.

Q.   I'm going to show you a photograph that has been admitted as Exhibit 1 in this case.  And do you recognize that photograph?

A.   Yes, I do.

Q.   Can you tell us what it is, please?

A.   That's a street I was going down when the dog attacked me.

Q.   And were you riding your bicycle down this street just before the incident?

A.   Yes, I was.

Q.   And when you were riding down the street, were you riding in the same direction as that car that is facing in that photograph?

A.    Yes, I was.

Q.    Were you riding a road bike?

A.    Yes, I was.

Q.    Were your feet clipped into the pedals?

A.    Yes, they were.

Q.    I want to ask you about the car that you see in this photograph, Mr. Cronfel.  Was that car there on the day of the incident or were there more cars there?

A.    I can't say that that car was there.  There was two or more cars that were there.

Q.    In the same position as where that car is?

A.    That's correct.

Q.    As you approached these cars over by the curb, did you see the defendant or his dog at all?

A.    No, I didn't see either of them.

Q.    And as you began approaching the cars, Mr. Cronfel, how close were you to them?

A.    Well, I wasn't close enough whereby I'd be worried about a door opening or anything like that. But I was far enough where I knew that I wasn't going to have that problem.

Q.    And you didn't see the defendant or his dog on the sidewalk or anything like that?

A.    No, I -- I never saw them.

Q.    Did you later learn where the defendant and

his dog were just before this attack?

A. My understanding is that they were in a front yard to the right of that vehicle.

Q. As you began passing the cars on the right, tell us what happened next.

A. Well, I was clipped in my bike. I was focused on what I was doing. I was ramping up, trying to get a good workout. And as I was passing the edge of a car, all of a sudden, this dog is coming at me like a rocket. And it -- it smashed into my front end of the wheel and knocked it up, and all the force that I had going forward, pushed me down toward the ground, and I was heading toward the ground. My head was headed toward the ground. And I put my -- my -- luckily, I was able to put my arm up, but all of that force went into my arm and my wrist and my elbow, and I smashed into the ground.

Q. When the dog impacted your wheel, would you say that the wheel got knocked out from under you?

A. It hit the wheel and the wheel went up, and it forced me down into the ground.

Q. Looking back at -- at the scene of -- of this incident, were the cars obscuring your view of the defendant and his dog, do you think?

A. I did not see them. I think that that would

be the case.

Q. Did you have any time to react or avoid the dog?

A. I was -- the dog was on top of me. I had no time to react, no.

Q. How fast do you think you were going at the time of the impact with the dog?

A. I was picking up speed. I was going at a good clip, trying to get a good workout in.

Q. Were you wearing a helmet?

A. Yes, I was.

Q. And what part of your body hit the pavement first?

A. The first thing that hit the pavement was my wrist, my forearm, elbow, and then my shoulder.

Q. Mr. Cronfel, can you describe for us the force of the impact that you had with the pavement?

A. The force was violent. It was -- it was terrible. It was -- it was scary, but it was very, very violent.

Q. Describe how you felt as soon as you hit the pavement.

A. I felt great pain. I -- I hit the pavement and then I slid, and I felt the pain from the initial impact and that violent impact. And then I slid on

that granular surface.  Then it was 6:30 in the evening, so it was burning hot, on top of that.

Q.    You said you slid on the pavement.  Do you know how far you slid?

A.    No, I don't know.

Q.    Did you get any of that -- what do you call that, road rash?

A.    I got scrapes on my face.  I got scrapes on my arm and my elbow and on my leg.

Q.    Mr. Cronfel, did you get up immediately after you hit the pavement?

A.    I couldn't get up.  I was dazed.  I was in great pain.  I was scared.  I -- things were swirling around.

Q.    And tell us, just so we're clear, where you were feeling the pain as you lay there on the roadway?

A.    I was feeling the pain in my wrist and in my forearm and elbow, part -- part of it in my shoulder.

Q.    And how severe was the pain that you were experiencing at that time?

A.    It was severe enough that I -- I was scared that something was really wrong.

Q.    What happened next?  Did you ever see the defendant, Murray?

A.    He hovered over -- I remember looking up, and

he was over me.  And he tried to help me up by pulling on my arm, but I yelped in pain.  And he let me go, went back on the ground.  And then I think he took off to go get his dog.

Q.   Did Mr. Murray say anything to you at that time?

A.   I'm sure he said something, but it's -- I -- I can't -- I don't know what he said.

Q.   Okay.  Did anyone else come over to check on you?

A.   Some children came over first, and then I think their moms came over, and people started huddling around me and started, you know, trying to help me.  As they were trying to help me come to and gather myself, and they were -- they were caring for me.  Slowly I started to try to regain my composure.  And they sort of sat me up.  And as I was regaining my composure, they were asking me questions.

Q.   How did you end up getting home?

A.   Well, once I was able to sort of regain my composure, the neighbor sort of stood me up.  Some of them kind of helped me up, and then they started walking me toward a house.  And a -- a man and his wife took me into their house, and they sat me on the couch.  And the lady went and got some ice and some water and

she brought some Ibuprofen to me, and she started putting the ice on where I was telling her it was hurting. It turned out she was a nurse.

And she was looking at it and telling me, You're probably going to have to go to the doctor. But they -- they took care of me for a while and then, you know, they watched me for a while, and then they got my bicycle and they put it in their truck, and they gave me a ride home. And they walked me into my house, sat me on my couch. The lady got me some ice, and they were very kind people.

Q. The neighbors that came to help you out, were they kind to you?

A. Yes, very much so. I appreciate them. I wouldn't have been able to get home without them.

Q. And not just the folks that came and actually delivered you home, but for the others that gathered around?

A. Yes. Yes. I'm glad I have neighbors like that.

Q. Did you ever see the dog after he ran into your bike and took off?

A. No, I never saw the dog again.

Q. So you don't know where --

A. I --

Q.    I'm sorry.

A.    I -- I did not see the dog.

Q.    Okay.  So you don't know where he ran off to?

A.    I would imagine somewhere in the neighborhood, but I don't know.

Q.    Did you see a leash at any time when you saw the defendant's dog that day?

A.    I didn't.

Q.    What did you do that night to help you deal with the pain that you were experiencing?

A.    I sat on the couch and I kept icing it, you know, and then I tried to eat something, and then I went to bed.  And I -- hoping that things were okay, kind of hoping it would go away.  And I didn't sleep well at all that night.  I was in pain all night.  And next day, I went to the doctor.

Q.    Can you tell us for certain whether or not Mr. Murray was holding a leash in his hand at the time the dog impacted your wheel?

A.    I can tell you for certain that -- that that's the case.  He was not -- there was no human being next to that dog when that dog slammed into me.

Q.    The next day -- when did you first go and seek medical attention?

A.    The next day?

Q. The next day.

A. The next day.

Q. Yeah, what time the next day?

A. I don't remember, to tell you the truth.

Q. Where did you go to seek medical attention?

A. I went to go see my general practitioner, whose name is Dr. Paul Keinarth.

Q. Mr. Cronfel, why didn't you go to the emergency room that night?

A. Because I was hoping that I didn't have -- didn't have to go. I was hoping it would go away by morning.

Q. I'm going to show you what's been admitted into evidence in this case, an excerpt from Dr. Keinarth's records. Have you seen this document before?

A. Yes, I have.

Q. When you first went to Dr. Keinarth's office the day after the attack, did you have pain in your right shoulder?

A. Yes, I did.

Q. And you had pain in your right elbow, right wrist, and right hand?

A. Yes, I did.

Q. And you see all those areas listed in the

medical records from Dr. Keinarth's office?

A. Yes, I do.

Q. Do you see where I've circled here, hopefully for us to follow along. Do you see where it says, right wrist edema and limited ROM?

A. Yes, I do.

Q. What does limited ROM of the right wrist mean? Do you know?

A. My understanding, it means range of motion, limited range of motion.

Q. Do you recall experiencing any problems with your wrist range of motion on your right wrist from the day after the attack?

A. Yes, I had limited range of motion.

Q. And is it your understanding that the term "edema" means swelling?

A. Yes, my wrist was swollen.

Q. And your wrist was swelling on that -- on that day when you saw Dr. Keinarth?

A. Yes.

Q. Do you recall if you were sent to get any X-rays done at all?

A. Yes, I was sent to get X-rays.

Q. I'm showing you another excerpt from Dr. Keinarth's records in this case. Have you seen

this document before?

A. Yes, I have.

Q. Do you recall getting those X-rays done at Austin Radiological Association on July 24th, the day after the attack?

A. Yes, I do.

Q. And what was your understanding of the results of the X-ray of your right forearm on the day after the attack?

A. My understanding was that I had broken the radial bone down here by the elbow, and it was kind of like -- like you look at a dog bone, right at the neck where that part flares out across the neck.

Q. Were you surprised that you had suffered a fracture of your radial bone?

A. No, I wasn't surprised.

Q. Why not?

A. Because of the impact and how violent it was -- it was and how much it hurt and how it suffered through the night.

Q. Did Dr. Keinarth treat you for any injuries, or did he send you to someone else?

A. He put me in like a blue sling thing, and then he sent me to see Dr. Carey Windler.

Q. Is that Dr. Carey Windler at Austin Sports

Medicine?

A. Yes, it is. Yes, it is.

Q. Do you recall the first date that you saw Dr. Windler at Austin Sports Medicine?

A. It was shortly thereafter. It says July 29th, 2009.

Q. I'm showing you an excerpt from those records. Do you recognize that document?

A. Yes, I do.

Q. What was your understanding of your course of treatment after seeing Dr. Windler for the fractured radius bone?

A. Dr. Windler explained that -- that because of where that fracture was across the bone at the neck, that there was a possibility that I would have to have surgery, and that they would have to put a fake bone like that there.

He explained to me that they may have to separate my arm from my elbow, cut -- saw off that head of the radius and then put a fake one in there, and then I'd have to be in a cast and healing. And he said that I would have to be in that sling for a couple of weeks before they decided if they were going to have to do surgery or not.

Q. How did that make you feel when you heard

that?

A. I -- when he described the process, I became nauseous. I was breaking into a cold sweat. I -- I couldn't believe it, and, you know, for the full two weeks waiting to come back and see him, I was -- I would break out in panic thinking about that surgery, and wake up at night -- after I would roll on my arm and it would wake me up, I would think about that, and it would make me nauseous.

Q. Aside from the radius fracture that you saw Dr. Windler for, did Dr. Windler offer any treatment to you for your right wrist?

A. No. I told him about it, but he was focused on this. I guess because of the severity of the surgery and what he was concerned about.

Q. How long were you in a sling in your right arm due to the radius fracture?

A. About two weeks. I went back two weeks later, and, fortunately, I understood that I wasn't going to need the surgery. And I was put in this big plastic cast. It was like, instead of fiberglass or plaster of paris, it was a big plastic thing with straps. And I was in that for four to six weeks, or something like that.

Q. Even when you were in that cast, did you still

experience pain from the fractured radius?

A.   Yes.  It was throbbing.  It was hurting on a daily basis.  It was very painful.

Q.   Did it interfere with your sleep at all?

A.   Yes.  I would roll over at night, and it would be a very sharp pain, and it would wake me up, and it was very difficult.

Q.   And, again, talking about just the radius fracture, on a scale of 1 to 10, how would you have rated your pain from that fractured radius bone?

A.   At -- at the first few weeks, it was 10.  It was pretty bad.  And I'm right-handed as well, so it -- it created some problems, but the pain was very bad.

Q.   Can you describe the type of pain you -- you felt from that radius fracture?  And by that I mean, was it kind of a jabbing pain or dull pain?

A.   It was -- it would be a constant dull pain. And then if you'd move your wrist or try to use it, as you would want to because you're right-handed, you'd -- you'd feel pain from, you know, bumping-into-something pain, rolling-over-on-it pain.  There was a constant dull pain.

Q.   What was that like, being right-handed and being locked up in that long plastic cast?

A.   It was a terrible experience.  It was -- it

interfered with all my activities.  Besides the pain, I couldn't do the normal things that you would do when you're right-handed.  You can't write.  You can't cook.  You can't do the things that you would normally do.  You can't even go to the bathroom, you know, without struggling.

Q.    While your arm was in the sling for the radius fracture, Mr. Cronfel, were you experiencing any pain in your right wrist?

A.    Yes, I was.  I had complained about the pain from -- in my right wrist to Dr. Windler and Dr. Keinarth.

Q.    Were you more focused on the fractured radius bone than you were the wrist at that time?

A.    Yes, I was.

Q.    How come?

A.    Well, for one, I was concerned about the surgery; and number two, the doctor seemed to be more focused on that.

Q.    Did you ever discuss your right wrist with Dr. Windler?

A.    On every occasion that I saw him, I discussed it with him.

Q.    I'm going to show you an excerpt from Dr. Windler's records.  Do you recall going to see

Dr. Windler on October 21st, 2009?

A.   Yes, I do.

Q.   And that was just less than about three months after you were attacked by defendant's dog?

A.   That's true.

Q.   At that time, were you feeling any pain up by the elbow where the fractured radius was?

A.   My -- my elbow by that time was healing, and I was feeling a lot better about that elbow.  I was on my way -- I was happy with where I was at that point with regard to my elbow.

Q.   Have you noted pain anywhere else in your right arm or hand at that time?

A.   In my wrist, in this area here.

Q.   How long had you experienced that pain that you just showed us?

A.   From the moment that I had the impact from the dog attack.

Q.   Do you see where on this record it says, quote, He has noted soreness in the region of the distal radius and ulna.  Do you see that?

A.   Yes.

Q.   Can you point us to where you were experiencing that soreness?

A.   The soreness was right here where this bone

is. This is where the radius -- well, the ulna comes into the wrist.

Q. Do you see also where it says that you have discussed the possibility of soreness in that area of your wrist secondary to fracture of the radius bone?

A. Yes.

Q. Do you have an understanding of what that means?

A. Well, that was the first time that I understood that a break here can cause problems here.

Q. That a break up here by your elbow could cause problems all the way down by your wrist?

A. Right.

Q. And even though your radius fracture had healed, were you still concerned about the pain in your wrist?

A. Yes.

Q. Now, despite the continuing pain in your right wrist, what was your understanding of whether you should try to engage in your regular activities at that time?

A. I was told -- I understood, excuse me, that I was to try to go back to my normal activities with pain as a guide.

Q. And did you do that?

A.    Yes.  I tried my best to do that.

Q.    Did you return at some point to Dr. Windler's office regarding your right wrist pain?

A.    Yes, I did.

Q.    I'm showing you an excerpt, again, from Dr. Windler's office notes.  Have you seen this progress note?

A.    Yes, sir.

Q.    This was a June 14th, 2010 visit to Dr. Windler; is that right?

A.    Yes, sir.

Q.    Why did you go back to Dr. Windler on that date?

A.    Well, I went for two reasons.  I was having some knee problems at that time, but I also went to see about my wrist as well.

Q.    At that time -- actually, let me scratch that. Did you and Dr. Windler review the July 24th, 2009 X-rays of your right wrist at that time?

A.    Yes.  We reviewed those -- the X-rays that were taken after the day of the dog attack again.

Q.    Do you know if Dr. Windler reread those July 24th X-rays and looked at the wrist with you?

A.    Yes, he did.

Q.    And just so we're all clear, the July 24, 2009

X-rays that you reviewed with Dr. Windler, those were the ones -- those were the ones done the day after the attack?

A.    Yes, they were.

Q.    And what was your understanding of the reread of those July 24, 2009 X-rays?

A.    My understanding was that I had -- that as a result of the dog attack and the impact on the pavement, my ligament across the hand, the scapholunate ligament, was torn, and that I had broken a bone in the wrist called the lunate, and there was pressure from the ulna into my wrist as well.

Q.    So it was your understanding that you had torn a ligament in your right wrist?

A.    That's correct.

Q.    And that was the scapholunate ligament?

A.    That's correct.

Q.    And was it your understanding even at that time that that was the from July 23rd, 2009 incident?

A.    That's correct.

Q.    Did you have any other injuries to your right wrist from July 24th, 2009, through the visit you had with Dr. Windler in June of 2010?

A.    No, I did not.

Q.    Did Dr. Windler at that time send you to get

another imaging study, an MR arthrogram of your right wrist?

A. Yes, he did.

Q. And did you undergo that study?

A. Yes, I underwent that study.

Q. I'm showing you a document excerpted from Dr. Windler's medical records. Have you seen this document before?

A. Yes, I have.

Q. This document says it's an MR arthrogram of your right wrist on June 22nd, 2010. Do you remember doing that procedure at River Ranch Radiology?

A. Yes, I do remember undergoing that procedure.

Q. Can you explain to us what that procedure entailed?

A. You arrive there, and they -- they -- they took me into this room, which had a surgical bed. They sat me down, and I had put on like a frock. And then they put a big sheet over my wrist with a big hole over the wrist -- over the wrist area here, a big sheet over my arm. And then a nurse rolled in a tray with two big shots, and then a doctor came in and put one shot in to administer some kind of numbing. And then they took the next shot with a much bigger needle, and it went right into the joint so they could put the dye into the

joint.

And then after they did that, they put me into a little -- little -- sort of a little -- an MRI machine on a bed where they roll you in, and you're in this enclosed space for 45 minutes, built like a coffin, and makes these noises.

Q. Did that procedure hurt?

A. The needles hurt very much.

Q. But you also got the results of that MR arthrogram. And do you recall reading the impressions of that report?

A. Yes.

Q. And what was your impression at that time?

A. That I had, as a -- as a result of the tear, that I had arthritis in my wrist and that there was some changes, negative changes, bad changes.

Q. What do you mean "negative changes"?

A. That there had -- there had been -- arthritis had been developed as a result of the scapholunate tear, the large scapholunate tear.

Q. So was it your understanding that the reason that you had arthritis on this June 2010 arthrogram -- let me strike that question.

A. Okay.

Q. What was your understanding of the reason you

had arthritis, as revealed by that arthrogram in June of 2010?

A.    I -- I had arthritis as a result of the tear which was caused by the dog attack.

Q.    And was -- just so we're absolutely clear, was it your understanding that this was traumatic arthritis as opposed to degenerative type of arthritis?

A.    Yes.

MR. PAYNE:   Objection; predicate, Your Honor.

THE COURT:   That's sustained.

Q.    (BY MR. CAGLE)  Did you review the 2010 arthrogram with your physicians?

A.    Yes, I did.

Q.    And were you familiar with the results of that arthrogram?

A.    I remember reviewing it.

Q.    Because the results were part of your -- the way you design your course of treatment?

A.    That's right.

Q.    Do you know if that 2010 arthrogram showed any injury to your scapholunate ligament?

A.    I can't read them, but I was -- I understood it tore the scapholunate ligament.

Q.    Prior to July 23rd, 2009, to your knowledge,

had you ever been diagnosed with a large scapholunate ligament tear in your right wrist?

A. No, I had not.

Q. After Dr. Windler reread the July 23rd, 2009 right wrist X-ray and after you got these arthrogram results, did you continue to treat with him or were you sent elsewhere?

A. I was sent elsewhere.

Q. Were you sent to Dr. Robert Walters?

A. Yes, I was.

Q. I'm going to show you a page out of Dr. Walters' records, which have been admitted into evidence in this case. When did you first go see Dr. Walters?

A. It says there August 4th of 2010.

Q. So a little more than a month after Dr. Windler referred you over there?

A. Yes.

Q. Did Dr. Walters examine you during that visit?

A. Yes, he did.

Q. What area was he looking at during that examination?

A. He was looking at my ulna and the radius.

Q. Did Dr. Walters give you a diagnosis at that time?

A.   Yes, he did.

Q.   And what was your understanding of that diagnosis?

A.   His diagnosis was that they were going to have to break my ulna and saw off a piece of the bone to shorten it in order to make it equal to the radius so that I wouldn't have the ulna smashing up into my hand causing pain and problems.

Q.   And so, Mr. Cronfel, are you familiar with the term ulna impact syndrome?

A.   Yes, I am.

Q.   Did you ever discuss surgical treatment options for your ulna impact syndrome with Dr. Walters?

A.   Yes, I did.

Q.   And can you tell us, in your own words, what your understanding of that surgical procedure entailed?

            MR. PAYNE:  Objection; predicate.

            MR. CAGLE:  Your Honor, he has personal knowledge of what his understanding of what the surgical procedure was.

            MR. PAYNE:  Okay.  Let me add repetitive. We've gone through this with Dr. Lown.

            THE COURT:  I'm going to overrule that objection.

            MR. CAGLE:  Thank you, Judge.

A.    Can you ask the question again, please?

Q.    (BY MR. CAGLE) Sure. Tell us briefly, if you could, what was your understanding of this ulna surgical procedure.

A.    That they were going to break my ulna, saw off a piece of it, and put two plates and screws into it.

Q.    How did that make you feel when you heard that that was the surgical plan?

A.    When Dr. Walters explained this to me, I was shocked. I was nauseous. I broke out in a cold sweat. It was -- it looked like a medieval torture of some sort. I couldn't believe that this was going to happen.

Q.    After that surgery, was it explained to you, Mr. Cronfel, on August 4th, 2010 -- was there a day that had gone by that you hadn't thought about that surgery?

A.    I know I thought about it a lot and it worried me a lot. I had already experienced the inconvenience and the problems of not being able to use my right hand. And I had concerns about the pain and the recovery associated with that; made me panicky and nauseous to think about it.

Q.    As you sit here today, have you had that ulna surgery?

A.   Yes, I have.

Q.   Before we go on with the injuries that we're here to discuss and the surgery that you've already had and the surgery that you're going to have, I want to talk about some injuries you had from long ago.  Okay?

A.   That's fine.

Q.   Before you saw Dr. Walters on August 4th, 2010, you also saw him in November of 2005.  Do you recall that?

A.   Yes, I do.

Q.   I'm showing you an excerpt from Dr. Walters' records dated November 16th, 2005.  Have you seen that document before?

A.   Yes, I have.

Q.   This document says that in September 2005, you fell off your bike and tried to block your fall with a right hand.  Do you recall that incident?

A.   Yes, I do.

Q.   When you fell off your bike in 2005, were you riding through your neighborhood or were you out on the mountain biking trails?

A.   I was on the greenbelt on the -- on the mountain bike.

Q.   And what was your understanding of your diagnosis at that time back in 2005?

A.    I understood that I broke a little -- a bone here on the palm of your hand called the hook of the hamate by pressing -- by trying to break my fall.

Q.    I'm going to show you another excerpt from Dr. Robert Walters' records.  Do you recall undergoing a CT scan back in 2005 of your right wrist?

A.    Yes, I do.

Q.    Let's take a look at that CT scan from 2005.  This was about four years before the July 23rd, 2009 incident.  Is my math right?

A.    It's in the vicinity.

Q.    And do you see where the results of the November 2005 CT of the right wrist show a fractured hamate?

A.    Yes.

Q.    Were there any other fractured bones in your hand?

A.    No.

Q.    Do you see where it says questionable mild widening of the scapholunate articulation?

A.    Yes, I do see that.

Q.    And it says, Ligamentous injury cannot be excluded.  Do you see that?

A.    I see that.

Q.    Was it your understanding that your

scapholunate ligament had a mild widening or a large tear back then?

A.    I understood a mild widening.

Q.    Was it ever your understanding that you had a large tear in your scapholunate ligament of your right wrist back in 2005?

A.    I don't remember that being the case.

Q.    Did you ever discuss or have you ever recalled discussing having surgery for any injury to your scapholunate ligament in your right wrist in 2005?

A.    I do not recall any discussions about a surgery to my scapholunate.

Q.    Did you ever discuss other surgeries or another surgery in your right hand back in 2005?

A.    Yes.

Q.    What was that?

A.    There was -- we discussed surgery to repair the hamate bone if it was not going to heal on its own.

Q.    And did you end up having that surgery on the hamate bone?

A.    No, I did not.

Q.    Did you get a follow-up MRI on your right wrist back in December of 2005?

A.    Yes, I did.

Q.    And do you see the results of the MRI mention

the hamate fracture?

A. Yes, sir.

Q. Was it your understanding that the hamate fracture was still healing at that point in December 2005?

A. I think it was -- yes, it was still healing.

Q. Do you see where the tendons of your right wrist in this December 2005 MRI -- it says that they showed no evidence of tenosynovitis or other abnormality. Do you see that?

A. I see that.

Q. Do you have an understanding as to whether the tendons in your right wrist were normal or abnormal in December of 2005 after the fracture healing?

A. Well, I don't know what that means, but I know that I didn't have any problems with my tendons.

Q. Do you see where it says "disruption of the scapholunate ligament"?

A. Yes, I do see that.

Q. Was it ever your understanding that you had a significant injury to your scapholunate ligament at any time in 2005?

A. No, it was not. I never understood that to be the case.

Q. Did you have pain in your right wrist during

2005 when you fractured the hamate bone in your right hand?

A.    I did have pain, but it dissipated after a little while.

Q.    Had any pain associated with that hamate injury, whether it be in the wrist or the hand, lasted longer than, let's say, the first couple of months into 2006?

A.    No.

Q.    Did you have any continued or lingering pain in your hand or wrist after the hook of the hamate fracture healed?

A.    No, I did not.

Q.    Did you have any restricted range of motion in your hand or your wrist after the hook of the hamate fracture of 2005 healed?

A.    No, I did not.

Q.    I want to show you an excerpt from Dr. Walters' records.  It's a -- a chart note from his office.  Have you seen this document before?

A.    Yes.

Q.    After the hamate fracture healed, you saw Dr. Walters again?

A.    Yes, I did.

Q.    And what date did you see him again?

A. It says there March 14th, 2007. I presume that's correct.

Q. And what injury did you suffer that sent you to Dr. Walters in 2007?

A. I believe I broke a finger on my left hand.

Q. And can you look at this record from Dr. Walters and tell us if you ever complained of pain to your right wrist when you saw Dr. Walters in March 2007?

A. Yes, I can, and I did not.

Q. And just so the folks on the jury are clear, this broken left finger, this is not part of the claims that you're making here today?

A. No, it is not.

Q. But, nonetheless, you broke your finger and had to go see Dr. Walters in 2007?

A. Yes.

Q. Was that your left finger?

A. It was my left finger. I believe it was my left finger.

Q. You didn't mention any pain in your right wrist to Dr. Walters in March 2007, but would you have told Dr. Walters if you did have right wrist pain in 2007?

A. Yes, I would have.

Q. And can you look at this record from Dr. Walters' office and tell us if you complained of any restricted range of motion in your right wrist in 2007?

A. Yes, I can, and, no, I didn't.

Q. Would you have told Dr. Walters if you did have restricted motion in your right wrist in March of 2007?

A. I would have told him.

Q. So in 2007, two years after the hamate fracture in 2005, did you have any pain or restricted range of motion in your right wrist or hand at all?

A. I did not.

Q. Did you ever discuss any residual pain or restricted range of motion in your right wrist with Dr. Walters in 2007?

A. I did not.

Q. I'll show you another excerpt from Dr. Walters' records. This is a chart note from January 2008.

A. Yes, sir.

Q. Do you recognize that document?

A. Yes, sir.

Q. Can you tell us what injury you saw Dr. Walters for in 2008?

A.    I broke the tip of my finger, my middle finger on my right hand.

Q.    And this was about a year or -- more than a year and a half before the July 23rd, 2009 incident?

A.    That's right.

Q.    And can you look at this record in January 2008, tell us if you had any complaints of pain to your right wrist during your visit with Dr. Walters this time?

A.    I don't think I did.

Q.    And can you look at this record and can you tell us, Mr. Cronfel, if you had any complaints of restricted motion in your right wrist in 2008?

A.    I did not.  I can look at it, and I did not.

Q.    Are those complaints of pain something that you would have told your doctor at that time?

A.    Yes, I would have.

Q.    During those visits, did you mention anything to Dr. Walters about any problems that you had lingering from the 2005 hamate fracture?

A.    I'm sorry.  Can you repeat that question?

Q.    Sure.  During these visits with Dr. Walters, did you ever tell him about lingering problems from the hamate fracture.

A.    No, I did not.

Q.    So when you saw Dr. Walters in 2000 and 2000 -- in 2007 and 2008, had the injuries from 2005 resolved, to your understanding?

A.    Yes.

Q.    Did you ever see Dr. Walters or any other medical provider in between this January 2008 visit and the day after the dog attack regarding wrist pain?

A.    Can you -- can you repeat that question?

Q.    Sure.  Did you ever see Dr. Walters or any other medical provider after this January 2008 appointment and before the day of the dog attack?

A.    No.

Q.    Regarding wrist pain?

A.    Right.

Q.    Do you recall the last time you saw Dr. Walters he draw you a picture of the ulna shortening surgery, but after that date, did you ever see Dr. Walters again?

A.    No, I did not.

Q.    Unfortunately, Dr. Walters passed away while he was treating you in 2010?

A.    That's correct.

Q.    Once Dr. Walters passed away, were you ultimately referred to another doctor for the injuries you suffered in the 2009 attack?

A.    Yes.  I discovered that Dr. Walters had passed away, so I called Dr. Windler's office.  And they referred me to another hand specialist, Dr. Vagner.

Q.    Is that Dr. Vagner of Orthopaedic Specialists of Austin?

A.    Yes.

Q.    I'm showing you an excerpt from Dr. Vagner's records?

A.    Yes, sir.

Q.    Do you recall going to see Dr. Vagner at Orthopaedic Specialists of Austin in March of 2011?

A.    Yes, I do.

Q.    In looking at this medical record, it indicates that your right wrist pain started in July of 2009.  Do you see that?

A.    Yes, I do.

Q.    Is that accurate?

A.    Yes, that's the date of the dog attack.

Q.    When you first saw Dr. Vagner, where were you experiencing the most pain?

A.    On the -- this part of the wrist and on the other side of the wrist as well.

Q.    When you first saw Dr. Vagner, were you experiencing impaired range of motion in your wrist?

A.    Yes, I was.

Q. Did you tell Dr. Vagner during that visit if the pain had gotten better or worsened since --

A. It had worsened.

Q. -- since July 2009?

A. It had worsened.

Q. Can you tell us what Dr. Vagner did for you, if anything, to help your right wrist pain and limited range of motion?

A. Dr. Vagner gave me a steroid shot. He put a needle into my wrist, which was not a pleasant experience.

Q. How do you feel about needles? Do you like needles?

A. I -- I hate needles.

Q. Did that injection help you?

A. It helped for a little while, but it dissipated.

Q. Did you continue to see Dr. Vagner after that injection?

A. No, I did not.

Q. Were you referred to another hand specialist?

A. Yes. I was referred to my current doctor, Dr. Lown.

Q. That's the Dr. Lown that just came up here today and took us to class?

A. Yes.

Q. I'm going to show you an excerpt from Dr. Lown's records. Can you tell us the first date that you saw Dr. Lown?

A. It says here August 11th, 2011.

Q. And what was your understanding of your diagnosis at that first appointment with Dr. Lown at Austin Hand Group?

A. That I had a broken -- I had an ulna that needed to be shortened and that I had a torn scapholunate ligament that needed to be addressed.

Q. Was there anything different in that diagnosis compared to the other diagnoses you had heard in the past to your understanding?

A. No.

Q. Did you do anything to help try to get yourself better or try to put this surgery off, or did you have the surgery right away?

A. No. I -- I understood from Dr. Lown that I was to put it off as long as I could. And Dr. Lown prescribed physical therapy for me, and I've been undergoing physical therapy since that date. I'm still undergoing physical therapy. And so I was constantly going to physical therapy and seeing the doctor as needed for these issues, and I was also -- I was also

given home exercises, which would include using like a rubber band to do exercises for the wrist, and stretching exercises, you know, and taking Ibuprofen and then icing it here and there.

Q. Icing it here and there?

A. Well, I would sometime forget to ice it, but I would try to be good about it.

Q. When you had formal physical therapy at Dr. Lown's office under his supervision, did you leave that physical therapy session sometimes feeling some pain?

A. Yes. I don't know what they call it, but the physical therapist, they sort of crank you and pull you and move you around, and it -- it can be painful. And so you can leave there feeling worse than when you got there.

Q. It can leave you feeling worse than when you got there? Did you ever talk about that with the physical therapist?

A. Yes, I did. My understanding was that these things were needed so that I could get better.

Q. Was it your understanding that sometimes the physical therapy, while it can help you get stronger and -- and try to recover, it could also be painful?

A. Yes.

Q.   Were you ever concerned after leaving the physical therapist's office that, because of the temporary increase in pain, that you had actually made your injury worse?

A.   I asked about that, yes.

Q.   And tell us about what your understanding was regarding pain versus making an injury worse?

MR. PAYNE:  Objection; predicate, hearsay.

MR. CAGLE:  Your Honor, can we approach?

THE COURT:  Yes.

*(Bench conference off the record.)*

Q.   (BY MR. CAGLE)  Do you know whether the shortening procedure recommended by Dr. Lown was the same or different that recommended by Dr. Walters?

A.   I believe it was the same.

Q.   As you sit here today, is it your understanding that you need a wrist fusion surgery?

A.   It's my understanding I need a four-corner wrist fusion surgery.

Q.   Is one of the goals of that surgery to help you with pain?

A.   Yes.

Q.   And you have not undergone the wrist fusion surgery yet, have you?

A. No, I have not.

Q. But you underwent the ulna shortening surgery in September; is that right?

A. That's correct.

Q. Why did you wait so long to have the ulna shortening surgery?

A. For a number of reasons. Number one, Dr. Lown suggested that I wait as long as I could; number two, he sent me to physical therapy, and we were monitoring things that were going on with physical therapy. I have a trainer who was aware of what was going on with the physical therapist and the doctor, so we were doing things to try to keep the training and alter the training to not make the injury worse.

And then, I'm right-handed. I had already experienced significant disruption in my life from daily activities to work and -- as a result of that, and I knew that it would be another significant interruption.

Q. You ended up having that procedure in September of this year?

A. Yes, I did.

Q. I'm showing you an excerpt from the operative report in that case. Have you seen this document before?

A.    Yes, I have.

Q.    Okay.  Not on the screen, but in the full document, it mentions an automobile accident in August of 2012.  Do you recall that discussion?

A.    Yes, I do.

Q.    Did you ever injure your right wrist or hand in August of 2012?

A.    No, I did not.

Q.    Did you injure your other hand, your left-hand around that time?

A.    Can you repeat that?

Q.    Yeah.  Did you ever injure any -- your left hand at that time?

A.    I injured my left hand August 5th of, what was it, 2012, I believe.

Q.    But were you involved in a car accident of any kind in August of 2012?

A.    No.

Q.    Have you suffered any other trauma or injury to your right arm or wrist since July 23rd, 2009?

A.    No, I have not.

Q.    I'm showing you an excerpt from Dr. Lown's medical records.  Have you seen this X-ray photograph before?

A.    Yes.

Q.  And what's your understanding of what this X-ray shows?

A.  This shows my right arm -- arm as it is today with those plates and those screws in it.

Q.  Do you know if, ultimately, those two sections of your ulna bone were successfully fused together?

A.  My understanding is that they have been successfully fused.

Q.  Were you put under general anesthesia for this procedure?

A.  Yes, I was.

Q.  Did that cause you any angst or anxiety?

A.  Well, you know, sometimes people don't come out of anesthesia.

Q.  Were you worried about it?

A.  Yeah.  You've got to be worried any time you go into surgery.

Q.  Mr. Cronfel, how did you sleep the night before you had the ulna shortening surgery?

A.  Not very well.  For weeks before that surgery, knowing that somebody was going to break my arm and saw a piece of bone off and put screws in there like that was scary.  It was -- I spent several sleepless nights and would wake up in a panic, be nauseous.

Q.  Was that surgery performed at the Arise

Surgical Center?

A.   Yes.

Q.   That's on Bee Caves Road?

A.   Yes.

Q.   What time did you have to get there that morning?

A.   7:00 a.m.

Q.   What time were you put under anesthesia?

A.   Around 9:00.

Q.   How did you feel when you woke up after that surgery?

A.   I felt terrible pain.  I had asked about a nerve block beforehand, and I understood that they couldn't give me the nerve block because they wanted to see how my nerves were after the surgery.  So when I woke up, I had no nerve block, and I had tremendous pain.  There was a -- a nurse right there to give me some -- some pills for the pain.  I don't know what they call them.  They were some kind of strong pills. And then I -- a doctor came and stuck a very large needle in my neck to deaden, to block the nerve.

Q.   And was that nerve blocked?  I mean, did you feel numbness?

A.   After awhile, the numbness came, but I lost all voluntary muscle control, too, so my arm was just

hanging for about 24 hours. And it would just kind of sway. I would have to hold onto it and carry it around.

Q. How long did you experience that level of pain after that surgery?

A. 24 hours or so.

Q. And after that, were you able to manage the pain postoperatively after the procedure with pain medication?

A. I tried to, but it still hurt a lot. For several weeks it was very difficult and extremely painful. And on days like today when it's cold, I can feel that pain in there from those -- from that metal in my body.

Q. Do you know if that's ever going to go away?

A. I -- I don't -- I don't know.

Q. Were you put in a cast after the ulna shortening surgery?

A. I was put in a soft cast for a couple of days and then in a hard cast.

Q. I'm going to show you a photograph. Is that the cast, the soft cast you're wearing right afterwards?

A. Yes.

Q. You don't look super happy in that photograph.

Can you tell us what you were -- what was going through your mind then?

A. I'm in pain. You know, that's a day or two after the surgery. I'm -- I'm just trying to function.

Q. I'm showing you another photograph that's been admitted as Exhibit 1. Can you tell us what this photograph is?

A. This is the scar from the surgery, the ulna shortening surgery.

Q. Do you know whether or not the scar in this photograph is going to be permanent in nature?

A. My understanding, it's going to be permanent in nature.

Q. How does that make you feel?

A. It doesn't make me feel good. I -- you know, I don't expect to go be in pictures or anything like that, but, you know, a permanent scar like that is a daily reminder of what you've been through, this five-year ordeal that hasn't finished yet.

Q. As you sit here today, Mr. Cronfel, do you have any other surgeries scheduled right now?

A. No, I don't.

Q. Do you intend on having any other surgeries?

A. Yes, I do.

Q. What surgeries will that be?

A.   I'm going to have the four-corner fusion that Dr. Lown spoke about earlier this morning.

Q.   Do you expect to have any physical impairment in your wrist and hand movement after that surgery?

A.   My understanding is that after that surgery, I'm going to be permanently impaired.  I'm going to be impaired for the rest of my life.

Q.   Nonetheless, is it still your intention to do the surgery?

A.   Yes.  The pain and the interference of my daily life, yes.

Q.   And so even after the ulna surgery, the one where the ulna was shortened, you're still experiencing pain in your wrist?

A.   Yes.

Q.   And tell us about how often you feel that pain.  Do you feel it every day?

A.   I feel it every day, yes.

Q.   Let's just go through a normal day for you. When you first wake up, when's the first time that you feel that pain in your wrist?

A.   I feel it when I'm reaching over to hit the alarm clock, or when I'm trying to brush my teeth.  I'm starting to use my left hand for a lot of things, or when I try to soak myself in the bathroom in the

morning.  Buttoning shirts is really difficult, making coffee, taking -- trying to get a gallon of milk out of the refrigerator.  I now have to do that with my left hand because it hurts to much to get a gallon of milk out of the refrigerator.

Q.    Thank you.  I'm going to show you another note from Austin Sports Medicine.  This is Dr. Carey Windler.  Do you see that record?

A.    Yes.

Q.    Okay.  Have you seen that document before?

A.    Yes, I have.

Q.    Has it been your experience that you have a temporary increase in pain in your right wrist when you work on the computer?

A.    Yes.

Q.    Do you -- do you experience a temporary increase in pain when you do exercises?

A.    Yes, I do.

Q.    Do you experience a temporary increase in pain when you do push-ups or pull-ups?

A.    I did.  We don't do them anymore.

Q.    You don't do what anymore?

A.    Push-ups or pull-ups.

Q.    But just like push-ups and pull-ups, do you experience temporary increases in pain if you're

writing with pen and paper a lot?

A. Yes.

Q. And the same way with typing at a keyboard?

A. Yes.

Q. Can you go through a normal day of work without typing on a keyboard?

A. No, I can't.

Q. I don't know if anybody can anymore. I was just curious. So certainly you cannot, can you?

A. No. I type until it starts hurting, then I get somebody to help me.

Q. Have you actually had to -- have you had to hire somebody to come help you?

A. Somebody -- I hired somebody to help me type and to write notes for me.

Q. Have you made any changes in your exercise routine as a result of these injuries?

A. I made changes that the therapist and that my trainer suggest as guided by pain. They suggest -- they ask me -- they monitor me when I'm working out. The therapist -- sometimes I'll make a mistake. She'll tell me, you need to change this. The same thing with the trainer, and we make adjustments, but I'm not going to stop trying to live my life. I'm going to try to keep exercising and try to keep doing things that I

like to do, but with pain as a guide.

Q. Since the date of these injuries in July of 2009, have you exercised with the same amount of weight and repetitions as you did before?

A. No. That has changed over time. And, again, as I said, I'm listening to people who are professionals, who are watching me and suggesting changes. I try to follow them.

Q. What about something fun like bowling? Can you go bowling anymore?

A. No.

Q. Could you bowl before?

A. Yes, I did.

Q. I want to show you -- I saw a kettle bell here in the courtroom earlier. I've never seen that before.

A. It's right there.

Q. Oh, there it is. Do you work out a lot with kettle bells?

A. No.

Q. I'm showing you this chart note from Dr. Lown's office. And you can see it's dated February 13th of 2013. It says, Patient worked out with kettles, and it has aggravated his musculature. Do you see that?

A. Yeah.

Q.   Do you recall ever having an instance with kettle bells that -- where you injured your wrist?

A.   I didn't injure it.  I increased the pain, but we stopped after that.

Q.   Was the increase in pain after using kettle bells any different than the temporary increase of pain you would experience, say, typing a lot or writing a long letter?

A.   It might be a little bit more, but it'll dissipate after a while after icing and doing things, and I would go see the therapist or taking Ibuprofen.

Q.   Would you describe the temporary increase in pain that you felt after using the kettle bells on this date to be similar or much different than the pain that you felt after engaging in the physical therapy sessions in Dr. Lown's office?

A.   There's some similarities.

Q.   And just so we're all clear, that chart note on kettle bells is February 13, 2013.  When you first saw Dr. Lown in August of 2011, was it your understanding that you were a candidate for a wrist fusion?

A.   Yes, and for the ulna shortening.

Q.   Has it been your understanding, after being treated by your medical doctors, that exercising has

ever made your injuries worse?

A.   Can you repeat that question?

Q.   Is it your understanding that exercising has made any of your injuries worse?

A.   No, it has not.

Q.   And as you sit here today, you intend to have the wrist fusion surgery?

A.   I do.

Q.   Are you scared about your future in the level of impairment you're facing with your hand?

A.   Yes, I am.  I've already had problems for years.  And to think that I'm going to face permanent disablement -- another surgery, permanent disablement, and the possibility that won't work is -- is unsettling, so I am worried about my future.  I know I'm going to have to go through another surgery and go through the rehabilitation process and the inconvenience of it again, yes.

MR. CAGLE:  Thank you very much, Mr. Cronfel.  We'll pass the witness.

MR. PAYNE:  May I proceed?

THE COURT:  Yes.

**CROSS-EXAMINATION**

BY MR. PAYNE:

Q.   Mr. Cronfel, you and I have met before in your

deposition and a couple of things in this case, true?

A. Yes, sir.

Q. And, of course, you remember giving your deposition long about a year ago, October of -- of 2013, right?

A. Yes, sir.

Q. And you agree that in your sworn deposition, you told me back then that you had never injured your right wrist before the July 2009 event, correct?

A. I think that later in that deposition I had sort of cleaned that up a little bit.

Q. But at least when I asked you the specific question, prior to the event that we are here for today, had you previously sustained an injury to your right wrist, do you remember what your response was?

A. What you just said, sir.

Q. Never, correct?

A. Yes, sir.

Q. And -- and you recall that I asked you, Prior to the event that we are here for today involving Mr. Murray's dog, have you ever seen a healthcare provider for the purpose of treating right elbow pain or right wrist pain, and you answered that I remember, no, correct?

A. Correct.

Q.    And, of course, these records reveal something different, true?

A.    Right.  They weren't in front of me when I was taking the deposition.

Q.    And you didn't -- when I took your deposition, you didn't remember having any therapy in 2005, and we know that not to be true as well, correct?

A.    That's true.

Q.    And when I took your deposition, you didn't remember a ligament injury, and we now know that not to be true, correct?

A.    That I didn't remember it?  I don't know.  That's not the truth.  I didn't remember it.

Q.    Well, in fact -- well, and you were a surgical candidate in 2005, were you not?

A.    For the break of the hook of the hamate, correct.

Q.    That is -- that's your stated understanding on the record, correct?

A.    That's my understanding.

Q.    And you do agree that you did, in fact, have a ligament injury in 2005, correct?

A.    That's what the medical records say, yes, sir.

Q.    And you did have treatment to your right wrist in 2005 with Dr. Walters, correct?

A.    I don't remember whether I had treatment with him in 2005 for my wrist.

Q.    Well, at his referral to HealthSouth, correct?

A.    I know I went to HealthSouth.  I remember that.

Q.    And then you had another bike wreck in August of 2012, correct?

A.    Yes, sir.

Q.    And you went over the handlebars, correct?

A.    Yes.  That was when I was down in the greenbelt on the mountain bike, yes, sir.

Q.    Right.  Your deposition testimony was that you were in the greenbelt, you went over the handlebars, and you broke your left wrist?

A.    Correct, yes, sir.

Q.    And, of course, we -- I'm not going to pull it up right now, but you've seen the medical record that Dr. Lown writes that you actually struck a car in August of 2012, correct?

A.    Right, yes.  He had made a mistake.  Right.

Q.    And it's your contention that's inaccurate?

A.    Well, that portion is inaccurate, yes.

Q.    And, of course, you -- you just testified you had another bicycle accident in 2007 where you went over the handlebars and you hurt your right hand,

correct?

A. Yes, sir.

Q. And very similarly -- and as a result of that injury, you also had some difficulty typing, difficulty gripping, difficulty writing, correct?

A. If that's what it says, it's true.

Q. And, of course, you are not claiming any lost income in this lawsuit, correct?

A. Correct.

Q. And other than any doctors' appointments, you haven't missed any time away from your law practice, correct?

A. Yes, sir.

Q. All right. Now, this accident occurred, you've talked about this, it was on July the 23rd of 2009 around 6:00 to 7:00 p.m., correct?

A. Somewhere in there, yes, sir.

Q. And you're on a street that you're familiar with and that you rode often, correct?

A. Yes, sir. That's correct.

Q. And prior -- this was -- you talked about this earlier. This was your neighborhood. You rode it. You had two or three routes in the neighborhood you rode hundreds of times, correct?

A. That's correct, sir.

Q. At no time before July 23rd, 2009, had you ever noticed Mr. Murray, in particular, or his dog, in particular?

A. That's correct, sir.

Q. You're not aware of any prior instances where Mr. -- you had an altercation with Mr. Murray or his dog, or noticed anything afoul before July 23rd, 2009, correct?

A. That's correct, sir.

Q. The dog had never barked at you or jumped up at you or anything like that before July 23rd, 2009, correct?

A. That's correct, sir.

Q. Well, in fact, on July 23rd -- we'll talk about this a little bit more -- but you're not alleging that there was any barking or any contact between you and the dog itself, true?

A. It's possible that the dog made contact as I was going down to the ground, but it was so fast, it would be difficult to say. But there was no barking, you're right about that.

Q. Okay. No barking. And do you specifically recall any contact between you and the dog?

A. My leg may have touched him, but nothing that -- it was -- it might have been glancing.

Q. You agree that -- that wherever the contact, if any, was, it was at your front wheel, not against you and not at your back wheel?

A. Right. It was the front wheel, yes, you're right, sir.

Q. And, of course, you were on a road bike?

A. Yes, sir.

Q. And that -- the road bikes are such you actually have to clip into your pedals where your shoes are attached to your pedals, right?

A. Correct, sir.

Q. And at the time of the accident, you were coming up on parked cars, right?

A. Correct, sir.

Q. And you agree you were going pretty fast?

A. I was trying to pick up speed, yes, sir.

Q. And I think the term you might have used before is, you were revving up, correct?

A. Yes, sir. That's correct.

Q. You were going pretty fast and revving up beside the parked cars, correct?

A. That is true.

Q. And you agree that the rules of the road apply to bicyclists just like they do to automobile drivers, correct?

A.   I would think so.

Q.   Okay.  The rules of the road apply to bicyclists, true?

A.   I think so, yeah.

Q.   And a bicyclist, like anybody operating a motor vehicle on a public street, you've got a duty to keep a proper lookout, right?

A.   Right.

Q.   You've got to look at your surroundings, right?

A.   Right.

Q.   Well, in fact, on a bicycle, you're even more -- more vulnerable, and so you've got to be -- you've got to have this heightened sense of everything that's going on around you, true?

A.   True.

Q.   And we -- I -- I can't bring that picture back up, but you would agree, this roadway is pretty open, fairly flat, correct?

A.   It's kind of an uphill.

Q.   A gradual uphill?

A.   Yes, sir.

Q.   Okay.  And other than cars parked along the street, there's nothing there to block your view, no curves, no big hump in the road, anything like that,

correct?

A. Yes, sir.

Q. It's your testimony and contention, you never saw Mr. Murray or his dog at any moment before the dog came out in -- in front of you or into your path?

A. Yes, sir.

Q. And as you were going pretty fast and starting to rev up, you never noticed Mr. Murray over in the yard, correct?

A. Yes, sir. That's correct.

Q. And we've already talked about this, but the collision, if any, occurred between your front wheel and the animal?

A. Yes, sir.

Q. All right. Your helmet was not damaged in the accident, correct?

A. There might have been some scrapes on it, but not -- not -- not to where I needed a replacement or anything like that.

Q. At least when you offered your deposition, you -- you advised or swore that your helmet was not damaged, true?

A. Right. Right.

Q. And other than putting on some new tape on the handlebars, your bicycle was not damaged in the

accident, correct?

A. Right.

Q. And -- all right. So as you're coming up this road -- remind me which roadway this was on?

A. I think it's Twisted Tree, sir.

Q. Twisted Tree. You're coming up Twisted Tree. You did -- cannot offer an estimate as to how far back from the dog you were when the dog entered into your path, true?

A. I don't understand the question, sir.

Q. Do you have any estimate or can you offer any estimate as to the distance separating you and the dog as it came into your path?

MR. CAGLE: I mean, it clearly calls for speculation, Judge.

THE COURT: Rephrase.

Q. (BY MR. PAYNE) Do you know the distance separating you and Magnum, the dog, as you noticed that something may occur?

A. He was on top of me when I noticed. It was already -- he was already on top of me practically.

Q. Now, when you say on top of you, you don't literally mean on you?

A. No. He was -- he came out from behind a car, or, you know, he was coming out from behind a car.

When I noticed him, he was already almost making contact with the bike.  It was a very short distance.

Q.    I thought I understood earlier, you felt like you were far enough out in the roadway that you were not concerned about a swinging door of a parked car?

A.    Yes, sir.

Q.    All right.  So you agree would be -- what distance is that?  What distance made you feel safe far enough away from those parked cars?

A.    You know, three, four feet --

Q.    Okay.

A.    -- something like that.

Q.    All right.  So in any event, the dog, Magnum, would have had to have come out three or four feet in order to get up to your path, fair?

A.    I guess so.

Q.    So the dog would have had to move three or four feet within your point of view before any contact could have been made?

A.    No.  Because that's assuming that I'm seeing him come in front of me.  He came -- as I was passing that car and came from the side this way.

Q.    I thought we agreed it was between your front wheel and the dog, if at all, the -- the contact?  I mean, it's not as if he's coming into you.  He's coming

into your front wheel?

A. He came into my front wheel from the side, sir.

Q. Okay. As you're going pretty fast and revving up, the dog has an opportunity to travel four feet into the side of your wheel, three feet out from a parked car as you traveled up this roadway?

A. You know, you can come up with numbers. All I can tell you is that he came into my bike from the side, and I had no chance to react or avoid him.

Q. And you agree you did not react; you did not shift to the left or the right; brake; do anything to avoid the accident?

A. I had no chance.

Q. I'm sorry?

A. I had no chance.

Q. And you did not do so, true?

A. True.

Q. Now, you had just this moment in time to see the dog before the accident, right?

A. Yes, sir.

Q. Okay. And you never saw the dog after the accident, correct?

A. No. I don't remember seeing the dog after the accident, sir.

Q.   Okay.   So we're just talking about this moment in time where you saw Magnum, the dog, right?   That's the only time you saw him that day, was just that moment, as he came out from the car and whatever occurred, occurred, and then you never saw him again, right?

A.   Right.   That's my memory, sir.

Q.   Okay.   And so the testimony you've offered today about not seeing a leash or not seeing a collar, it's based solely on that moment in time, correct?

A.   I would agree with that.

Q.   Okay.   Now, you agree that -- at least when I took your deposition, in October, about a year ago, as of a year ago, you were still doing push-ups, correct?

A.   Yes, sir.

Q.   And about a year ago, you were still doing pull-ups, correct?

A.   Under the supervision of a therapist and a trainer, yes, sir.

Q.   And you continued to ride your road bike and your mountain bike, correct?

A.   Yes, sir.

Q.   And you continued to lift weights, correct?

A.   Reduced reps and amounts of weights, yes, sir.

Q.   And you continued to water ski?

A.    I water skied once.

Q.    These neighbors that took you in, good Samaritan style, do you recall their names?

A.    No, sir.

Q.    Did you do anything for them?

A.    No, I didn't.

MR. PAYNE:  Your Honor, can we approach real quick?

THE COURT:  Yes.

*(Bench conference off the record.)*

THE COURT:  Let's go ahead and take our 15-minute break.  It's 2:45.  We'll come back at 3:00.  Thank you.

*(Jury not present.)*

THE COURT:  You were giving a long statement up here at the bench, and so I just wanted you to be able to argue what you're arguing.

MR. PAYNE:  Sure.

THE COURT:  Okay.

MR. PAYNE:  Part of our motion in limine is that I would not discuss the other procedures, in particular, the knee procedures and the like.  But -- and so I approached before introducing evidence.

It is my contention that plaintiffs have opened the door, at least to some brief questioning,

about the other surgical -- surgical procedures, the five knee procedures, including the total knee replacement. The reason I believe that the door has been opened is the testimony about all of the fear and nausea associated with having to undergo the surgery; the being terrified of needles; the fear of not being able to wake up from a surgery; being sad about having metal in his body; the scar doesn't make him feel good about himself and it's a daily reminder; when, in fact, there -- there are several other procedures -- there's other, presumably metal, some -- some material in his body and his knee, and I just think that the door's been open to discuss that, at least briefly.

THE COURT: Okay. What's it relevant to though?

MR. PAYNE: Well, he -- he's -- he has laid the groundwork for all this mental anguish associated with having to undergo this procedure. He -- he has clearly undergone similar procedures before and since, which negates those claims.

MS. SACRA: He's saying it's -- it's contributed to his delay in getting the surgery.

MR. CAGLE: No, that's not what he was saying.

MR. PAYNE: Yeah. Actually, he testified

under oath that one of the reasons he was delaying the surgery is he wanted to address his knee first.

THE COURT: What's your response?

MR. CAGLE: Sorry, Judge. If I may. Thank you. As an initial matter, he testified that the primary fear of him having the surgery is that he's right-handed, and that interferes with his daily activities. That's number one.

Number two is, the mental anguish and emotional stress associated with having to undergo a serious procedure like the one that he has and still looks forward to doing, is that he only has to do this because of this defendant's negligence.

If we all get older and we all have these knees and things like that that we have to have worked on, that's a completely different situation than having -- being forced into this situation without any choice. These aren't -- there's nothing elective about these. These are situations he has to undergo because someone else didn't care enough to take care of their stuff. That's a much different situation than what -- what they're talking about.

THE COURT: And what all types of questions -- do you want to get into all of his different --

MR. PAYNE: It -- it would go -- it would be real brief. It'd be something like this. Mr. Cronfel, in fact, you know, you've testified about your -- you know, the hesitation you have about surgery. In fact, you've undergone five separate knee surgeries, you've offered testimony that you have -- you have this daily reminder of a scar and fear of metal in your body when, in fact, you've had a knee replacement involving, you know, the same situation. And that's essentially it.

MR. CAGLE: I just can't imagine, Your Honor, how that's relevant at all to the issues in this case.

THE COURT: Yeah, I don't -- I don't think it's relevant. I'm going to say the door is still closed on that.

MR. PAYNE: Your Honor, I mean, they spent --

THE COURT: If you want to make an offer of proof, you're welcome to put him back on the stand.

MR. PAYNE: Let's do it real quick.

THE WITNESS: Okay. May I take a comfort break, Your Honor?

THE COURT: Yeah. Sure. We'll start in five minutes.

*(Recess was taken.)*

THE COURT: I want to put on the record that I've changed my mind, and I do think the door was opened. Looking back at the transcript, he testifies that he basically couldn't sleep, he was to worried about the anesthesia, and I think that has opened the door. But I want to be real -- you need to do it in two or three questions. You don't have open to kind of go into a lot of stuff, just two or three questions, I think, is all I want to do on it.

MR. PAYNE: Yes.

THE COURT: All right.

MR. CAGLE: Judge, we're objecting to this evidence coming in.

THE COURT: I understand. But he did open the door, I'm fairly confident. So if you could go ahead and come back up, Mr. Ochoa Cronfel. So it's overruled. Sorry. Give you your ruling.

MR. CAGLE: Thank you.

*(Jury present.)*

THE COURT: We will pick back up.

Q. (BY MR. PAYNE) Mr. Cronfel, in the past you have had several procedures -- other surgical procedures done to your knees, correct?

A. Yes, sir, over the last 30 years I've had

several procedures.

Q. You have had a total knee replacement performed to your right knee in August of 2010, correct?

A. Yes, sir.

Q. You have hardware present in your body in terms of a new knee, correct?

A. Yes, sir.

Q. And you have had multiple injections to your knees in the past, correct?

A. Yes, sir.

Q. All right. Shifting gears and finishing up real quickly, in case there's any confusion, I have heard the term "dog attack" several times in the course of this. But just so we're clear, the dog, Magnum, did not bite you, correct?

A. Correct, sir.

Q. And other than this glazing blow that may or may not have occurred, there was no contact between you and the dog, correct?

A. Correct, sir.

Q. If there was any contact, it was just the dog coming out either into your wheel, in front of your wheel, beside your wheel. The contact was with the wheel, correct?

A.   There may have been some contact with my leg, but it may have been glazing --

Q.   Sure.

A.   -- as you had said, sir?

Q.   And -- and so in terms of the event in question, it was dog to wheel, perhaps glazing into something else, true?

A.   My leg perhaps, yes, sir.  That's correct.

MR. PAYNE:  Pass the witness.

**REDIRECT EXAMINATION**

BY MR. CAGLE:

Q.   Mr. Cronfel, in regards to any previous surgeries you were just questioned about, were any of those forced upon you through the negligence of someone else?

A.   No.  Those were natural-age type things.  And with the same risks and the same concerns about needles and the same concerns about coming out of anesthesia, same worries.

Q.   Okay.

MR. CAGLE:  Thank you very much, Mr. Cronfel.  Pass the witness.

THE COURT:  Okay.  Thank you.  You may step down.  You may call your next witness.

MR. CAGLE:  Thank you, Your Honor.  We'll

Thank you.

THE COURT: Plaintiffs may call their first witness.

MR. CAGLE: We call Dr. Ira Lown.

THE COURT: Dr. Lown, it's on this side. Come up through the middle. Please raise your right hand.

*(Witness was sworn in.)*

THE COURT: Thank you. You may have a seat.

**IRA LOWN**,

having been first duly sworn, testified as follows:

## DIRECT EXAMINATION

BY MR. CAGLE:

Q. Good morning, Dr. Lown.

A. Good morning.

Q. Would you please introduce yourself to the jury?

A. My name's Ira Lown. I'm a hand surgeon here in Austin.

Q. I want to start by asking you a little bit about your educational background for the folks in the jury. Is that okay, Doctor?

A. Sure.

Q. You earned your undergraduate degree from the

University of Texas at Austin?

A.    That's correct.

Q.    Doctor, would you mind moving the mic toward you a little bit?

A.    Sure.

Q.    So you earned your undergraduate from the University of Texas here in Austin?

A.    That's correct.

Q.    And you attended medical school at the University of Texas, Medical School in Houston?

A.    That's correct.

Q.    After you earned your M.D. from UT Medical School in Houston, did you do a residency up in New York?

A.    Yes, I did.

Q.    What did that residency involve?

A.    That was general surgery.

Q.    After you completed your residency in general surgery, did you pursue a fellowship training course?

A.    I did.

Q.    Can you tell us what a fellowship training course means?

A.    It's extra training after specialized, subspecialized training.  So I did my five years of general surgery in New York, and then did a year of

just hand surgery, hand and wrist surgery, in Connecticut.

Q. So your fellowship was more narrowly focused on the hand and the wrist?

A. Yes, sir.

Q. Do all doctors have fellowship training in hand and wrist surgery?

A. No.

Q. Can you tell us why you were interested in the orthopedic hand fellowship?

A. I enjoy the anatomy. It's a little more intricate than the rest of the body, and you get to work with bones, tendons, nerves, arteries.

Q. Doctor, are you a fellow in the American College of Surgeons?

A. I am.

Q. And, Dr. Lown, are you a member of the American Society for Surgery of the Hand?

A. I am.

Q. Do you have what's called a certificate of added qualifications in hand surgery?

A. I do.

Q. Can you tell us a little bit about what that means?

A. That is a -- it's a -- it's -- basically, it's

a test, an added test that you take after being board certified, to demonstrate your knowledge of hand and wrist surgery.

Q. Is that something that many doctors in our community have or something that a few doctors have?

A. A few.

Q. Doctor, have you ever gotten paid as a hired medical expert in a civil lawsuit?

A. No.

Q. And have you been hired by either side in this case to be an advocate for either side?

A. No.

Q. Are you getting paid for your time here today?

A. Yes, I am.

Q. Doctor, just so everyone here is clear, that you're testifying here because you just simply happen to be Mr. Cronfel's treating hand surgeon; is that right?

A. That's correct.

Q. And you don't care one way or another who wins this lawsuit?

A. No.

Q. Are you here to give us all objective medical opinions about, not just Mr. Cronfel's injuries, but the treatment that he's been through thus far, his

current condition, and the medical treatment that he still needs?

A.   Yes.

Q.   Is it your understanding, Dr. Lown, that Mr. Cronfel suffered injuries to his right arm and wrist as a result of a dog attack on July 23rd, 2009?

A.   Yes.

Q.   And, Doctor, are you familiar with Drs. Margolin and Keinarth, Paul Keinarth, here in Austin?

A.   I am.

Q.   Were you aware that Mr. Cronfel visited Dr. Keinarth's office on July 24th, 2009, just a day after this incident?

A.   Yes.

Q.   I'm going to show you what's been admitted into evidence as Margolin & Keinarth medical records. Do you recognize those documents?

A.   Yes.

        MR. Cagle:  Your Honor, may I approach the witness?

        THE COURT:  Yes.

Q.   (BY MR. CAGLE)  I brought a binder for you, Doctor.  This might make it easier.  It's tabbed for you, and I'll let you know when we're at the tab that I'm showing to the folks on the jury.  Okay?

A.    Okay.

Q.    Would you please turn to Tab 1 in your binder?

A.    Okay.

Q.    I'm showing you an excerpt from the Margolin & Keinarth medical records which have been admitted into evidence as Plaintiff's Exhibit 2.  Have you seen these documents before?

A.    Yes, I have.

Q.    Looking at Page 2 under Assessment, is it your understanding that Guillermo was experiencing pain in his right shoulder, elbow, hand, and wrist on the day after the dog attack?

A.    That's correct.

Q.    And looking at that second page, can you tell us if Dr. Keinarth did a right-hand examination of Guillermo on that day?

A.    He did.

Q.    Looking at the Margolin & Keinarth records from the day after the attack, was there any indication that Mr. Cronfel had a lingering hand problem from any prior injury?

A.    No.

Q.    And what about on his right wrist, Dr. Lown? On the day after the attack, were there any abnormal findings of Guillermo's right wrist on that day?

A.    He did say that it has edema, which is swelling, and limited range of motion.

Q.    So the document you're looking at from the day after the attack shows swelling in his right wrist and limited range of motion?

A.    That's correct.

Q.    Do those findings indicate to you whether there was a traumatic injury to Guillermo's right wrist the day before?

A.    It would indicate that they did.  There was.

Q.    Can swelling and limited range of motion in the wrist suggest a tear of the scapholunate ligament?

A.    It can.

Q.    Have you seen that before in your practice, Doctor?

A.    Yes, I have.

Q.    Is it your understanding that X-rays were ordered of the right elbow, hand, shoulder, and wrist on that day?

A.    Yes.

Q.    And do you know if those X-rays were done?

A.    I believe they were.

Q.    If you turn to Tab 2, Doctor.  Have you seen the document that is in Tab 2?

A.    Yes.

Q.   That is an X-ray result.  Do you see that?

A.   Yes, I do.

Q.   What does this X-ray show?

A.   He's got a radial head-neck fracture.

Q.   And have you treated patients with that injury before?

A.   Yes, I have.

Q.   Just so the folks on the jury are clear, the radial head fracture is shown on X-ray dated July 24th, the day after the incident with the dog?

A.   That's correct.

Q.   I'm showing you now, Doctor, an X-ray image of a right forearm.  Do you see that?

A.   I do.

Q.   Can you tell us if -- if that's a fair anatomical depiction of a right forearm?

A.   Yes.

Q.   And the radius is one of the bones in the forearm, right?

A.   That's correct.

Q.   Are you able to point that out to the folks in the jury?

A.   How do you want me to do that?

Q.   Would you mind getting up?

A.   Go up?  Sure.  So this is the radius, this is

the radial head and the neck, and this is just the radius, the hand is facing down.  This is the ulna next to it.

Q.    Okay.  And do the radius and the ulna bones, do they both meet where the wrist joint is?

A.    It's called the distal radial ulna joint. It's right here.

Q.    And can you show us on that X-ray where the July 24th, 2009 noted fracture was in Guillermo's radius bone?

A.    It's up here in this area.

Q.    It's way up there by the elbow joint?

A.    That's correct.

Q.    Is that kind of fracture -- how do you treat that?  Is it nonsurgical, or can it be surgical?

A.    In his case, it's nonsurgical.  It can be surgical.  Depending on the amount of damage done to the bone.

Q.    Can a radial fracture like that be painful, in your experience, treating patients?

A.    Yes.

Q.    Can it limit motion, in your experience?

A.    Yes.

Q.    Does the patient have to be in a cast or a sling?

A.    Yes.

Q.    How long, Dr. Lown, does a patient normally have to be in a cast or a sling?

A.    Depending on the fracture and the patient, usually I keep them in a sling for a couple of weeks and then start range of motion.

Q.    Do you know if Guillermo's radius bone, after it healed from this fracture of July 23rd, 2009, was it shorter than it was before?

A.    Yes.

Q.    And how do you know that?  Can you explain that to us?

A.    From subsequent X-rays.  So what happens is the -- these -- the radius and the ulna are at the same length.  They're equal.  What happens with this fracture is the radius sometimes gets shortened.  So in more recent X-rays, you'll see that this is shortened, which makes the ulna a little bit longer.

Q.    Do you call that condition an ulna impact syndrome?

A.    Yes.

Q.    And is that a condition that -- in your experience, treating Guillermo for these July 23rd, 2009 injuries --

A.    Yes.

Q.   -- did Guillermo have an ulna impact syndrome?

A.   Yes, he did.

Q.   So it's difficult for me, Doctor, sometimes to understand how a fracture way up high on the radius like that can affect the wrist joint, but I think you just showed us how that can happen.

Is there any medical treatment available to correct ulna impact syndrome other than surgery?

A.   No.

Q.   I think you can sit down now.  Thank you very much, Doctor.

A.   Sure.

Q.   When you discuss the problems caused by the ulna becoming longer than the radius, can you describe for us in what kinds of problems do -- does that cause a patient?

A.   Well, if the -- if the ulna is longer, it can cause pain in the wrist from, twisting or rotating motions, extension, inflexion.  Any time there's a -- a transfer of force across the wrist, when you go to grab something, pick something up, squeeze something, that force goes across the wrist.  And the normal anatomy of the wrist is no longer there.

Typically, in a normal wrist, the ulna will take about 15 percent of the load, but when the

radius is shorter than the ulna, the ulna -- the ulna takes more of the load.

Q. And that's a condition that can cause pain for patients?

A. It causes pain, yeah.

Q. Do these problems associated with the ulna impact syndrome, do they occur immediately, Doctor, or do they take some time to develop?

A. They take some time.

Q. Based on your experience treating Guillermo, was he suffering from those problems, too, down by his wrist as a result of the radius fracture by the elbow?

A. Can you say that again?

Q. Sure. Based on your experience treating Guillermo, was he having problems down at his wrist joint due to that radius fracture?

A. Yes, yes.

Q. In addition to the shortened radius bone and the ulna impact syndrome, Doctor, were there any other injuries from that July 23rd, 2009 incident that you have diagnosed Guillermo with?

A. He has a scapholunate ligament tear.

Q. And the scapholunate ligament, that's a ligament in your wrist?

A. It's in your wrist. It's between the

scaphoid -- the scaphoid bone and the lunate bone.

Q. And has that scapholunate ligament tear that you just mentioned, has that caused Guillermo to suffer any degenerative conditions in his right wrist?

A. Yes, it has.

Q. Can you tell us about those, what types of degenerative conditions have developed?

A. So the -- the scaphoid and lunate are connected with -- imagine a ligament between here. They move together when you flex and extend your wrist. And when it's torn -- that ligament is torn, the bones don't move together.

And so I always explain it to patients as, imagine if you had two spoons, if they're lined up normally. They fit together nicely. But now imagine if you had one twisted and they don't fit together and they rub together, so that -- with those bones not moving together, they rub in an abnormal way and you can get arthritis in the wrist, which means that the cartilage is damaged on -- on the radius and on the wrist bones.

Q. Do you refer to that arthritis as traumatic arthritis?

A. Yes.

Q. So currently, Doctor, so we're clear, you've

treated Guillermo for the -- the fractured radius and the resulting ulna impact syndrome and also for the scapholunate ligament tear?

A. Yes.

Q. I want us to focus on the shorted radius first, okay?

A. Okay.

Q. In your experience, when a patient fractures a radius bone like Guillermo did, can it be painful to engage in just very mundane everyday activities, like shaking hands?

A. It can.

Q. And I think we've discussed this, but I want to make sure that we all understand it. This is not the kind of pain that eventually goes away, but does it get worse?

A. It can.

Q. And if it gets worse, then -- as opposed to saying, you know, lifting a heavy bag of groceries hurt at the beginning of this injury, but now it's gotten worse and now it hurts to shake hands. Have you seen patients experience that kind of development?

A. Yes, I have.

Q. When you talk with your patients that have the ulna impact syndrome and you talk about a potential

surgery fix, do you tell them to have the surgery right away?

A.   No, I don't.

Q.   Okay.  Do you tell the patients to -- to try to put the surgery off as long as possible?

A.   I do.  We try the conservative stuff first: physical therapy, activity modification --

Q.   Why do you tell patients that?

A.   Because sometimes bad things can happen with surgery.  And if you don't have to have surgery, if there's an easier way to fix it, then I prefer to do it that way.

Q.   Did you tell Guillermo to try to put off his surgery, his ulna shortening surgery, for as long as possible?

A.   Yes, I did.

Q.   And while Guillermo was following your orders and putting that surgery off, do you know whether or not he was engaging in conservative medical care, like physical therapy, injections, things like that?

A.   Yes, he was.

Q.   Is that something a reasonable patient would do?

A.   Yes.

Q.   Is it your medical opinion that Guillermo

developed this ulna impact syndrome as a direct result of the July 23rd, 2009 injury?

A.    Yes.

Q.    And is that opinion based on your education, your experience, and your real life treatment of Guillermo?

A.    Yes, it is.

Q.    And is that based on reasonable medical probability?

A.    Yes.

Q.    Regarding the injury to Guillermo's scapholunate ligament tear, do you have an opinion as to whether that injury was caused by the dog attack on July 23rd, 2009?

A.    I believe it was.

Q.    And that, again, Doctor, is based on your skills, your training, your experience, and your real-life treatment of Guillermo?

A.    That's correct.

Q.    And that, again, is based on reasonable medical probability?

A.    Yes, it is.

Q.    I say real life treatment, Doctor, and I know that you're confused by me using that term.  But just so the folks on the jury are clear, you've actually

seen Guillermo, examined his arm and his wrist, you've actually done the surgery on him, and seen films on him; is that right?

A. Yes, I have.

Q. Dr. Lown have you diagnosed a patient with a medical condition without ever seeing that patient?

A. I don't believe that I have.

Q. And have you ever determined the cause of a patient's condition or injury without ever having the benefit of seeing or examining that patient?

A. I don't believe that I have.

Q. Do you know any doctors in town that would give a patient a diagnosis without ever seeing or examining the patient?

A. Well, there can be a review of medical records, but other than that, no.

Q. When you're trying to actually help a patient, do you agree that it's better to examine the patient before making a diagnosis?

A. Yes, yes.

Q. Is that more reliable?

A. Yes.

Q. Thanks, Doctor. I want to turn our attention now to what's Tab 4 in your binder. It's an excerpt from Plaintiff's Exhibit 3 -- oh, I'm sorry,

Plaintiff's Exhibit 2. And have you seen this document before?

A. Yes, I have.

Q. Can you tell us what it is?

A. It's an X-ray from July 24th, 2009.

Q. So what you're looking at is an X-ray of Guillermo's right wrist from July 24th, 2009, the day after the attack?

A. That's correct.

Q. And I want to show you this image, this wrist X-ray image. Is that a fair and accurate depiction, anatomically of what a right wrist looks like?

A. Yes, it is.

Q. We've talked about the schapholunate ligament tear earlier. And although you can't see the scapholunate ligament on X-rays, can you show us where it would be on this picture?

A. Sure. So this is scaphoid bone and a lunate bone. The ligament is right there.

Q. Okay. And what's the purpose of that scapholunate ligament?

A. To let those bones move together.

Q. And the ligament holds the bones together, but also, Doctor, does it allow those bones to move or articulate in unison together?

A. Right. That's correct.

Q. As a hand and a wrist surgeon, can you look at an X-ray of a wrist, and even though it doesn't show ligaments and soft tissues, can you still look at an X-ray and tell whether or not there's a history of a large scapholunate ligament tear?

A. You can for a large -- or a large tear, there would be a space between the ligaments -- I mean, between the bones, if the ligament isn't doing its job, holding the bones together. Also on a lateral view, there's certain angles of the scaphoid and lunate that you can get a pretty good idea of a significant scapholunate ligament injury.

Q. So, in other words, just so we're all clear, even though you can't see the scapholunate ligament on the X-ray, but the two bones of that ligament holds together are separated, that can give you an indication that there's been a large tear of the scapholunate ligament?

A. Yes.

Q. When the scapholunate ligament is not torn, it holds the scaphoid bone and the lunate bone together, right?

A. Yes.

Q. You mentioned that earlier?  And a normal

range could be anywhere from one or five millimeters, separation between those two?

A. I think it's four, one to four.

Q. Okay. And if the tear causes those two bones to separate and move independently of each other, Doctor, is that the condition that can cause traumatic arthritis?

A. That's correct.

Q. And you've seen your patients with large scapholunate ligament tears develop traumatic arthritis over time?

A. Yes, I have.

Q. How long would it take, Doctor, in your experience, from the moment that someone suffers a large scapholunate ligament tear until you first would see arthritic changes in an X-ray?

A. It can take years.

Q. Can it take months?

A. It could.

Q. Certainly if someone suffered a large scapholunate ligament tear, would you expect to see arthritic conditions on an X-ray taking somewhere between two and three years later?

A. You would.

Q. In other words, by two or three years after a

large scapholunate ligament tear, you would expect to see arthritic changes in the X-ray?

A. That's correct.

Q. Thank you, Doctor. You can sit down, unless you like it up there. You're all settled in?

A. Set.

Q. All right. In your experience, Dr. Lown, does every injury of the scapholunate ligament result in this traumatic arthritis in the wrist?

A. No, it does not.

Q. Does a mild -- well, let me back up. Have you treated patients that have had mild disruptions in the scapholunate ligament?

A. Yes, I have.

Q. Does a mild disruption in the scapholunate ligament normally cause the traumatic arthritis that you see with Guillermo?

A. No.

Q. And have you treated -- and have you treated patients, Dr. Lown, that have a mild widening of the space between the scaphoid bone and the lunate bone due to a mild disruption of the scapholunate ligament before?

A. Yes.

Q. And not every single one of those patients

will ever have to have a wrist fusion surgery; is that true?

A. That's correct.

Q. I want to take you back, Doctor, to the July 24th, 2009 X-ray of Guillermo's right wrist. I think it's Tab 4 in your binder.

A. Okay.

Q. Are you there?

A. Yes.

Q. Okay. If Guillermo had suffered a large scapholunate ligament tear in his right wrist two or four years before July 23rd, 2009, would you expect to see some arthritic changes in that X-ray that you're looking at?

A. I would.

Q. And looking at that wrist X-ray report of July 24th, 2009, was there any indication of arthritic changes due to a scapholunate ligament tear from back in 2005?

A. No, there's not.

Q. Do you see arthritic changes noted in X-ray reports like the one you're looking at now from July 24th, 2009, often?

A. There can be.

Q. Okay. In other words, if there is a

significant finding of a traumatic arthritic condition in someone's right wrist, you would expect that to be recorded on an X-ray?

A. Yes.

Q. From the lack of evidence of arthritic changes in Guillermo's right wrist on the July 24th, 2009 X-ray, can you tell us whether or not, in your opinion, Guillermo suffered a large scapholunate ligament tear at any time prior to July 23rd, 2009?

A. I do not believe that he had.

Q. I'm showing you -- if you could flip to Tab 6 for us, Doctor. I'm showing you an excerpt from records from Dr. Walters' office. When you get there, let me know, please?

A. Okay.

Q. Okay. Have you seen this document before, Doctor?

A. I have.

Q. Is this a CT scan taken of Guillermo's right wrist from an accident he had back in 2005?

A. Yes, it is.

Q. And do you see where it says, quote, mild widening of the scapholunate articulation measuring about four millimeters?

A. I do.

Q. And what does that mean? Can you explain that to us?

A. Well, it could mean a couple of things. It could just be an anatomic variant, which means that we're all born with a little bit different -- the way our ligaments and bones are lined up, or it could mean that he's had a minor injury to that ligament.

Q. Is that type of injury that you're looking at, is that a condition you've seen many patients for?

A. Yes.

Q. And does a mild widening to the scapholunate articulation a condition that requires surgical repair of any type, or even a wrist fusion surgery?

A. Usually not.

Q. Is a mild widening of the scapholunate space the type of injury that you would expect to result in degenerative arthritic changes?

A. No.

Q. In referring you, again, to the circled area, so we can follow along with you, a mild widening of the scapholunate space measured at approximately four millimeters -- I asked you a little bit about four millimeters. That gap between the scaphoid bone and the lunate bone, is a four-millimeter gap considered normal?

A.    Yes, it is.

Q.    So even without looking at the actual film of that CT scan back in 2005, you can look at the measurements of that interval and tell us if that's within normal limits?

A.    That's correct.

Q.    If it's a normal finding, Doctor, does that exclude the possibility that Guillermo suffered a large scapholunate ligament tear back in 2005 in November?

A.    I believe it does.

Q.    I want to show you an excerpt.  This is Tab 7 for you, Doctor, out of the Austin Radiological Association, reading from Dr. Walters' records.

A.    Okay.

Q.    Have you seen this document?

A.    Yes, I have.

Q.    And this is an MRI of the right wrist, Guillermo's right wrist done in 2005?

A.    That's correct.

Q.    And back then it says, He broke a bone called the hook of the hamate.  Is that your understanding?

A.    That's correct.

Q.    Can you show us where the hook of the hamate is?

A.    Sure.  Actually, the hook of the hamate is

right here basically.

Q. And, in your opinion, did that fracture of the hook of the hamate cause any problems with Guillermo's wrist that we're dealing with now?

A. No.

Q. And, then, also looking at this MRI from 2005, do you see where it says, disruption of the scapholunate ligament?

A. Yes, I do.

Q. And that's the same disruption that we just talked about from the CT scan in November of 2005?

A. That's correct.

Q. And does everyone that ever has a disruption of a scapholunate ligament require a four-corner wrist fusion surgery?

A. No.

Q. Do you have an opinion as to whether the disruption of the scapholunate ligament on that December 2005 MRI has any bearing on a large scapholunate ligament tear that you're treating Guillermo for?

A. I don't believe it does.

Q. Dr. Lown, would you have recommended Guillermo undergo a four-corner wrist fusion surgery if he simply had a mild disruption of the scapholunate ligament in

his right wrist?

A. No, I would not.

Q. I want to take you back, Doctor, I believe it's Tab 4 for you, to the July 24, 2009 X-ray. I just want to clear up some things and maybe learn some medicine from you?

A. Maybe.

Q. Looking at that July 24th, 2009 X-ray, do you see where it says -- and I'll quote -- "There is a well corticated ossicle adjacent to the ulnar styloid process which could reflect accessory ossicle or old avulsion injury." That was a lot to get out of my mouth.

A. Uh-huh.

Q. Do you see where it says that?

A. I do see that?

Q. What does that mean?

A. It means that he either could have been born with this -- it's a little bone -- lots of little bone fragments. He was either born with it, or it could have been from a previous injury, but it's not acute.

Q. I'm sorry?

A. It's not an acute injury. It's an old injury.

Q. Okay. And so if anyone gets up here and says, Well, Guillermo had a well corticated ossicle, and so

you know he had problems with his wrist.  Does that make any sense?

A.    No.

Q.    Okay.  So this well corticated ossicle has nothing to do with the wrist problems that you're treating Guillermo for?

A.    That's correct.

Q.    If there was an old avulsion injury in Guillermo's right wrist, would that have any impact on his condition or his treatment?

A.    No.

Q.    I want to refer you, Doctor, to Tab 8, an excerpt from Carey Windler's records at Austin Sports Medicine.

A.    Okay.

Q.    Have you seen this document before?

A.    I have.

Q.    Can you tell us when Guillermo first went to see Dr. Carey Windler?

A.    July 29th.  I don't know if it is the first visit.

Q.    Okay.  Does July 29th, 2009, sound right?

A.    Yeah.

Q.    So that was just about six days after the dog incident on July 23rd?

A.    Yes.

Q.    And can you tell us, looking at that record, did Dr. Windler initially treat Guillermo for the fractured radius?

A.    He did.

Q.    In looking at those records, does it appear that Dr. Windler was mostly focused on the radial neck fracture?

A.    He was.

Q.    If I could have you flip over to Tab 9, please.    Looking at -- did you flip to Tab 9, Doctor?

A.    I did.

Q.    And that's showing you Dr. Windler's note from October 21st, 2009; is that right?

A.    That's correct.

Q.    Have you seen this document before?

A.    I have.

Q.    Do you see where it's noted that Guillermo is experiencing soreness in the region of the distal radius and ulna?

A.    I did.

Q.    And does that mean that Guillermo's experiencing pain in that distal radial ulna joint we talked about earlier?

A.    That's correct.

Q.   That's the wrist joint, right?

A.   That's correct.

Q.   Is that a symptom you would expect for a patient that's developing -- I'm sorry.  Scratch that question.  I think I've already asked you that.  Let me refer you to Tab 10, Doctor.  This is another excerpt from Dr. Windler's notes from June -- from June 14th, 2010.  Do you see that?

A.   Yes.

Q.   And can you tell us if Dr. Windler ever diagnosed Guillermo with another injury in addition to the radial neck fracture in his upper arm?

A.   Yes, he did.

Q.   And what was that injury?

A.   It was a right wrist probable scapholunate injury.

Q.   And can you tell us if that diagnosis from Dr. Windler was based on the July 24th, 2009 wrist X-ray that was taken the day after the dog attack?

A.   It was.

Q.   Have you worked with Dr. Windler in the past?

A.   I have.

Q.   Do you think he's a good doctor?

A.   Yes, I do.

Q.   And you're familiar with the way that he

handles patients with injuries to their -- if they have a fractured radius and if they have wrist injuries?

A. Somewhat.

Q. Do these chart notes, Dr. Lown, from Dr. Windler's office support your opinion that Guillermo suffered a significant scapholunate ligament tear on the day of the dog attack?

A. They do.

Q. And just so we're clear, Dr. Lown, you're not the only doctor that has diagnosed Guillermo with a scapholunate ligament tear as a result of the July 23rd, 2009 incident, are you?

A. That's correct.

Q. Can you tell us if Dr. Windler recommended any imaging studies of Guillermo's right wrist at that time?

A. He recommended an MR arthrogram of the right wrist.

Q. Is that a reasonable thing to do at that time?

A. Yes, it is.

Q. And do you know if that MR arthrogram was performed?

A. It was.

Q. If you flip to Tab 11, you can see the result of that arthrogram. What's the difference, Dr. Lown,

between an MRI and an MR arthrogram of the wrist?

A.   An arthrogram, they inject dye into the wrist. And if there is a ligament, a tear in the ligament, the dye can get someplace that it shouldn't normally get. You can diagnose the injury that way.

Q.   And that dye is delivered through a needle into the wrist joint?

A.   That's correct.

Q.   Quite a bit more invasive than your standard MRI?

A.   The needle.

Q.   After the needle is inserted in the wrist joint for the arthrogram, then is the patient sent into an MRI tube or --

A.   That's correct.

Q.   Have you had patients in the past say that that's a painful procedure?

A.   I don't order it very often, so I couldn't answer that.  It could be.

Q.   Okay.  Is it a scary procedure?  Is that why you don't order it?

A.   No.  I guess it could be scary for somebody.

Q.   Can you tell us, looking at that MR arthrogram, what were the results of that study in June 2010?

A.   So a large change -- arthritic -- arthritic changes at the proximal pole of the scaphoid, with the lunate.   There's a large scapholunate ligament tear.

Q.   And is that the scaphoid ligament tear that we've discussed?

A.   Yes.

Q.   And the arthritic changes that's noted in that MR arthrogram, are those the arthritic changes that develop after a large scapholunate tear?

A.   That's correct.

Q.   And this arthrogram was done almost a year after the dog attack; is that right?

A.   That's correct.

Q.   And the presence of arthritic conditions reported in that MR arthrogram, did that mean anything to you in terms of timing of a potential scapholunate ligament tear?

A.   Well, like we talked about, it takes time for the arthritic changes to develop.

Q.   Would that be a normal or abnormal timeframe in June 2010 to start seeing arthritic changes from a July 2009 scapholunate ligament tear?

A.   It's about right.

Q.   And you see that, not just in Guillermo's case, but in other patients you treat?

A.   That's correct.

Q.   And were the arthritic changes noted on that June 22nd, 2010 arthrogram, almost a year after the dog incident, were there any -- were those arthritic changes present back on July 24, 2009, on those X-rays?

A.   They were not.

Q.   When you look at the June 2010 arthrogram of the right wrist, does that support your opinion that Guillermo suffered a large scapholunate ligament tear on July 23rd, 2009?

A.   It does.

Q.   I want to take you back quickly to Dr. Carey Windler's records.  You've seen these records, haven't you, Doctor?

A.   Yes, I have.

Q.   And are you familiar with Dr. Walters, the hand surgeon, that was here in Austin that just recently passed?

A.   I am.

Q.   Do you know who Guillermo saw next after Dr. Walters passed?

A.   Dr. Vagner.

Q.   That's right.  Good memory.  He went from Dr. Windler to Dr. Walters, then to Dr. Vagner, then to your office.  Is that your understanding?

A.   That's correct.

Q.   Now, I'm showing you, finally, your medical records, Doctor.  Have you seen these before?

A.   I have.

Q.   All right.  When did you first see Guillermo?

A.   It looks like it was August 11th, 2011.

Q.   And when you first saw Guillermo on that date, had you reviewed the medical records from Dr. Windler, Dr. Vagner, and Dr. Walters in conjunction with Guillermo's injuries?

A.   I did.

Q.   And from August 2011, the first time you saw Guillermo, through today, have you reviewed diagnostic films of Guillermo's right wrist and arm?

A.   I have.

Q.   And from August 2011 through today, have you physically examined Guillermo as your client?

A.   I have.

Q.   And during that time period, have you physically examined Guillermo's right wrist and its range of motion?

A.   I have.

Q.   And during that time period, have you performed and interpreted X-rays of your own of Guillermo's right wrist?

A.    Yes, I have.

Q.    And as we sit here today, Doctor, you're still actively treating Guillermo; is that true?

A.    That's correct.

Q.    You are his hand doctor; is that right?

A.    That's correct.

Q.    Looking under X-ray wrist exam findings, in your records, you note that Guillermo has scapholunate arthritis.  Do you see that?

A.    Yes.

Q.    I hate to belabor a point, but I want to make sure that when we see scapholunate arthritis in any of these records, does that indicate the traumatic arthritis caused by this scapholunate ligament tear in July of 2009?

A.    Yes, it does.

Q.    Under Plan in your records, Doctor, it says, The radial fracture in his forearm has healed well, but now he's ulnar positive and has scapholunate DJD.  Do you see that?

A.    Yes, I do.

Q.    What is scapholunate DJD?

A.    Degenerative arthritis is DJD.

Q.    Okay.  And when you say that Guillermo's ulnar positive, is that referring to the radius being shorter

than the ulna, like we discussed?

A.    That's correct.

Q.    And when you say -- well, let me back up.  I'm sorry.  And as a result of that ulna impact syndrome, is it your opinion that Guillermo needed the ulna shortening surgical procedure?

A.    That's correct.

Q.    Is it medically necessary for Guillermo to have undergone the ulnar shortening surgery?

A.    Yes.

Q.    And you performed that procedure in September of just this year?

A.    I did.

Q.    I want to take you back to Tab 12 and show you an excerpt from the Austin Sports Medicine records.

A.    Okay.

Q.    They're admitted as Exhibit 6 in this case. Do you see where it says, Guillermo's experienced intermittent pain in his right wrist particularly when using the computer, doing push-ups, and pull-ups?

A.    That's correct.

Q.    Do many of your patients experience intermittent pain when they've been diagnosed with a large scapholunate ligament tear?

A.    Yes.

Q.    And in your experience, can that pain come and go as the patient, say, uses a computer, exercises, or ties a tie?

A.    Yes.

Q.    In your experience, is the scapholunate ligament tear that we're talking about the kind of injury that causes intermittent nagging pain through all types of daily activities?

A.    It can.

Q.    And in your experience, does surgical repair for that scapholunate ligament tear, is that something that you tell your patients that they need to put off as long as they can until they just can no longer bear the pain?

A.    Sometimes, yes.

Q.    Depending on the patient?

A.    Depending on the patient, depending on how recent the injury was.

Q.    Uh-huh.  In Guillermo's case, did you tell him to try to put off the surgery for as long as possible?

A.    Yes.

Q.    But certainly in your opinion, is Guillermo a candidate for this wrist fusion surgery?

A.    Yes.

Q.    And do you have an opinion, Doctor, as to

whether or not Guillermo was a candidate for that wrist fusion surgery from the second that he suffered this injury on July 23rd, 2009?

A.   At that point, he could have had a -- possibly had a repair to that ligament.

Q.   Okay.  But one way or another --

A.   He needed surgery.

Q.   Yeah.  Now, I want to show you an excerpt from your records under Tab 14.  Do you see that?

A.   I do.

Q.   Do you see where it says, Wrist fusion, there's arthritis involved so the patient is cautioned on the amount of exercise with weight and repetition. Do you see that?

A.   No.

Q.   Is that not there?  I'm sorry.  I think I have it up for you now, Doctor, to look at.

A.   Okay.  Yes, I see it now.

Q.   Okay.  And the date of -- that that note was entered, can you tell us when that was?  That was February 6th, 2013?

A.   That's correct.

Q.   And you started seeing Guillermo back in August of 2011?

A.   That's correct.

Q.   So when you first saw Guillermo in August 2011, was it your opinion that he was a candidate for this wrist fusion surgery?

A.   I don't believe so.  Can you say that again?

Q.   Yeah.  Let me see if I can back you up here. Let me make sure we get it right for you.

THE COURT:  You know while you're doing that, can we go ahead and take our morning break?

MR. CAGLE:  Sure.

THE COURT:  Okay.  Let's go ahead.  It's 10:25, and we are going to get started at 10:45.  But we are on a break now.

(Recess was taken.)

THE COURT:  We'll pick up where we left off.

MR. CAGLE:  Thank you, Your Honor.

Q.   (BY MR. CAGLE)  Okay.  Dr. Lown, we're back. And before we move on to the last segment, I promise, the last segment of your testimony, I want to clear up a couple of things from the earlier testimony.

In your professional opinion, would Guillermo need a wrist fusion surgery in his right wrist had he never been involved in this July 23rd, 2009 incident?

A.   No.

Q. And now I'm showing you an excerpt from your medical records. And do you see where it says, Wrist fusion. There's arthritis involved so the patient is cautioned on the amount of exercise with weight and repetition?

A. That's correct.

Q. And is that the traumatic arthritis that we've discussed a bunch today?

A. Yes, it is.

Q. Is it your understanding that Guillermo leads a very active life-style?

A. Yes, he does.

Q. Do you know whether or not Guillermo has modified his weight routines in terms of repetition and weight during the course of his treatment with you?

A. I believe that he has.

Q. And before this note cautioning Guillermo about the amount of exercise he does in February of 2013, had you already recommended him to undergo the wrist fusion surgery?

A. Say that again, please.

Q. Sure. So before this note was entered regarding, Patient is cautioned on the amount of exercise he does, before that was even created, had you already recommended a wrist fusion surgery?

A.    Yes.

Q.    So whether or not Guillermo is exercising, what someone may have thought, something he needed to watch at that time, at that point he was going to have the wrist fusion surgery regardless?

A.    That's correct.

Q.    Is there any medical evidence in this case that you've seen that would suggest that Guillermo needs a wrist fusion surgery because of his exercise routine?

A.    No.

Q.    Keeping in the exercise realm, Doctor, I -- I want to show you this note from February 13th of 2013. Do you see this?

A.    I do.

Q.    It says that patient works out with kettle bells, right?

A.    Yes.

Q.    And, again, Doctor, well before February 13th, 2013, is it your professional opinion that Guillermo is going to need to have this wrist fusion surgery, regardless of whether he was lifting kettle bells?

A.    Yes.

Q.    Going to back to the first day you saw him in August 2011, isn't it true that he could have juggled

kettle bells, and he still would need a wrist fusion surgery?

A. That's correct.

Q. You haven't seen any notes that says he juggles kettle bells, have you?

A. I have not, to my knowledge.

Q. Doctor, is it reasonable to engage in conservative medical care like physical therapy, exercising, having injections to deal with the pain before undergoing either the ulna shortening surgery or the wrist fusion surgery?

A. Yes, it is.

Q. Is it reasonable to engage in that type of conservative medical care even for a period of years before finally electing to have the surgery?

A. Yes.

Q. And in your experience treating Guillermo, did he engage in conservative medical care for a period of years to deal with the pain of the injuries that we've discussed today?

A. Yes, he did.

Q. Do you have an opinion today as to whether Guillermo will, in fact, need a four-corner wrist fusion surgery to definitively treat the wrist arthritis caused by that large ligament tear?

A. I believe he will.

Q. As you sit here today, though, you have done the ulnar shortening surgery?

A. Yes, I have.

Q. Can those -- can those surgeries not be done together?

A. No. I think it's -- I think it's better to separate them. They're two big surgeries.

Q. Okay. What makes them big surgeries?

A. The soft tissue dissection on the ulna, and the same thing at the wrist, the soft tissue dissection at the wrist.

Q. I want to move on to the ulna shortening surgery that you performed in September of this year. I'm showing you an excerpt from your records. It's the operative report from that surgery. Have you seen that document before?

A. I have.

Q. Before we get started into the actual medicine, can you tell us whether or not there was a dictation error in the operative report?

A. I believe there was.

Q. Was there some type of dictation that said that Guillermo had been injured in a car accident in 2012?

A.    Yes.

Q.    Do you know if that's true or not?

A.    I believe that's not true.

Q.    And was that medical record -- record fixed to reflect that error?

A.    I dictated an addendum to the note.

Q.    Doctor, and for some of us who don't dictate a lot of -- of notes in our normal lives, are dictation errors fairly common?

A.    Yes, they are.

Q.    And so when -- is it -- is it rare or often that you see typos or small errors in an operative report?

A.    It's often.

Q.    Okay.  And in this situation, you saw that there's an August 2012 car accident note.  You knew that that was incorrect?

A.    That's correct.

Q.    So talking about this ulna shortening surgery, did you place Guillermo under general anesthesia?

A.    Yes.

Q.    Next it says that you made a longitudinal incision along the ulna order -- of the ulna; is that right?

A.    That's correct.

Q.   Can you show us where that incision is made?

A.   It's right here.

Q.   How long was that incision?

A.   Did I say?  It's probably 8 to 10 millimeters -- 8 to 10 centimeters.  It's a long incision.

Q.   Then it says that you retract tissues out of the field.  What does that mean?

A.   So you make an incision in the skin, and the bone's not right there.  You have to pull the muscles and the nerves and blood vessels out of the way so that they're not injured.

Q.   Then it says you place a TriMed plate onto the bone.  I assume that means the ulna bone?

A.   That's correct.

Q.   What is a TriMed plate?

A.   TriMed is the name of the company that makes this ulnar shortening plate.

Q.   And then you drill -- you begin drilling holes through that plate.  And can you kind of just take it from there?

A.   That's correct.  So you place the plate on the bone and then you have to shorten the bone.  You stabilize the plate to the bone with screws and with some wires that hold them in place, and then you take

what's called a sagittal saw, which is something that goes back and forth, and you take that away from the bone to shorten it.

And in his case, I took two millimeters to bring up the ulna back down to where the radius was. Then once you get it lined up and you're happy with it on the X-ray, you put screws in the plate to hold the plate and the bone in place so it can heal.

Q. And did you do all those things with Guillermo?

A. I did.

Q. In your experience, performing procedures like that, what is the post-operative pain level for the average patient?

A. It's different for every patient.

Q. Would you characterize this as a -- as a painful recovery?

A. It's one of the more painful. Any time you break a bone or cut a bone and drill into bone and put screws in it, there's pain.

Q. And I think we have an X-ray photograph of your handiwork there, Doctor. Is that a fair and accurate depiction of the ulna bone after that ulnar shortening procedure was performed?

A. It is.

Q. The dark shadows on the X-ray, would those represent those plates?

A. That's correct.

Q. Then, obviously, the screws securing the plates to the -- to his ulna bone?

A. That's correct.

Q. Was this surgery a success?

A. Yes.

Q. And by success, his ulna and his radius bone are now evenly the same length?

A. They're better aligned, yes.

Q. And was Guillermo put in a cast after the surgery?

A. He was.

Q. How long was he put in the cast, do you recall?

A. I believe four weeks.

Q. Do you recall -- did you follow up with Guillermo after the surgery?

A. Yes, I did.

Q. Do you recall if he was experiencing any pain?

A. Yes, he was.

Q. Do you know if Guillermo underwent any physical therapy after the surgery?

A. He did.

Q.   And -- and is it your understanding that Guillermo's next in line to do a wrist fusion?

A.   Yes.

Q.   During the ulna shortening procedure, can you deaden the nerves in the right arm, or is there a reason during that procedure that you cannot?

A.   You can.  It's called a block, and the anesthesiologist can do that either before or after the case.  It takes the pain away for the first, you know, 18 to 36 hours.

Q.   And is that -- how is that anesthesia delivered?  Is it delivered --

A.   It's a needle into the neck area.

Q.   Okay.  And do know if in this case that anesthesia was delivered after the surgery was done?

A.   I don't remember.

Q.   Before the ulnar shortening surgery, can you deaden the nerve?

A.   Yes, you can.

Q.   And you don't recall if you did for this case with Guillermo or not?

A.   I don't.

Q.   Okay.  I'm going to show you this excerpt from your records.  It's a wrist -- a wrist X-ray image. Have you seen this document before?

A.   Yes, I have.

Q.   I want to talk to you about the wrist fusion surgery that you recommended for Guillermo due to that scapholunate ligament tear and the traumatic arthritis. Can you kind of just walk us through?  And if you want to be professor again, that would be wonderful.

A.   Sure.

Q.   Thank you.  If you could, Doctor, please just show us what that wrist fusion procedure entails.

A.   Sure.  So this is the disruption between like the scaphoid and lunate.  So the procedure is to take out the scaphoid.  Then we fuse the lunate to the capitate, to these other -- these other bones, so that the wrist moves as one unit from here without this.

Q.   Okay.  And then how -- how are those bones fused?  Can you explain that to us?

A.   I use -- there's several different ways to do it, but you take off the cartilage.  There's cartilage between these bones.  Take all of that out and you get the bones so you get down to -- down to good bone and then I usually put pins or stainless steel wires to hold the bones together to pin them in the position I want them in.  And then the pins or wires come out after the bones heal in about four to six weeks.

Q.   So even after the surgery is performed, four

to six weeks later the patient has to come in and have the pins removed?

A. That's correct.

Q. How long are the wrist bones fused to the forearm bones? Is that --

A. They're not.

Q. Okay. So that's not the four corner --

A. Four corners, one, two, three, four. That's what's fused.

Q. And how is that supposed to help with the pain?

A. Because this bone is removed, and this is what's kind of rubbing up on the radius and moving and not moving in line with the lunate. The lunate -- just the way we're built, it's a deeper -- this is the radius. It's a deeper -- deeper cup on the radius, so there's a very predictable pattern of -- of arthritis that develops. It usually starts here at the radial styloid, and it works its way around and can work its way between the capitate and the lunate. But what's always preserved or usually preserved is the space between the -- the lunate and the radius, so that's a good area to run the wrist off of.

Q. And that's what you plan on doing for Guillermo?

A.   Yes.

Q.   I think you can sit down now for the final time.  After this wrist fusion surgery that you just described to us is completed, will Guillermo ever have normal range of motion in his right wrist?

A.   No, he won't.

Q.   Can Guillermo expect at least 50 percent impairment in range of motion of that wrist?

A.   Yes, he can.

Q.   And just so the folks on the jury are clear, even if the surgery goes 100 percent perfectly well, Guillermo can still expect at least 50 percent impairment in his range of motion?

A.   That's correct.  I usually tell patients they're going to have about half of the motion that they come in with.  It's usually not that -- it can be better than that, but that's what I tell people.

Q.   And could it be worse than that?

A.   It could be.

Q.   You just won't know until you're done with the surgery?

A.   Right, right.

Q.   I want to talk a little bit about the cost of that procedure, that procedure has not been done yet.  The surgical fees show to be $4,571.49 for you.  Does

that sound right?

A. Yes.

Q. And you're going to do this surgery at a surgery center here in Austin?

A. That's correct.

Q. I'm showing the surgery center fees to be $8,175. Does that seem correct to you?

A. Yes.

Q. And in your experience, will there be a separate charge for the anesthesiologist?

A. Yes.

Q. Is a charge of $1,425 for an anesthesiologist a reasonable and necessary charge?

A. Yes.

Q. Will there be a separate cost for the bone chips that you use to achieve this fusion in the wrist?

A. For implants, yes. Anything I put in there will be extra.

Q. And do those bone chips cost you about $520?

A. Yes.

Q. Will Guillermo be immobilized in a cast after this surgery?

A. He will.

Q. And for how long will that be?

A. Six weeks.

Q.   And Guillermo will need more physical therapy after this wrist fusion surgery?

A.   Yes, he will.

Q.   So the total cost for this wrist fusion surgery that we just went through totals about $14,690. Does that seem right?

A.   Yes, it does.

Q.   Is that a reasonable charge for those procedures in this community?

A.   I believe so.

Q.   And that's based on your experience in providing these types of services?

A.   That's correct.

Q.   The surgery -- the wrist fusion surgery, is that Guillermo's best medical treatment option now?

A.   Yes.

Q.   And are there any guarantees for that surgery?

A.   No, there are not.

Q.   Even if the fusion surgery in his wrist goes 100 percent perfectly, is it possible that Guillermo may still experience pain?

A.   Yes.

Q.   And even if the fusion surgery goes perfectly, we know with medical certainty he's going to be impaired, right?

A.   That's correct.

Q.   Even if the surgery goes perfectly, is it possible that the wrist fusion just won't take?

A.   Yes.

Q.   I mean, it's possible that the bones don't fuse?

A.   Bones don't heal, yes.  That's correct.

Q.   Would that require a revision surgery?

A.   It would.

Q.   With all the attendant costs that we just discussed?

A.   Yes.

Q.   Have you had patients where a wrist fusion surgery, the bones didn't fuse?

A.   I have not had one.

Q.   Well, that's good to hear?  Do what?

A.   I have not had one --

Q.   Do what?

A.   I have not had one myself, but it can happen.

Q.   It's certainly a risk that you make a patient aware of?

A.   Yes.

Q.   If a fusion of the wrist, if the bones don't fuse the way you intend and a scaphoid bone has already been removed, what kind of anatomy of the wrist would

that patient have? I mean, would he have problems?

A. Yes. I mean, with motion, there could be pain. I mean, the idea of -- of the surgery is to decrease his pain and leave him with as much motion as possible, but it's not going to be a normal wrist.

Q. Even after the surgery, will he still expect to have some pain in his right wrist?

A. He could. It's possible.

Q. Is it possible that he can lose strength in his hand as a result of this surgery?

A. It's possible.

Q. Is it possible that Guillermo will have pain engaging in every day activities for the rest of his life even if the surgery goes well?

A. It's possible.

Q. Other than actually undergoing this wrist fusion surgery, is there anything certain about Guillermo's medical condition of his right wrist?

A. No.

Q. Have you expressed your opinions today in terms of reasonable medical probability, Doctor?

A. I have.

Q. And I want to -- before I pass you, I want to ask you one more question, kind of a housekeeping matter. From August 11th, 2011, through the present,

the total amount paid to Austin Hand Group, your medical practice, for Guillermo shows as $6,812.51. Does that sound right?

A.   Yes.

Q.   And are those charges for the services you've provided reasonable here in our community?

A.   Yes, they are.

MR. CAGLE:  Doctor, I thank you very much for your time.  I know this is the first time you've ever done this.  And so thank you, thank you, thank you.  We appreciate it very much.  I'll pass the witness.

MR. PAYNE:  May I proceed, Your Honor?

THE COURT:  Yes.

**CROSS-EXAMINATION**

BY MR. PAYNE:

Q.   Dr. Lown, you and I met once before, correct?

A.   That's correct.

Q.   And that was at your deposition in this case, correct?

A.   That's correct.

Q.   Now, you are being paid to appear here today, correct?

A.   Correct.

Q.   You are being paid by plaintiff's counsel, are

you not?

    A.    Correct.

    Q.    What amount are you being paid to appear here today?

    A.    $4,500.

    Q.    Okay.  So $4,500 to appear and -- and give testimony in the courtroom this morning, correct?

    A.    Yes.

    Q.    And you were previously paid by plaintiff's counsel to give your oral deposition in this case, correct?

    A.    I believe so, yes.

    Q.    And do you recall what that amount was?

    A.    No, I don't.

    Q.    And that lasted, I don't remember, two or three hours.  Would it be a similar fee to what you're charging today?

    A.    I don't know.

    Q.    Okay.

    A.    I don't know.

    Q.    And, of course, you've met with counsel in advance of this trial to prepare for trial?

    A.    That's correct.

    Q.    And when did you do that?

    A.    A week ago.

Q. And how long did you meet with them at that time?

A. Thirty minutes.

Q. And y'all went through your records and -- and your records and your testimony that you were going to offer this morning, correct?

A. That's correct.

Q. And you had gone through a similar process with counsel before your deposition, correct?

A. That's correct.

Q. And I, of course, have not -- not had that opportunity to meet with you. I have simply met with you twice while you're sworn under oath, true?

A. That's correct.

Q. And I have not agreed, nor have I paid you any fees to appear at any time in connection with this case or any case, correct?

A. No, you have not.

Q. And -- and just so we're clear, you'll recall you were asked questions that -- and I'm paraphrasing. But the idea was that it's -- it's better to lay hands on a patient, to actually examine them to offer a more thorough opinion?

A. That's correct.

Q. And that was kind of the nature of those

questions. And you agree you never met Mr. Cronfel until August of 2011, correct?

A. That's correct.

Q. That's more than two years after the accident that forms the basis of this lawsuit, correct?

A. That's correct.

Q. And it's another three-and-a-half years before this event of 2005, correct?

A. Yes.

Q. And so whatever occurred right at the time of November of 2005, you did not lay hands on Mr. Cronfel and -- and examine him in any way, correct?

A. That's correct.

Q. You don't -- you didn't examine him, visit with him, take a history from him, review his actual films in connection with that 2005 event, correct?

A. That's correct.

Q. All right. And, likewise, within the two years following the 2009 event, you did not lay hands on Mr. Cronfel, examine him, review his films, for two years later?

A. That's correct.

Q. Now -- but you agree we -- we talked about this in your deposition. Mr. Cronfel did, in fact, have a almost identical, certainly a very similar, bike

wreck in November of 2005.  You understand that, true?

A.    Yes.

Q.    All right.  And --

MR. PAYNE:  Your Honor, may I approach the --

THE COURT:  Yes.

MR. PAYNE:  -- the podium.

THE COURT:  Yes.

MR. PAYNE:  Sorry about that.  I apologize for the delay.

Q.    (BY MR. PAYNE)  All right.  You understand that Mr. Cronfel had this accident -- if I can get it to come up, we'll bring it up -- where he went, fell off bicycle.  Tried to break fall with right hand.  Pain along pinky down to wrist.  Limits use.  You've -- you've reviewed that record.  And if we can get it to come up, we can review it together, correct?

A.    That's correct.

Q.    And you understand that Mr. Cronfel saw Dr. Walters following that fall, correct?

A.    That's correct.

Q.    All right.  And Dr. Walters, he was a well-reputed hand surgeon in the local community before his untimely death, correct?

A.    Yes, he was.

Q. And you -- he was a respected surgeon?

A. Yes.

Q. All right. And you understood that Dr. Walters, following this fall and the history that Mr. Cronfel gave, had Mr. Cronfel undergo a CT scan of his wrist, did he not?

A. That's correct.

Q. And that CT scan, which I finally have been able to bring up on the screen -- well, let's just go through it together and we can -- well, here we go, maybe. All right. You talked about this a little bit with Mr. Cagle. That CT scan in November, it was taken November 16th of 2005, showed this widening, mild, but albeit widening, at the scapholunate articulation, correct?

A. That's correct.

Q. And that is the same widening that you had discussed that eventually -- or you had offered the opinion will lead to surgery in 2014-2015, correct?

A. That's correct.

Q. And Dr. Walters, or this -- this CT scan also referenced a concern with a ligamentous -- is that how you say that?

A. That's correct.

Q. Ligamentous injury, meaning an injury to the

ligament, but it doesn't show up -- that's the kind of thing that doesn't show up on a CT scan, right?

A. That's correct.

Q. So he referred Mr. Cronfel for an MRI, true?

A. That's true.

Q. So Mr. Cronfel -- and, of course, you have not had the benefit of the actual review of that CT scan of November 16th, true?

A. That's true.

Q. You haven't seen the film?

A. I've seen the reports.

Q. Right. And, likewise, you haven't seen the MRI that was taken on December the 20th. Here it is. December 20th, the -- the MRI that Dr. Walters wanted Mr. Cronfel to undergo, he did, in fact, have that MRI of his right wrist, correct?

A. That's correct.

Q. And that MRI revealed this disruption, which is another word for tear, correct?

A. That's correct.

Q. The MRI taken three-and-a-half years before the fall in July '09 showed that Mr. Cronfel already had a tear at this scapholunate ligament, true?

A. That's correct, yes.

Q. It doesn't say mild and it doesn't say the

location. It simply says disruption, correct?

A. That's correct.

Q. And, again, this particular tear is the topic or the subject that's going to lead to this four-corner fusion that you want to perform?

A. That's correct.

Q. All right. And this tear is evidenced as far back as 2005, December of that year, correct?

A. Yes.

Q. All right. 2005 Mr. Cronfel already has a tear in this part of his wrist, as evidenced by this MRI, correct?

A. That's correct.

Q. And, of course, you have not had the benefit of that MRI to understand the extent, the nature, the -- the significance of that tear. We just simply know that it was a tear, right?

A. That's correct.

Q. Okay. And now that I finally got this working, just so that we're clear, the initial record shows that Mr. Cronfel fell off bicycle. Tried to break fall with right hand. Pain along pinky down to the wrist. Limits use. Do you see that?

A. I do.

Q. And that's what led to the CT scan and the

MRI, which revealed the tear in his wrist, true?

A. True.

Q. And the tear that was evidenced in 2005 and the tear that was evidenced following 2009, as we sit here today in the end of 2014, five years after this fall and nine years after the other fall, this tear still has not been addressed by Mr. Cronfel, true, in a surgical way?

A. In a surgical way; that's correct.

Q. And, of course, following the July 23rd, 2009 fall, Mr. Cronfel treats with Carey Windler, Dr. Carey Windler, does he not?

A. That's correct.

Q. And within three months of treating with Dr. Windler, Mr. Cronfel appears there on October 21st of 2009, and it says he's got pain with activities of lifting and push-ups. Do you see that?

A. I do.

Q. So within three months of the fall in Travis Country that Mr. Cronfel had, he has resumed his push-ups and weight lifting, true, with pain?

A. True.

Q. And at that time, within three months of this accident, he has full motion of the wrist and no tenderness over the distal radial or ulnar joint at

that time, true --

A.    That's true.

Q.    -- according to Dr. Windler's records?

A.    But that's different from the scapholunate ligament.

Q.    Okay.  But full range of motion, in any event, and no tenderness in those areas?

A.    Yes.

Q.    True.

A.    Yes.

Q.    All right.  And he appears a year later in 2010, now almost a year removed from this event in Travis Country.  And at that time, he's still having pain, but he's reporting that he's still doing his bench press, his pull-ups, and his push-ups, is he not?

A.    He is.

Q.    So, again, a year after this accident, Mr. Cronfel is still engaging in his weight lifting activities despite whatever's going on in his wrist, true?

A.    That's correct.

Q.    And then the June -- he gets a -- an X-ray on July 21st, 2010.  And just so there's no question, at that time, a year after this accident, there's no change in the wrist X-ray compared to the prior wrist

X-ray, the date after this accident, true?

A.    That's correct.

Q.    So within a year of this accident, his wrist is unchanged, true?

A.    True.

Q.    According to the X-ray.  And then he begins to treat with you on -- on August 11th of 2011 and continues to treat with you through -- into -- well, to this date.  But, in particular, he treats with you on February the 2nd of 2012, does he not?

A.    He does.

Q.    And at that time, again, he is very physically active with a constant exercise regime, true?

A.    That's true.

Q.    And that's despite whatever is going on with Mr. Cronfel's right wrist.  And he sees your physical therapist a couple of weeks later, does he not?

A.    Well, that note that you just showed was from my physical therapist.

Q.    Okay.  Well, this is also your physical therapist as well.  And at that time Mr. Cronfel, I guess the -- it seems to me, my interpretation is the therapist is getting onto him that he's not icing, but he -- but he hurts after his exercise, this joint -- this joint pain hand hurts after exercise, and he's not

icing it.

A.    That's correct.

Q.    That's what's reflected in this record?

A.    Uh-huh.

Q.    And the therapist tells him he needs to stretch, pre-strengthening at the gym, and he needs to use ice post-exercise and he's not doing it.

A.    That's correct.

Q.    Is that what's reflected in this record?  And then he returns to either you or your physical therapist in March of 2012, and, again, he's complaining that during a workout he torqued his right wrist forcing his shoulder into hyperextension, and I don't know if ER means emergency room or not.  But in any event, he torqued his right wrist while lifting, sometime immediately before Feb- -- pardon me, March 20th of 2012, true?

A.    True.

Q.    And, you know, with weight lifting, I mean, that's certainly something that's foreseeable.  You can torque your wrist while lifting weights?

A.    True.

Q.    You can torque your wrist while lifting kettle bells, in particular, true?

A.    True.

Q. And that's what appears to have happened with Mr. Cronfel in March two years ago, true, according to this record, he torqued his right wrist?

A. Yes.

Q. And then he returns to your office, among other times, but he returns on August the 14th of 2012. And at that time, he reports an event where his brakes locked up and he went over the handlebars, sometime before that, correct?

A. Correct.

Q. And for that event, you performed surgery within two weeks, did you not?

A. No.

Q. You -- you didn't perform surgery to the left wrist within two weeks of that event?

A. Sorry. On the left side, yes, I did.

Q. Okay. And -- and doesn't that stand in contrast to your testimony today that we let -- we ride these things out and let them go and see if they're going to lead to surgery?

A. No, it does not.

Q. Okay. And then he returns following that event, that within two weeks of the surgery that you performed -- well, pardon me. Wrong record. Within two weeks, Mr. Cronfel wants to get in the lake with

his cast.  Do you see that?

A.    I do.

Q.    And you recommended against it?

A.    I did.  I did.

Q.    And then by November of that same year, Mr. Cronfel was physically able to deer hunt and load his supplies.  He had some pain with weekend activities, but recovered, true?

A.    True.

Q.    And then -- of course, Mr. Cagle has shown you this record, he returns to you again, and you caution him as to the amount of exercise -- with regard to weight -- you were cautioned -- or Mr. Cronfel is cautioned with respect to the amount of weight, amount of exercise with regard to weight and repetition, correct?

A.    That's my therapist, yes.

Q.    Yeah.  Your therapist is concerned that he's overdoing it with the weight -- both repetition and amount of weight that he's lifting, true?

A.    True.

Q.    And then he returns again this past year in 2013, and he's injured himself again or is complaining of pain again.  Patient worked out with kettles and aggravated his musculature, correct?

A.   Yes.

Q.   Now, a kettle bell, can -- can you -- well, Your Honor, may we approach?

THE COURT:   Yes.

*(Bench conference off the record.)*

Q.   (BY MR. PAYNE)   Doctor, just so we're clear, in case there's any question what a kettle bell is, this is a kettle bell, right?

A.   It is.

Q.   Have you ever worked out with kettle bells?

A.   I have.

Q.   You have?  Okay.  Well, you know some of the -- the exercises that you do with a kettle.  I mean, it -- it puts some significant torque on the wrist, does it not?

A.   It can.

Q.   Okay.  And, of course, Mr. Cronfel is working out with kettles two-and-a-half years post-accident, so much so that he's aggravated his musculature, true?

A.   True.

Q.   Now, Mr. Cronfel, again, returns to your office on March 5th of 2013, this past year, and he's talking about his right hand still hurts, but the left is better.  Do you see that?

A.   I do.

Q.   And then he returns again two weeks later, and he's still complaining of this right hand pain.  But here's what is interesting here:  On your medical record, on March 29th, 2013, it contains a reference to HPI.  And what does HPI stand for on your medical records?

A.   History of present illness.

Q.   All right.  And so this was with respect to Mr. Cronfel's right wrist.  His history of present illness is what?

A.   I'm sorry?

Q.   What's his history of present illness?

A.   Bicycle riding August 5th, 2012.

Q.   Okay.  And just so we're clear, according to your medical record from your office, Mr. Cronfel is complaining of right wrist pain, and the history provided for his right wrist pain last year, was a bicycle accident on August the 5th of -- bicycle riding on August the 5th of 2012, true?

A.   That's what it says.

Q.   And then he returns again on August -- pardon me, May 28th, and he had an event at the Westlake -- or it took him to the Westlake Hospital.  He comes to your office, and he's talking about, he woke up on May 25th with swelling and pain in his right wrist.  And, again,

what is the history of his present illness?

A. August 5th, 2012.

Q. All right. So, again, Mr. Cronfel woke up and, in fact -- let me just show you the record. He goes to Westlake Hospital emergency room complaining of right wrist pain, and it's talking about, had soft tissue mobilization. I can't make out a lot of this. But having painful swelling at right wrist, which -- so painful that it took him to the ER at Westlake, correct?

A. Correct.

Q. And he follows up with your office again the next day, after having to go to the emergency room and the history of present illness. What took him to the emergency room was whatever happened bicycle riding on August 5th of 2012, true?

A. That's what the record says.

Q. And that's what three other records before that say, do they not?

A. They do.

Q. As do subsequent records where he's, again, complaining of right wrist pain, and your therapist reports, Patient doesn't wear his splint very often because it gets in the way. Do you see that?

A. I do.

Q. And so he's there treating, still for his right wrist with a history of present illness of August the 5th of 2012, true?

A. True.

Q. And not to beat a dead horse, but this occurs again on -- on December 31st, he's at your office complaining, same history. He's there again in March of this year, same history. He's there in July of this year, same history. He's there in August, same history. And then you perform the surgery to the right wrist, this one you've described to this jury. And what does the narrative say? This is -- this is a couple of months ago, September 11th, 2014. At that time, this is the -- this is the history that you give in the narrative, correct?

A. Correct.

Q. What does it say? This is a 56-year-old male who is riding his bike and was hit by a car on August the 5th of 2012 and sustained a radial head fracture with some slight shortening after this heal. The -- the report that you submitted, or the narrative report that you created in connection with your surgery done a couple of months ago, references a whole new third accident involving a car in 2012, does it not?

A. That was a mistake on my part.

Q.    And so your records cannot be relied upon?

A.    Well, just to explain what happens with my records in my office is, Mr. Ochoa had a surgery on his left wrist.  And when we do that, our electronic medical records, we start a whole new thing with the history and all that stuff.  So after that surgery was kind of healed up, then he came back again.

Whoever my medical assistant or whoever was in the room, did not pull the stuff from the original note and just started kind of fresh where we were at the time.  So that's why the date from 2009 was not in there.

Q.    Well, but what we do know is that -- I lost count, but roughly 10 to 12 of your records from your office references something occurring with Mr. Cronfel's right wrist in August of 2012 --

A.    Uh-huh.

Q.    -- true?

A.    I believe it was an exacerbation of his injury.

Q.    Okay.  So you think he actually -- he went over the handlebars again in 2012, and he exacerbated himself again?

A.    It was his left wrist.

Q.    Okay.  That is -- granted this is a -- I mean,

I get what you're saying about the HPI, but this is a pretty specific narrative that you provided in Arise, is it not, Hit by a car on August 5th. That's not in any part of the medical records?

A. Well, it's obviously wrong. It's incorrect.

Q. All right. But you concede it's pretty specific?

A. It is.

Q. Okay. All right. Now, as to the chronology, you agree Mr. Cronfel did not -- in fact, I think I can sit down for this.

Mr. Cronfel did not -- was not seen by paramedics at the scene of this July event, correct?

A. I don't recall.

Q. You don't know?

A. I don't recall.

Q. Okay. I'll -- I'll represent to you he was not seen by paramedics at the scene. He didn't -- do you understand whether he went to the emergency room?

A. I don't.

Q. The first doctor he went to was his general practitioner, right?

A. Yeah.

Q. Dr. Keinarth?

A. Yeah.

Q. And then he saw Dr. Windler, who saw him twice in August, once in September, and once in October of '09. You're familiar with those records, correct?

A. Correct.

Q. And we already talked about the October '09. At the end of October, he's got full range of motion in his wrist, true?

A. Correct.

Q. And -- and, essentially, at that time he had a normal exam, did he not?

A. I believe so.

Q. Yeah. So -- just so we're clear, on August 21st of 2009, Dr. -- according to Dr. Windler's records, Mr. Cronfel's wrist exam was normal.

A. I believe so.

Q. And it was not -- as -- as best I recall, he was not treated again for the right wrist until June of 2010, some eight months later, where he had an injection in his wrist, correct?

A. Okay.

Q. Do you have any reason to disagree with that?

A. No.

Q. And -- and I'm really just taking this from your deposition.

A. Yes.

Q.  Okay.  So there's was an eight-month -- he had this normal wrist exam, and then no treatment for eight months, and then Dr. Vagner does an injection at the wrist some eight months later, true?

A.  True.

Q.  Do you disagree with that?

A.  No.

Q.  And then no more wrist treatment for another nine months until March of 2011.  Do you agree with that?

A.  Yes.

Q.  And then another five months passed with no treatment until you see him in August of 2011, fair enough?

A.  Yes.

Q.  Now --

MR. PAYNE:  May we approach again?

THE COURT:  Yes.

*(Bench conference off the record.)*

Q.  (BY MR. PAYNE)  Maybe this has been beaten to death, but -- but you agree -- certainly your own physical therapist records, all of Mr. Cronfel's other records, reflect that he has an extremely active life-style?

A.  That's correct.

Q.    And that's been true at all times following this July 2009 event, correct, or it's been that way for five years?

A.    Sure.

Q.    And someone who remains so active and copes with any pain associated with such an -- such activity, is not someone you would recommend performing a wrist fusion for, correct?

A.    I usually tell people that -- you know, in this case -- in this -- cases are different.  You know, whether this is an acute injury or whether it's a chronic injury, you know, his -- his left wrist was an acute injury, we treated it one way.  And his right wrist was a chronic injury, we treated it a different way.

Where it gets to the point where the ligament is torn and he's probably going to develop arthritis in that wrist, and just kind of tell him to go ahead and use it until it hurts you and until you're sick of the pain.  Because if it's not bothering you, I can't make that any better with surgery.  So go ahead and use it, do whatever you want to do.  And then when you're sick of it, come back, and we'll fix it.

Q.    At least what you told me before under oath was that you don't recommend fusion surgery to people

who are so active?

A.    I mean, you're taking a snippet out of -- out of a bigger, probably, sentence.  I don't mean that that's a hard and fast rule.

MR. PAYNE:  May I approach the witness?

THE COURT:  Uh-huh.

Q.    (BY MR. PAYNE)  Reading from Page 82, starting on Line 2, Dr. Lown, I asked you under oath, and it's -- so if someone continues to be active and only complains of intermittent pain, is that someone you would recommend doing a wrist fusion on?  And how do you respond?

A.    Intermittent pain I would not recommend a fusion for.

Q.    Okay.  And you agree there's no urgency to perform such a fusion?

A.    Agree.

Q.    Now, we don't know -- again, we don't know the extent that Mr. Cronfel's scapholunate ligament was torn in 2005.  We just know a report that -- that it was, in fact, torn to some degree, right?

A.    Correct.

Q.    And that necessarily means that the tear had to heal at some point or the disruption healed at some point, right?

A. That's correct.

Q. And now --

A. Well, it wasn't significant enough to cause arthritis.

Q. That's not my question, though. It -- it healed at some point. And healing leads to scar tissue, right?

A. It can.

Q. And scar tissue weakens the ligament, right?

A. It can.

Q. Okay. And I'm thinking in terms -- everything's got to be a football analogy, but I -- I was thinking about Robert Griffin, Jr. He -- he tears his -- he tears his ligament in his leg, it repairs, and then it pops like that because it's weak now, right?

A. Uh-huh.

Q. Is that -- is that a yes?

A. Yes.

Q. Okay. And so you could foresee a same scenario with respect to a ligament in the wrist. You -- you tear it once, you're going to tear it again?

A. Possible.

Q. All right. And, of course, minor point, but you've offered an estimate that the surgery center for

the second surgery is going to be $8,000, correct, roughly?

A.    Okay.

Q.    But would it surprise you that the -- the surgery center for the past procedure was less than $3,000?

A.    I don't know.  I don't know the numbers. Whatever my office manager gave you is probably the best estimate.

Q.    So you don't really know what the surgery center charges?

A.    The -- the surgery center is separate from me.

Q.    Okay.  Well, you've offered an opinion under oath to this jury as to what the reasonable estimate is of the -- of the surgery center fee.  But what I'm hearing you say is, you don't really know what they charge?

A.    My office manager pulled those numbers together for you.  I --

Q.    Okay.  So would it be a fair statement, that doesn't really fall under your personal knowledge and personal expertise?

A.    That's correct.

Q.    Okay.  You simply asked your office manager to come up with an estimate.  She gave you a number, and

that's what you testified to the jury?

A.   That's correct.

Q.   Okay.  And so that -- so we would have to talk to your office manager or really to the surgery center?

A.   You should probably talk to the surgery center and see what they charge.

Q.   Okay.  So does that mean that the jury really can't rely on the $8,000 figure because we haven't talked to the surgery center?

A.   I don't think so.  I think that I just don't know that number off the top of my head.

Q.   Okay.  So as far as your testimony goes, you can't personally offer testimony to this jury as to what the surgery center's going to charge Mr. Cronfel for some surgery that may occur in the future?

A.   Well, I can tell you that I didn't -- I wasn't over my office manager's back while she was, you know, doing the calculations, but she does this all the time.

MR. PAYNE:  Dr. Lown, thank you for your time.  I pass the witness.

MR. CAGLE:  Your Honor, may I approach?

THE COURT:  Yes.

## REDIRECT EXAMINATION

BY MR. CAGLE:

Q.   Doctor, hi.  I -- you just answered a lot of

questions about stuff that happened in August of 2012 and all throughout the year 2012. Do you recall that line of questioning?

A. Yes, I do.

Q. Well, I want to look through your notes. In looking at the very first page of your records when you -- when you very first saw Mr. Cronfel on August 11th, 2011 -- I mean, I went to A&M, but that's a whole year before August 2012, right?

A. That's correct.

Q. And can you tell me, under Plan, from August 11th, 2011, did you have an opinion at that time after putting your hands on Mr. Cronfel and examining his medical records, his chart notes, and doing your physical examination, what medical procedures on August 11th, 2011, did you think were appropriate for Mr. Cronfel?

A. We discussed the ulnar shortening and the four-corner fusion.

Q. So wait -- so -- oh, so you did discuss the four-corner wrist fusion in August 2011?

A. Yes, we did.

Q. And that was well before any of these notes that you just got all these questions about in August 2012?

A.    That's correct.

Q.    Do you have an opinion, Doctor, as to whether or not Guillermo was a surgical candidate for the wrist fusion surgery in August 2011, regardless what happened after that?

A.    Yes.  At that time he was.

Q.    And I mentioned earlier today that, you know, Mr. Cronfel could have been a participant in the world's strongest man competition even, but it wouldn't have mattered if it was after August 2011, would it, to you?

A.    The damage was already done.

Q.    And the damage was already done, and the surgery was already going to have to be had.  Is that true?

A.    Yes.

Q.    When we talk about the estimate for the surgery center, is that Arise Surgery Center?

A.    I believe so.

Q.    And that's the one that's right there by your office?

A.    That's correct.

Q.    When you talk about what the estimates of those billings are, you get them from your staff that routinely engages in that type of business, right?

A.    That's correct.

Q.    But isn't it true that when you get that estimate, that you rely on your experience in scheduling those procedures and getting paid, you know, for performing those procedures and how much the surgery costs?  You're familiar with those procedures, aren't you?

A.    I'm familiar with my part, my portion of it --

Q.    Right.

A.    -- the surgeon fee.

Q.    But even with the surgery center, you're familiar with their pricing schedule.  You may not know it like the back of your hand.  You can answer questions intelligently about it for patients, can't you?

A.    Usually, yes.

Q.    And that's just part of your life as being a hand surgeon that uses that facility, right?

A.    Right.

Q.    In terms of the other costs that we've asked you for, just to give us an estimate for what this wrist fusion will cost into the future.  You said it was just over $14,000.  Are you very comfortable with the reliability of that figure for how much that wrist fusion will cost?

A.    I am.

Q.    Is that a number that the jury can rely on and say, Dr. Lown really believes that 14,000 -- so the folks on the jury can say to themselves, when Dr. Lown says that $14,690 is about right for everyone, the anesthesiologist, the surgery center, the surgeon to come in and do the surgery, that's a reliable number for them?

A.    I believe so.

Q.    And that's based on your experience in dealing with these numbers?

A.    It's based on my knowledge of my office staff and them preparing the information.

Q.    Great.  On -- on August 5th, 2012, did Mr. Cronfel injure his left wrist?

A.    Yes.

Q.    Okay.  And there was no confusion -- there's a lot of talk about that date, that date, that date. Does that date correspond to his left wrist injury?

A.    That's correct.

Q.    I just want to make clear.  And after answering Mr. Payne's questions, have your opinions changed at all as Mr. Cronfel's treating physician that, other than this July 23rd, 2009 injury, would Mr. Cronfel need this ulnar shortening surgery or would

he need the wrist fusion?

A. No, he would not.

Q. And that's based on your skills, experience, training, and reasonable medical probability?

A. That's correct.

MR. CAGLE: Thank you very much, Dr. Lown. I'll pass the witness.

THE COURT: Anything further?

MR. PAYNE: Briefly.

### RECROSS-EXAMINATION

BY MR. PAYNE

Q. Dr. Lown, in your deposition you gave an estimate for the surgery that you did in September, right? Do you remember doing so?

A. I don't remember specifically.

Q. Well, I'll represent to you that you did. And I'll represent to you further that it was wrong and it was high. Does that surprise you?

A. Yes.

Q. Okay. Well, likewise, you've now offered an estimate as to this --

MR. MORIN: Your Honor, can we approach?

THE COURT: Yes.

*(Bench conference off the record.)*

Q. (BY MR. PAYNE) Dr. Lown, you're relying on

what your office staff tells you to some degree about these estimates?

A.    That's correct.

Q.    And not your personal expertise?

A.    True.

MR. PAYNE:  Nothing further.  Thank you, Dr. Lown.

THE COURT:  Anything?

MR. CAGLE:  Nothing further.

THE COURT:  Okay.  Thank you, Dr. Lown. You may step down, and you're excused as a witness. It's a natural breaking point.  Even though we're a little earlier than noon, I'm going to go ahead and we'll take our lunch break.

What that means is, when we come back at 1:15, we'll have a little bit longer of an afternoon, so just make sure you come back well fed and ready to go until five o'clock.  But at this time, it's 11:45. I'll see you all at 1:15.

(*Lunch recess was taken.)*

THE COURT:  Plaintiff, you may call your next witness.

MR. CAGLE:  Thank you, Your Honor.  We call the plaintiff, Guillermo Ochoa-Cronfel.

THE COURT:  Mr. Ochoa-Cronfel, please

**PATRICK MURRAY,**

having been first duly sworn, testified as follows:

## DIRECT EXAMINATION

BY MR. MORIN:

Q. Would you please state your full name for the record?

A. Patrick Charles Murray.

Q. Mr. Murray, my name is Paul Morin, and I'm assisting Mr. Cagle in representing Mr. Cronfel. We've never met before; is that correct?

A. That's correct.

Q. You've met Mr. Cagle when he took your deposition; is that correct?

A. That's correct.

Q. And you remember taking your deposition?

A. Yes.

Q. And you recall -- have you read that recently?

A. Yes, on Sunday.

Q. Okay. And you live here in Austin?

A. Yes. I live at 4600 Canyonwood Drive.

Q. That's the same residence you lived back in July 23rd of 2009?

A. That's correct.

Q. All right. And you're employed here in Austin?

A.  Yes.

Q.  And what type of work do you do?

A.  I'm in insurance.

Q.  Okay.  Now, you obtained your dog from the rescue center; is that correct?

A.  From the GSP Rescue, yes, sir.

Q.  Okay.  And what type of dog is he?

A.  A German short-hair pointer.

Q.  Okay.  How much does he weigh?

A.  Approximately 55 pounds.

Q.  Did he weigh approximately 55 pounds back in July 23rd, 2009?

A.  Yes, sir.

Q.  And how high does he stand?

A.  Two feet I guess at the shoulders.

Q.  All right.  So you didn't raise the dog from a baby?

A.  That's correct.

Q.  And you got him when he was about three years old?

A.  That's what we believe, yes.

Q.  All right.  And -- so he was full grown when you got him?

A.  Yes.

Q.  All right.  And so you didn't know his

background or history; is that right?

A. No. Just that he came from a -- like I said, a hunting-type lodge or camp. He was a failed hunting dog.

Q. A failed?

A. Failed. Apparently, he was afraid of noises or he didn't retrieve. I -- I don't know. He was a failed hunting dog. They were going to put him down, so we rescued him.

Q. Okay. Did he already have his name Magnum or --

A. Yes.

Q. -- you named him?

A. That was the name that he already had.

Q. That was the name that he was given?

A. Yes, sir.

Q. Okay. So he was kind of a wild dog when you got him?

A. I don't believe so, no.

Q. Well, aren't you telling us that he was untrainable as a bird dog so...

A. He was apparently afraid of noises.

Q. Okay.

A. I don't know -- he was not a wild dog. He was a pretty well trained dog when we got him and we did

additional training.

Q. Okay. So -- but afterwards, he needed additional training to keep him under control?

A. No.

Q. No?

A. To build a trust between the owner and the pet.

Q. So you went with him or you sent him off to be trained?

A. No. This fellow would come to our house.

Q. Okay. Now, did you understand why he was named Magnum? I mean, is that because he's fast?

A. I have no idea, other than maybe Magnum shotgun shell. That's all I can think of. I have no idea.

Q. Magnum is named after like a bullet, like 44 Magnum that Clint Eastwood uses in the Dirty Harry movies?

A. I have no idea.

Q. Okay. On the evening of July 23rd, 2009, you -- you took Magnum out for a walk in your neighborhood; is that right?

A. That's correct.

Q. And you had walked, what, approximately a mile from -- from your house to the location where this

incident occurred?

A. That's correct.

Q. All right. Now -- now, we have a photograph that I believe you've seen before of -- it's Plaintiff's Exhibit No. 1. Do you see that photograph?

A. Yes, sir.

Q. And you saw that photograph and we talked about that -- or you talked about that with Mr. Cagle at your deposition; is that right?

A. Yes, sir.

Q. Were you -- I notice there's only a sidewalk on the right-hand side of the street --

A. That's correct.

Q. -- right? You were walking your dog down that sidewalk; is that right?

A. I would be coming toward the vehicle, toward the camera view.

Q. Okay. So you're coming against that car on the sidewalk?

A. Correct.

Q. All right. And -- now, you say that you had the dog on a leash; is that right?

A. That's correct.

Q. And you say that you were -- this is a rock right here; is that right?

A.   That gray object is a big, big rock, yes, sir.

Q.   Okay.  And then off to the right here, I can't tell what that is.  Can you -- do you recall what that is there, in those people's yard?

A.   When you say to the right, I mean, I see like a -- a sprinkler.  It holds a hose, one of those hose -- if that's what you're --

Q.   Oh, it looks like a chair and a -- and a sprinkler hose holder.  Is that what it is?

A.   Yeah.

Q.   Okay.  And a chair, right?

A.   Correct.

Q.   And you don't know these people, correct?

A.   I do not, no, sir.

Q.   All right.  So you told us that you were on the other side of this big rock, right?

A.   That's correct.

Q.   That your dog had done its business?

A.   That's correct.

Q.   And that you were attempting to pick up the waste; is that right?

A.   Yes, sir.

Q.   And what do you -- how do you think from the other side of that rock where you were standing picking up the waste, how far is it over here all the way over

to the sidewalk?

A.   I'd say 20 feet maybe.

Q.   I'd say -- how big is that rock, about a 10-foot rock there, isn't it?

A.   No.  It's not that big, no.

Q.   From end to end?

A.   I would say it's about five to six feet.

Q.   Okay.  So what do you think, 15, 20 feet between where you're standing and the side -- the edge of the sidewalk?

A.   Well, I wasn't standing, but, yes, sir, from where I was located.

Q.   What was that?

A.   From where I was located, yes.

Q.   Yes.  Where you were standing on the other side of the rock?

A.   I wasn't standing.

Q.   You weren't standing?

A.   No.

Q.   What were you doing?

A.   I was kneeling down to pick up his waste.

Q.   Okay.  Now, if you're -- how far do you say you are from the front door of these people's home?

A.   Maybe 30 feet.  I don't know.  I've never measured it.

Q.   All right.  So, Mr. Murray, are you saying you walked your dog coming up this sidewalk, correct?

A.   Yes.

Q.   You walked your dog.  You have him on a leash, and you literally pass by 10 -- 10 trees to walk in these neighbors' yard, that you don't know, so that your dog can do its business?

A.   That's kind of how dogs work, yes, sir.

Q.   That's kind of how dogs work?

A.   They go where they feel comfortable.

Q.   And are you kind the person that goes around and let your dogs defecate in somebody else's yard?

A.   That's why I was picking it up, yes, sir.

Q.   I mean, if the dog's got to do its business, you really -- and you're controlling him with a leash, you really only got to walk a couple of feet for him to -- to take care of business, don't you?

A.   Apparently, he wasn't comfortable doing his business that close to the sidewalk.  I'm -- I'm sorry.

Q.   Well, is it more likely he was off the leash way over in that person's yard up close to the front door doing his business?

A.   No, sir.

Q.   You walked him right over there.

A.   I didn't walk him.  I -- he led me --

Q. Did he pull you?

A. He did not pull me. They -- they sniff. And when they find a place that they're comfortable with, that's where they go.

Q. Well, I've got a dog, and my dog walks me. It's smaller than your dog, but he literally -- he pulls me on the leash. Literally some people say, Well, your dog's out walking you. Is that the same kind of way you are with Magnum?

A. No, sir.

MR. PAYNE: Objection; side bar.

THE COURT: Sustained. Hold on. I'll sustain side bar objection. Rephrase your question.

Q. (BY MR. MORIN) But does your dog walk you, or you walk the dog? You have control of him?

A. I walk the dog.

Q. Okay. He's not pulling on you?

A. No, sir.

Q. Well, I mean, don't you have enough control over your dog that you can keep him next to the sidewalk rather than walking some 15 or 20 feet into a -- a neighbor's yard?

A. I guess if I wanted to, yeah, but I don't see any problem with him walking into the neighbor's yard.

Q. You don't see a problem with your trespassing

on somebody's land and -- and you're letting your dog take care of business on their -- on their front lawn?

A. I've never had a complaint. I'm sorry.

Q. Okay. So it's your testimony that you didn't see Mr. Cronfel biking down the street?

A. Not at all, no, sir.

Q. And he's going -- headed towards the direction that the car is parked, correct?

A. That's correct, yes, sir.

Q. All right. And you agree that it was about 6:30 in the afternoon?

A. It was sometime 6:30 -- between 6:30 and 7:30. I don't know exactly.

Q. Okay. And you agree it was a weekday?

A. Yes, sir.

Q. Okay. So people are off work, and -- and there's typically more cars when people are off work?

A. Typically more cars? I don't...

Q. People -- there's more cars parked because they're off work, they're home. Do you know what time this photograph was taken?

A. I believe that was taken in the morning on a weekend.

Q. Okay. You took it?

A. Yes, sir.

Q.   Okay.  Do you recall there being more cars parked where the white car is parked?

A.   No, sir.

Q.   Okay.  All right.  You don't recall either way?

A.   That's generally how it was every time I walked by there.  That white car was parked right there.

Q.   Yeah.  But I'm asking you on July 23rd, around 6:30 in 2009, were there more than one car parked there?

A.   I don't believe there was.

Q.   Okay.  All right.  So you can't -- you're facing whatever direction you're facing, and you didn't see Mr. Cronfel bicycling in -- in that direction, down the direction that the car's parked?

A.   That's correct.

Q.   All right.  But you've bent down -- I'm sorry.  Let's back up.  You're holding the leash while your dog is taking care of business; is that right?

A.   I'm holding the leash.  And when I'm picking up his waste is when I drop it, and step on it, and kneel down and pick up the -- his waste.

Q.   Okay.  And so you drop the leash, you drop control of the leash; is that right?

A. I put it under my foot.

Q. Okay. So does the leash have a loop at the end of it?

A. Yes, it does.

Q. And do you keep it around your wrist?

A. I do not.

Q. You do not. You just hold -- you don't put your hand into the loop?

A. No.

Q. When you're walking?

A. That could be dangerous if a dog were to -- you could injure yourself.

Q. Take off running on you? Has that happened before?

A. To me, no.

Q. Okay. So you don't put your hand into the loop, right?

A. That's how we were trained, yes.

Q. All right. So you -- you let go of the leash to lay it down on the grass, right?

A. That's correct.

Q. And that looks like some pretty lush St. Augustine grass there, correct?

A. Yes.

Q. And -- so you let go of the leash, and you

step on it?

A. Correct.

Q. And that's your attempt to control the dog, correct?

A. That's correct.

Q. But when you let go of the leash, you let control of the dog, correct?

A. I don't believe so.

Q. All right. Well, you're putting the leash down on the soft grass, the St. Augustine grass, correct?

A. That's correct.

Q. So you're not going to have your foot pressing weight on a hard surface that's going to make it hard to pull that leash out, are you?

A. I guess that's true.

Q. Right. You've got a soft surface, so it can easily pull out of there because you've got several inches of sod, correct?

A. I weigh 200 pounds. I don't know how far the leash is being compressed into -- into the earth, but...

Q. But not against a hard surface?

A. That is correct.

Q. So the next thing you know your dog barks and

takes off; is that right?

A.   I don't know if he barked or not.

Q.   You don't know if he barked?  Didn't you say in your deposition that he barked and then he took off?

A.   I don't know.

Q.   Did you -- did you see your dog take off?

A.   I did not.

Q.   All right.  And since you read your deposition on Sunday, the question was asked of you, But you didn't see him take off?  You answered, No, I mean, I just heard him take off.  I mean that -- that's kind of a bark and takeoff type -- type -- type of action.  Do you recall that?

A.   If that's what it says right there, then I -- I don't disagree.

Q.   All right.  Did -- did you know what the dog was barking at?

A.   No, sir.

Q.   Did you see what the dog was barking at?

A.   No, sir.

Q.   When he immediately takes off, what action do you do to try and stop him?

A.   I didn't -- I didn't do anything.  I mean, when I turned around is when the accident occurred.

Q.   Okay.  Did you attempt to call him to stop

him?

A.   No, sir.

Q.   Do you have that kind of control over Magnum that you can -- you can make a command, and he stops?

A.   No, I don't believe I do.  He'll come, but stop?  I -- I don't know.

Q.   All right.  And then the next thing you hear is barking and screaming; is that right?

A.   I don't know that I heard screaming.  I think Mr. Cronfel made a noise, but I don't know if it was screaming.

Q.   Okay.  Let's -- you recall your deposition that you gave on October 29, 2013, correct?

A.   Yes.

Q.   All right.  Let me point you to Page 14, Line 20.  The question is, What's the first thing you saw with regards to the bicyclist?  Your answer?  Could you read that, sir?

A.   "I think I heard the dog barking and some screaming or, you know, ouch.  I don't really recall. I mean, I wish I did."

Q.   Okay.  When you first saw Mr. Cronfel, where was he?

A.   He was in the middle of the street.

Q.   Okay.  Was he standing?  Was he laying on the

ground?

A.   He was laying on the street.

Q.   Okay.  And was he moaning in pain?

A.   Yes.

Q.   You heard his -- him moaning in pain?

A.   Yes.

Q.   And you saw him, correct?

A.   Yes.

Q.   And you could see that he was in extreme pain?

A.   I don't know the extreme -- the amount of pain he was in.  I could tell he was in pain, yes, sir.

Q.   You could tell he was in a lot of pain?

A.   You'll have to ask Mr. Cronfel.

Q.   What did you do next?

A.   I asked him how he was doing.

Q.   Did he respond?

A.   He said he was hurting.

Q.   Okay.  Did you attempt to lift him up?

A.   I asked him if he wanted to move.  I did not attempt to lift him, no, sir.

Q.   Okay.  And then what was the next thing you do?

A.   Then more people started gathering around, some of the neighbors.

Q.   Okay.

A.   And I was also concerned about my dog as he had taken off.  I think he was scared by the incident as well.

Q.   Okay.  And -- so you took off to chase down your dog?

A.   I went to go locate the dog, yes.

Q.   Could you see him from where you stood?

A.   I don't know.  He was maybe three houses down, four houses down.

Q.   Okay.  And were you afraid for other people?  Is that why you went after Magnum?

A.   No.  I was afraid for the dog.  I mean, he just was involved in a traumatic event himself.

Q.   Okay.

A.   So I don't know what he's going to do, if he's going to run off.  I -- I don't know.

Q.   Okay.  And, in fact, he -- he got injured from the bicycle accident, correct?

A.   He got injured, yeah.  He had a nick on his nose.

Q.   Okay.  And so is there any doubt in your mind that your dog collided with the wheel as Mr. Cronfel described?

A.   I don't know what happened.  I don't know if he hit the wheel.  I don't know if he hit the street.

I don't know what happened.  I didn't see it.

Q.    Okay.  Now, you had -- had previous instances where your dog got upset when bicyclists came by, correct?

A.    The only time is when there was a large group that would ride through the neighborhood.  There was maybe 30 or so, maybe more, and the -- and the noise involved with those guys talking and all, he would get a little upset.  That happened on Saturday mornings, when they would ride through the neighborhood on Saturday mornings.

Q.    Okay.  And he would get upset and like lunge towards them, or he'd be hard to control him on a leash?

A.    He would bark.

Q.    Okay.  But, I mean, as you're holding him on the leash?

A.    As we're -- yes, as we're holding him on the leash.

Q.    Now, you agree that after you put your foot on the leash to pick up the waste and the dog pulled away, you agree that you were no longer in control of your dog, correct?

A.    That's correct.

Q.    Now, do you have any knowledge of any facts

that Mr. Cronfel did anything wrong in this collision with your dog?

A.   I don't know what he did because I did not see him.

Q.   Okay.  So you don't have any facts to base on that --

A.   I don't know.  I did not see what he was doing.

Q.   Okay.  Prior to the collision or after the collision and until you saw him on the ground; is that right?

A.   The only time I saw him was after the collision.

Q.   Now, while you're holding your dog on a leash and it's taking care of business, can you not put the loop around your wrist and pick up the waste with one hand?

A.   That is an option, yes, sir.

Q.   Okay.  Were you trained that way?

A.   No.

Q.   No?  When was the last time you had a dog prior to having Magnum?

A.   When I was living in El Paso as a teenager, almost -- almost 40 years ago now.

Q.   40 years prior to 2009?

A.    No.  I would say 30 years prior to 2009.

Q.    Okay.  Now, do you carry the bags around yourself that you put the waste in?

A.    Yes, sir.

Q.    And have -- have you since then tried a different technique where you do -- the bag goes over your hand, and you pick it up, and then you pull the bag back?

A.    That's the only way I've ever picked up dog waste, yes, sir.

Q.    Okay.  So that's the same technique -- you put your hand in the bag, you pick up the waste, and then you pull the bag over?

A.    Correct.

Q.    And that day you could have looped that -- looped the leash around your hand and kept control of the dog by doing that technique, correct?

A.    I guess I could have, yes, sir.

Q.    And you didn't do so, correct?

A.    I did not.

Q.    Prior to doing that, did -- did you take a moment to look around if -- if there was any bikers coming -- coming through?

A.    I did not.

Q.    Did you hear Mr. Cronfel coming through?

A.   I did not.

MR. MORIN:  Pass the witness.

MR. PAYNE:  May I proceed?

THE COURT:  Yes.

**CROSS-EXAMINATION**

BY MR. PAYNE:

Q.   Mr. Murray, you alluded to, just a moment ago, that -- just briefly, by way of background, where did you grow up?

A.   I grew up in El Paso, Texas.

Q.   And where did you go to school after that?

A.   I went to college in San Antonio at St. Mary's University.

Q.   And you -- and when did you come to Austin?

A.   Moved to Austin in -- in 1994.

Q.   And when did you move into Travis Country?

A.   1996.

Q.   Are you a married man?

A.   Yes.

Q.   And your wife lives there with you with Magnum?

A.   That's correct.

Q.   And you talked about this a little bit, but how did you come to have Magnum?

A.   Well, when my wife and I met, we decided to

get a dog, and she did some research on dogs that maybe don't shed a whole lot and also aren't real, I guess, real barkers, so to speak, and so that was the breed that we decided upon.

Q.    And where did y'all get him from?

A.    From the Texas GSP Rescue.

Q.    What does GSP stand for?

A.    German short-haired pointer.

Q.    Oh, okay.  Okay.  It's a unit particular to that breed?

A.    Solely that breed, yes, sir.

Q.    I see.  All right.  Then once you got Magnum -- and you had gotten him about a year and a half before this incident occurred?

A.    Yes.  In December 2007.

Q.    All right.  And after you got him, you alluded to this again earlier, but tell us about what kind of training you -- you did with him?

A.    For Christmas in December 2007, my wife bought me -- actually us, the first round of training lessons. It was six in-home training lessons from a fellow at Gateway Dog Training, Greg Sharp.  And then probably about a year later, we had another lady come by, Tara -- I can't remember her last name, Training by Tara, who also did two in-home trainings with us.

Q.   And I -- you alluded to this earlier, but I understood this was about a establishing trust between the dog and --

A.   Correct.

Q.   -- the people?  And did you -- did you routinely walk Magnum?

A.   Every day, yes.

Q.   Okay.  And was this road -- is it Twisted Tree?

A.   Twisted Tree, yes, sir.

Q.   Was this part of y'all's regular route?

A.   It depends.  I think that was probably a little bit of a shorter walk because of the summer heat.  Generally, we would do a three-mile loop around the -- the neighborhood, but that was because there was a little more shade and all involved.  My wife was -- she's a flight attendant, so she was out of town.  So that's the route I chose to take.

Q.   Okay.  Now, the -- you've described how you took care of Magnum's waste.  He -- he -- you know, kind of hints that he wants to go over here, and he does his business, and then you put -- you kneel down, you put the leash under your foot, and you put on the glove, and you scoop it up.  Is that a fair statement?

A.   Yes.

Q.    Is that -- was that also something routine? Is that -- is that how you did it?

A.    Yes.

Q.    And before July 23rd, 2009, had you had any problems with Magnum getting out from under your foot?

A.    Never.

Q.    And I didn't -- I didn't know this, but you mentioned this in direct -- or cross-examination. Were -- did you say you were trained not to put it -- not to put the loop on your wrist?  Did I misunderstand?

A.    Correct.  Yeah.  Because it can injure the -- the owner, I mean, if the dog takes off, you want to have just -- hold it when you're walking.

Q.    And who taught you that?

A.    Greg Sharp.

Q.    Okay.  So the professional trainer who came to your home and you had the lessons with, he's the one who gave you that instruction?

A.    That's correct.

Q.    And this picture here, you took this picture on a weekend morning; is that right?

A.    That's correct.

Q.    And this was one of your routine walks, correct?

A. Yes.

Q. And is it your testimony that this is typically how this scene looked on that Twisted Tree Street?

A. Yes, sir.

Q. And to the best of your recollection, is this about how it looked when this event occurred?

A. Correct, other than the sun would have been on the other side, but, yes.

Q. And -- all right. And when you went out there, you -- you heard the commotion behind you, you turned, you go to see what has occurred. Where did you find Mr. Cronfel?

A. In the middle of the street.

Q. Was he up against that white car?

A. No, no. He was three, four feet, at least, to the left of it. He wasn't even with the car. He was a little forward of the car.

Q. He was forward of the car and out in the middle of the street?

A. Correct.

Q. And that's where -- based on what you saw immediately thereafter, that's where he came to rest?

A. That's correct.

Q. In the middle of the street?

A. Correct.

Q. Mr. Murray, did you feel like the way you handled the waste process to be safe?

A. Yes, I do.

Q. Did you feel like you had control of Magnum at the time?

A. Yes.

Q. Thank you, sir.

MR. PAYNE: Nothing further.

MR. MORIN: No more questions, Your Honor.

THE COURT: Okay. Thank you. You may step down.

All right. Plaintiff, do you have any other witnesses?

MR. MORIN: We have one final witness, Your Honor.

THE COURT: You may call your next witness.

MR. CAGLE: Shane Selberg.

THE COURT: Come on up. Please raise your right hand.

(Witness was sworn in.)

THE COURT: Thank you. Please have a seat.

CAUSE NO. D-1-GN-11-002136

| | | |
|---|---|---|
| GUILLERMO OCHOA-CRONFEL | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff | § | |
| | § | |
| vs. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| PATRICK C. MURRAY | § | |
| | § | |
| Defendant | § | 345TH JUDICIAL DISTRICT |

## PLAINTIFF'S BRIEF IN SUPPORT OF HIS ARGUMENT AGAINST DEFENDANT'S MOTION FOR SANCTIONS

TO THE HONORABLE JUDGE OF SAID COURT:

**NOW COMES** Plaintiff in the above-entitled and numbered cause, and files this brief in support of his argument against Defendant's Motion for Sanctions and in support thereof would show:

## INTRODUCTION

On October 28, 2014, this Court heard Defendant's Motion for Sanctions in the above-numbered and styled cause. During the hearing, Defense Counsel represented to the Court that Defendant has been unable to obtain medical records from Plaintiff's treating Hand Surgeon, Dr. Ira Lown due to a restricted medical authorization signed by Plaintiff. **This representation was false.** Plaintiff submits this brief, outlining the factual timeline regarding Defendant's "attempts" to retrieve Dr. Lown's records. Further investigation of this matter reveals that Defendant intentionally delayed retrieving the records until immediately after the hearing on his motion for sanctions. See the attached affidavit of Guillermo Ochoa Cronfel which contains NEW EVIDENCE of Dr. Lown's office and is incorporated herein by reference. The following timeline reveals the depth that Defendant has gone to manufacture an imagined discovery dispute

[1]

on which to base its request for "death penalty" sanctions instead of having this case decided on its merits:

### TIMELINE OF DEFENDANT'S "ATTEMPTS" TO RETRIEVE DR. LOWN'S RECORDS

| | |
|---|---|
| Sept. 18, 2014 | Hearing before Judge Meachum on Defendant's Motion to Compel discovery of Dr. Lown's Records, Judge Meachum ordered Plaintiff to execute a medical authorization for Dr. Lown's records, noting that mental health records should not be disclosed. |
| Sept. 19, 2014 | A medical authorization was signed by Plaintiff and delivered to Defense Counsel. The signed authorization contained a restriction prohibiting the disclosure of mental health records. |
| Oct. 2, 2014 | Defendant raised concerns over the restrictions in the medical authorization signed by Plaintiff. Plaintiff, in an effort to appease Defendant, signed an unrestricted medical authorization and served it on Defense Counsel. |
| Oct. 1, 2014 | Defendant's document retrieval company "LEGAL PARTNERS", prepares an 8 page letter to Dr. Lown with the restricted medical authorization, requesting the medical records. The request for medical records was not to sent Dr. Lown's office for another 12 days. |
| Oct. 7, 2014 | Plaintiff sends another copy of the unrestricted medical authorization to Defendant, and Defense Counsel Ms. Sacra admits she received it. |
| Oct. 13, 2014 | Legal Partners faxes the 8 pages to Dr. Lown, which still contains the "restricted release" even though Defendant had the "unrestricted release" admittedly by October 7th. |
| Oct. 15, 2014 | Dr. Lown's office has the documents ready for pick up based upon the "restricted release," Defendant never sent the "unrestricted release." Mr. Ochoa provided an unrestricted release directly to Dr. Lown. |
| Oct. 15, 2014 | Defendant fails to pick up the records from Dr. Lown's office despite numerous phone calls advising that the records are ready for pick up. |
| Oct. 23, 2014 | After Defendant's Motion for Sanctions is filed with the Court, Defendant finally returned the calls from Dr. Lown's office and made arrangements |

[2]

to pick up the records from Dr. Lown's office. The records had been available for pick up at this time for more than one week. **Notwithstanding these "arrangements", Defendant still failed to pick up the records, and set a hearing on his Motion for Sanctions with the Court.**

Oct. 28, 2014    Defendant has made no effort to retrieve the medical records from Dr. Lown's office. The records have been available for pick up for nearly two weeks, but **Defendant chose to attend the hearing for sanctions and represented to the Court that they have been unable to retrieve Dr. Lown's records.** This representation was blatantly false and misleading.

Oct. 28, 2014    Defendant picked up the records from Dr. Lown's office immediately at the conclusion of the hearing for Sanctions.

## CONCLUSION

Defendant never used the "unrestricted medical authorization" to attempt retrieval of the records. Defendant never attempted to pick up records from Dr. Lown's office when they were made available. Instead of picking up the records that Defense claims are so "vital" to their defense of the case, they intentionally delayed procuring the records until immediately after the hearing on their Motion for Sanctions. This is the type of gamesmanship and deception that warrants sanctions be issued *against Defendant*. Instead, Defendant has manufactured a dispute in an attempt to trick the Court into issuing sanctions against *Plaintiff.*

WHEREFORE PREMISES CONSIDERED, Plaintiff prays that the Court deny all relief requested by Defendant's motion for sanctions.

Respectfully Submitted,

Paul T. Morin, PC
503 West 14th St
Austin, TX 78701
(512) 499-8200
Fax (512) 499-8203

By: /s/ Paul T. Morin

[3]

386

Paul T. Morin
State Bar No. 14460550
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I certify that on October 30, 2014, a true and correct copy of the above and foregoing instrument was served on counsel for Defendant e-mail, to **WALTERS, BALIDO & CRAIN, L.L.P.**, BRETT H. PAYNE.


/s/ Paul T. Morin_____
Paul T. Morin

[4]

CAUSE NO. D-1-GN-11-002136

| | | |
|---|---|---|
| GUILLERMO OCHOA-CRONFEL, | § | IN THE DISTRICT COURT OF |
| *Plaintiff*, | § | |
| | § | TRAVIS COUNTY, TEXAS |
| vs. | § | |
| | § | |
| PATRICK MURRAY, | § | |
| *Defendant* | § | 345TH JUDICIAL DISTRICT |

## AFFIDAVIT OF GUILLERMO OCHOA-CRONFEL

| | |
|---|---|
| THE STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

ON THIS DAY, Guillermo Ochoa-Cronfel, Plaintiff, in the above-styled and numbered cause, personally appeared before me, the undersigned Notary Public, and after I had administered an oath to him, upon his oath, he said:

1.  "My name is Guillermo Ochoa-Cronfel, Plaintiff, in the above-styled and numbered cause. I am over twenty-one (21) years of age, of sound mind, capable of making this affidavit, and I have never been convicted of a felony, or a crime of moral turpitude. I have personal knowledge of the facts stated in this affidavit, and they are true and correct.

2.  "On September 18, 2014, the Honorable District Judge Meachum entered an Order in this cause to produce to the Defendant's counsel a signed authorization releasing Dr. Ira Lown's complete medical chart for me by September 19, 2014. When my attorneys informed me of said Order that day, they informed me that Judge Meachum had also specifically stated that mental health records were not part of what was to be produced. Certainly no one assumed that an orthopedic doctor would have mental health records.

3.  "In light of the above-referenced Order and my attorneys' description of the hearing regarding same, I executed the attached restricted Authorization directed to Dr. Lown's office, seeking only to withhold those portions of Dr. Lown's file that disclosed prescriptions I have for medications related to mental health. I signed the Authorization and I forwarded to my attorneys to produce to Defendant's counsel on September 19, 2014. *See Authorization Restricted attached hereto as Exhibit Aff-1.*

4.  "On October 2, 2014, my attorneys asked me to execute another authorization, without any restrictions of any kind, related to Dr. Lown's file on me. I executed that unrestricted Authorization directed to Dr. Lown's office, and forwarded same to my attorneys to produce to Defendant's counsel on October 2, 2014. *See Authorization Unrestricted attached hereto as Exhibit Aff-2.*

[1]

388

5. "It is my understanding that my attorneys forwarded each of the above-referenced Authorizations to Defendant's counsel on the day that I forwarded each such affidavit to my attorneys. I heard Ms. Sacra say in court that she did not get the unrestricted Authorization emailed to her on October 2, 2014, but she did receive the unrestricted Authorization emailed to her on October 7, 2014.

6. "On October 16, 2014, I went to Dr. Lown's office to have a follow-up examine and at that time discovered Dr. Lown's office had not received the unrestricted version of the Medical Authorization I previously executed and provided to Defendant's counsel. Therefore, to assist in full disclosure, I provided another unrestricted release to Dr. Lown's office the following day.

7. "On October 28, 2014, a hearing was held on Defendant's Motion related to the above-referenced discovery of my medical records. At that hearing, Defendant's counsel represented to the Court that her firm had still not received the medical records sought from Dr. Lown's office. I found this surprising given that, as described above, the unrestricted Authorizations had been executed and forwarded at least 21 days earlier.

8. "On October 29, 2014, I investigated this matter further by meeting with the administrative person in charge of medical records, at Dr. Lown's office, Ms. Sondra Cutrer. To my surprise, I discovered that the medical records responsive to the authorizations had been available as of October 15, 2014, but were not picked up until the afternoon after the hearing on Defendant's Motion.

9. "Attached are documents from Dr. Lown's office demonstrating that numerous calls were made to Legal Partners, Defendant's record retrieval company, indicating the records were ready to pick up on October 15, 2014. I understand Legal Partners returned Ms. Cutrer's call on October 23, 2014 stating the records would be picked up on that date. Notwithstanding the two unrestricted Authorizations I executed and the availability of the medical records responsive thereto some two weeks prior, Defendant simply chose not to pick up those records until the afternoon **after** the hearing held in front the Honorable District Judge Gus Strauss. *See E-mails and documents attached hereto as Exhibit Aff-3.*

10. "Of further significance, notwithstanding the fact that I provided an unrestricted Authorization to Defendant's counsel through my counsel, Defendant's counsel never used that unrestricted Authorization or forwarded it to Dr. Lown's office.

11. "It is my perception that misrepresentations were made to the Court knowing full well records were available at Dr. Lown's office as early as October 15, 2014. I did not take any action to disobey any court order and I did not take any action to delay or obstruct Defendant from getting the medical records he needed to defend this case. "

FURTHER AFFIANT SAITH NOT.

Guillermo Ochoa-Cronfel

[2]

389

SUBSCRIBED AND SWORN TO BEFORE ME on this the 30th day of October, 2014.

_____
Notary Public in and for the State of Texas



JAMES M. FLOYD
NOTARY PUBLIC
COMMISSION EXPIRES:
05-05-2018

[3]

**Paul Morin**

| | |
|---|---|
| **From:** | Paul Morin [pmorin@austin.rr.com] |
| **Sent:** | Friday, September 19, 2014 3:23 PM |
| **To:** | 'Brett Payne' |
| **Cc:** | 'Katie Sacra'; 'Chris Cagle' |
| **Subject:** | Ochoa Cronfel Release |
| **Attachments:** | 144807.PDF |

Brett and Katie: See attached medical release. Thank you.

Regards, Paul

Paul T. Morin, P.C.
Board Certified Civil Trial Law
Texas Board of Legal Specialization
503 W. 14th Street
Austin, Texas 78701
512-499-8200
512-499-8203 fax
PMorin@austin.rr.com

CONFIDENTIALITY NOTICE: The information contained in this ELECTRONIC MAIL transmission is confidential. It may also be subject to the attorney/client privilege or be privileged work product or proprietary information. This information is intended for the exclusive use of the adressee(s). If you are not the intended recipient, you are hereby notified that any use, disclosure, dissemination, distribution {other than to the intended addressee(s)}, copying or taking of any action because of this information is strictly prohibited.

IRS CIRCULAR 230 NOTICE REQUIREMENT: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. Federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding taxes or penalties under the Internal Revenue Code or promoting, marketing or recommending to another party any transaction or matter addressed herein.

P- Ex: Aff-1 1 of 2

1

**AUTHORIZATION TO DISCLOSE PROTECTED HEALTH INFORMATION (IN COMPLIANCE WITH ALL CORE ELEMENTS AND REQUIRED STATEMENTS PURSUANT TO 45 CFR § 164.508)**

Directed To:＿＿＿AUSTIN HAND GROUP / DR. IRA LOWN＿＿＿＿＿

Patient: ＿GUILLERMO OCHOA-CRONFEL＿＿＿＿ Date of Birth:＿05-14-1958＿＿＿＿

Re:＿＿＿OCHOA-CRONFEL V MURRAY＿＿＿＿＿ *(Style of case OR reason for request)*

    I hereby Authorize and request, you furnish to the law firm of Walters, Balido & Crain, L.L.P. and/or their designee the following:

*Please also redact information relating to any medication I am taking that was not prescribed by Dr. Lown.*

- ✓ History / Physical
- ✓ Doctor's Notes / Office Notes
- ✓ Admissions / Initial Visits
- ✓ Consultations
- ✓ Discharge Summaries
- ✓ Copy of Entire Health Record OR from ＿＿＿＿＿ to ＿＿＿＿＿
- ✓ Itemized Billing Statements / Billing Records
- ✓ Records from other health care providers which are maintained as part of your file
- ✓ Other _ALL AT THE EXPENSE OF WALTERS, BALIDO & CRAIN, LLP._

*To the extent any information exists related to these matters, please redact same.*

I understand that the information in my health record *may* include information relating to sexually transmitted disease, acquired immune deficiency syndrome (AIDS) or human deficiency virus (HIV), communicable or non-communicable diseases. It may also include information about behavioral or mental health services, information concerning alcohol or drug abuse and social and family matters.

A photostatic copy of this authorization is considered as effective as the original and will expire 180 days from date signed *OR* at the conclusion of this litigation.

This release of the aforementioned records is only for evaluation and use in connection with civil litigation or other cause as referenced above.

I understand that authorizing the disclosure of this health information is voluntary. I understand that I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand that any disclosure of information, carries with it the potential for unauthorized re-disclosure and the information may not be protected by Federal confidentiality rules.

I understand that my refusal to sign this form does not affect my health care treatment or the payments of my health care treatment. Medical providers may not condition treatment or payment on execution of this authorization.

Signature of Patient or Patient Representative

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
(If not the patient, please state your relationship to the patient)

＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿ Date: ＿＿＿＿＿＿＿＿＿

*AFF-1 2 of 2*

# Paul Morin

**From:** Paul Morin [pmorin@austin.rr.com]
**Sent:** Thursday, October 02, 2014 6:45 PM
**To:** 'Brett Payne'
**Cc:** 'Katie Sacra'; 'Chris Cagle'
**Subject:** Ochoa Cronfel release

Here is the new release that came in yesterday. Please segregate the medical prescription records and the left hand and wrist records so they can be easily referenced for redaction and/or exclusion at a pretrial conference or at trial. Thank you.

Regards, Paul

Paul T. Morin, P.C.
Board Certified Civil Trial Law
Texas Board of Legal Specialization
503 W. 14th Street
Austin, Texas 78701
512-499-8200
512-499-8203 fax
PMorin@austin.rr.com

CONFIDENTIALITY NOTICE: The information contained in this ELECTRONIC MAIL transmission is confidential. It may also be subject to the attorney/client privilege or be privileged work product or proprietary information. This information is intended for the exclusive use of the adressee(s). If you are not the intended recipient, you are hereby notified that any use, disclosure, dissemination, distribution {other than to the intended addressee(s)}, copying or taking of any action because of this information is strictly prohibited.

IRS CIRCULAR 230 NOTICE REQUIREMENT: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. Federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding taxes or penalties under the Internal Revenue Code or promoting, marketing or recommending to another party any transaction or matter addressed herein.

*P- Ex: Aff-2 1 of 5*

*\* Defendant claims this email not received.*

## AUTHORIZATION TO DISCLOSE PROTECTED HEALTH INFORMATION (IN COMPLIANCE WITH ALL CORE ELEMENTS AND REQUIRED STATEMENTS PURSUANT TO 45 CFR § 164.508)

Directed To:   __AUSTIN HAND GROUP / DR. IRA LOWN__

Patient:  __GUILLERMO OCHOA-CRONFEL__      Date of Birth: __05-14-1958__

Re:   __OCHOA-CRONFEL V MURRAY__                (*Style of case OR reason for request*)

    I hereby Authorize and request, you furnish to the law firm of Walters, Balido & Crain, L.L.P. and/or their designee the following:

- ☑ History / Physical
- ☑ Doctor's Notes / Office Notes
- ☑ Admissions / Initial Visits
- ☑ Consultations
- ☑ Discharge Summaries
- ☑ Copy of Entire Health Record OR from _____  *No time limit* (GO)
- ☑ Itemized Billing Statements / Billing Records
- ☑ Records from other health care providers which are maintained as part of your file
- ☑ Other *At expense of Walters, Balido & Crain, LLP*

I understand that the information in my health record *may* include information relating to sexually transmitted disease, acquired immune deficiency syndrome (AIDS) or human deficiency virus (HIV), communicable or non-communicable diseases. It may also include information about behavioral or mental health services, information concerning alcohol or drug abuse and social and family matters.

A photostatic copy of this authorization is considered as effective as the original and will expire 180 days from date signed **OR** at the conclusion of this litigation.

This release of the aforementioned records is only for evaluation and use in connection with civil litigation or other cause as referenced above.

I understand that authorizing the disclosure of this health information is voluntary. I understand that I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand that any disclosure of information, carries with it the potential for unauthorized re-disclosure and the information may not be protected by Federal confidentiality rules.

I understand that my refusal to sign this form does not affect my health care treatment or the payments of my health care treatment. Medical providers may not condition treatment or payment on execution of this authorization.

Signature of Patient of Patient Representative

_____

(If not the patient, please state your relationship to the patient)

*Guillermo Ochoa-Cronfel*         Date:  __9/18/14__

P-EX: Aff-2  2 of 5

# Paul Morin

**From:** Paul Morin [pmorin@austin.rr.com]
**Sent:** Tuesday, October 07, 2014 4:42 PM
**To:** 'Brett Payne'; 'Katie Sacra'; 'Chris Cagle'
**Subject:** FW: Ochoa Cronfel release
**Attachments:** 160930.PDF

If I forgot to attach it, here is the release again.

Regards, Paul

Paul T. Morin, P.C.
Board Certified Civil Trial Law
Texas Board of Legal Specialization
503 W. 14th Street
Austin, Texas 78701
512-499-8200
512-499-8203 fax
PMorin@austin.rr.com

CONFIDENTIALITY NOTICE: The information contained in this ELECTRONIC MAIL transmission is confidential. It may also be subject to the attorney/client privilege or be privileged work product or proprietary information. This information is intended for the exclusive use of the adressee(s). If you are not the intended recipient, you are hereby notified that any use, disclosure, dissemination, distribution {other than to the intended addressee(s)}, copying or taking of any action because of this information is strictly prohibited.

IRS CIRCULAR 230 NOTICE REQUIREMENT: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. Federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of avoiding taxes or penalties under the Internal Revenue Code or promoting, marketing or recommending to another party any transaction or matter addressed herein.

**From:** Paul Morin [mailto:pmorin@austin.rr.com]
**Sent:** Thursday, October 02, 2014 6:45 PM
**To:** 'Brett Payne'
**Cc:** 'Katie Sacra'; 'Chris Cagle'
**Subject:** Ochoa Cronfel release

Here is the new release that came in yesterday. Please segregate the medical prescription records and the left hand and wrist records so they can be easily referenced for redaction and/or exclusion at a pretrial conference or at trial. Thank you.

Regards, Paul

Paul T. Morin, P.C.
Board Certified Civil Trial Law
Texas Board of Legal Specialization
503 W. 14th Street
Austin, Texas 78701
512-499-8200
512-499-8203 fax
PMorin@austin.rr.com

*Defendant Admits receipt of this email and unrestricted release.*

*P-EX: Aff-Z 3 of 5*

CONFIDENTIALITY NOTICE: The information contained in this ELECTRONIC MAIL transmission is confidential. It may also be subject to the attorney/client privilege or be privileged work product or proprietary information. This information is intended for the exclusive use of the adressee(s). If you are not the intended recipient, you are hereby notified that any use, disclosure, dissemination, distribution {other than to the intended addressee(s)}, copying or taking of any action because of this information is strictly prohibited.

1

## AUTHORIZATION TO DISCLOSE PROTECTED HEALTH INFORMATION (IN COMPLIANCE WITH ALL CORE ELEMENTS AND REQUIRED STATEMENTS PURSUANT TO 45 CFR § 164.508)

Directed To:___AUSTIN HAND GROUP / DR. IRA LOWN_____

Patient: ___GUILLERMO OCHOA-CRONFEL_____  Date of Birth:__05-14-1958_____

Re:___OCHOA-CRONFEL V MURRAY_____  *(Style of case OR reason for request)*

I hereby Authorize and request, you furnish to the law firm of Walters, Balido & Crain, L.L.P. and/or their designee the following:

- ☑ History / Physical
- ☑ Doctor's Notes / Office Notes
- ☑ Admissions / Initial Visits
- ☑ Consultations
- ☑ Discharge Summaries
- ☑ Copy of Entire Health Record OR from _____ No time limit — Go! _____
- ☑ Itemized Billing Statements / Billing Records
- ☑ Records from other health care providers which are maintained as part of your file
- ☑ Other __At expense of Walters, Balido & Crain, LLP__

I understand that the information in my health record *may* include information relating to sexually transmitted disease, acquired immune deficiency syndrome (AIDS) or human deficiency virus (HIV), communicable or non-communicable diseases. It may also include information about behavioral or mental health services, information concerning alcohol or drug abuse and social and family matters.

A photostatic copy of this authorization is considered as effective as the original and will expire 180 days from date signed *OR* at the conclusion of this litigation.

This release of the aforementioned records is only for evaluation and use in connection with civil litigation or other cause as referenced above.

I understand that authorizing the disclosure of this health information is voluntary. I understand that I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand that any disclosure of information, carries with it the potential for unauthorized re-disclosure and the information may not be protected by Federal confidentiality rules.

I understand that my refusal to sign this form does not affect my health care treatment or the payments of my health care treatment. Medical providers may not condition treatment or payment on execution of this authorization.

Signature of Patient or Patient Representative

_____

(If not the patient, please state your relationship to the patient)

Guillermo Ochoa-Cronfel      Date:___9/18/14_____

P- EX:Aff-2. 4 of 5

 

**COURT REPORTING | RECORD RETRIEVAL**

October 1, 2014

Reference No. 198529

AUSTIN HAND GROUP
3345 Bee Cave Road, Suite 101
Austin, Texas 78746
*fax: (512) 328-8903*

<u>**PLEASE CALL UPON RECEIPT**</u>

RE:   *GUILLERMO OCHOA-CRONFEL VS. PATRICK C. MURRAY*

Enclosed you will find the necessary legal papers for the release of **MEDICAL RECORDS** pertaining to Guillermo Ochoa-Cronfel (Date of Birth: 05/14/1958, Social Security #: ***-**-1098).

Listed below are the directions for proper compliance with this request:

- Answer **ALL** direct questions, sign on the witness line, and have notarized. If an affidavit is included, please complete it as well. The records must be certified by completion of the legal documents attached. Return the original signatures.

- **If you DO NOT HAVE ANY RECORDS**, please complete the deposition stating that you do not have any records, sign, and have notarized; if an affidavit of no record is included, please complete it as well. Always return the original signatures.

- Call or invoice BEFORE copying records **if fees exceed $50.00**. If pre-payment is required, do not send the request back; please call our office so that payment can be sent. Please **hold the requested records** until the fees are approved and the records are authorized for release.

- If records are available in digital format, please provide in digital format. If only hard copies are available, please make single-sided copies clear and legible on 8.5" x 11" paper.

Please prepare the requested records immediately as they are **due by 10/27/14.**

Upon completion of the legal documents, **please mail all copies of the records and the original legals via a traceable manner** to my attention at the address listed below. **DO NOT FAX DEPOSITION OR AFFIDAVIT-MUST MAIL ORIGINAL!**

Sincerely,

Sarah Bishop
SBishop@legalpartners.com
512-693-3890
Fax: 512-852-4499

*"NEW EVIDENCE"*

*P. Ex. Aff-3  1 of 12*

13915 N Mopac Expy, Ste 303 * Austin, TX 78728-6517 * Tel: 512.693.3890/Fax: 512.852.4499
Web: www.LegalPartners.com

/CL///AD/SB 198529

**AUSTIN HAND GROUP**

Ira G. Lown, M.D., F.A.C.S.
3345 Bee Cave Road
Suite 101
Austin, TX 78746

www.austinhandgroup.com
Phone (512) 327-HAND (4263)
Fax (512) 327-4265

Ochoa – Chantel

MEDICAL RECORDS FEE

Please remit payment to:

**Austin Hand Group**

**3345 Bee Cave Rd**

**Austin, TX 78746**

STATEMENT $ 144⁰⁰ + 15⁰⁰ = /15/ $16⁰⁰ = $165.00

DATE 10.15.14

Medical Records paper copies

| | | |
|---|---|---|
| 1st 20 pages | | $25.00 |
| Additional pages | # 222 @ .50 per page | $ 111 |
| Electronic records | | $25.00 |
| Diagnostic Imaging | | $ 8.00 |
| Affidavit | | $15.00 |
| Notary | | $6.00 |
| Supplies & Postage | | $_____ |

TOTAL DUE: $ 144⁰⁰ + 15⁰⁰ = $159⁰⁰

$165.00

Texas Medical Board (TMB) rules (including §165.2, Medical Record Release and Charges) set allowable charge for copies under Texas law. The board says physicians may charge a "reasonable, cost-based fee," as follows:

- For paper copies :$25 for the first 20 pages, and 50 cents for each page thereafter.
- For records provided in an electronic format: $25 for 500 pages or less and $50 for more than 500 pages.
- If your records are provided in a hybrid — partially electronic and partially paper — : fee would be a combination of the above fees.
- Additional charges: supplies and postage
  $8 per copy for films or other diagnostic imaging studies.
- If an affidavit is requested certifying that the information is a true and correct copy of the records, fee :$15 for executing the affidavit.

P- EX. AFF-3 2 of 12




### Legal Partners
COURT REPORTING | RECORD RETRIEVAL

October 1, 2014                     Reference No. 198529

*(handwritten)* Attn: Medical Records
512.327.4265

AUSTIN HAND GROUP
3345 Bee Cave Road, Suite 101
Austin, Texas 78746
*fax: (512) 328-8903*

**PLEASE CALL UPON RECEIPT**

RE:    *GUILLERMO OCHOA-CRONFEL VS. PATRICK C. MURRAY*

Enclosed you will find the necessary legal papers for the release of MEDICAL RECORDS pertaining to Guillermo Ochoa-Cronfel (Date of Birth: 05/16/1958, Social Security #: ***-**-1098) ... ...

Listed below are the directions for proper compliance with this request:

- Answer ALL direct questions, sign on the witness line, and have notarized. If an affidavit is included, please complete it as well. The records must be certified by completion of the legal documents attached. Return the original signatures.

- If you DO NOT HAVE ANY RECORDS, please complete the deposition stating that you do not have any records, sign, and have notarized; if an affidavit or no record is included, please complete it as well. Always return the original signatures.

- Call or invoice BEFORE copying records if fees exceed $50.00. If prepayment is required, do not send the request back; please call our office so that payment can be sent. Please hold the requested records until the fees are approved and the records are authorized for release.

- If records are available in digital format, please provide in digital format. If only hard copies are available, please make single-sided copies clear and legible on 8.5" x 11" paper.

Please prepare the requested records immediately as they are due by 10/27/14.

Upon completion of the legal documents, **please mail all copies of the records and the original legals via a traceable manner** to my attention at the address listed below. **DO NOT FAX DEPOSITION OR AFFIDAVIT-MUST MAIL ORIGINAL.**

Sincerely,

*(signature)*

Sarah Bishop
SBishop@legalpartners.com
512-693-3890
Fax: 512-852-4499

13915 N Mopac Expy, Ste 303 * Austin, TX 78728-6517 * Tel: 512.693.3890/Fax: 512.852.4499
Web: www.LegalPartners.com

/CLJ//AD/SB 198529

*(handwritten)* P-EX.Aff-3 3of12

Notice: This document contains sensitive data.

NO. D-1-GN-11-002136

| | | |
|---|---|---|
| GUILLERMO OCHOA-CRONFEL | § | IN THE DISTRICT COURT |
| | § | |
| VS. | § | 345TH JUDICIAL DISTRICT |
| | § | |
| PATRICK C. MURRAY | § | TRAVIS COUNTY, TEXAS |

## NOTICE OF INTENTION TO TAKE
## DEPOSITION BY WRITTEN QUESTIONS

To all parties by and through their attorney(s) of record: Paul T. Morin for Plaintiff Guillermo Ochoa-Cronfel; Chris Cagle for Plaintiff Guillermo Ochoa-Cronfel and the non-party witness(es) listed below.

You will please take notice that after (20) days from the service of a copy hereof with attached questions, a deposition by written questions will be taken at the offices of the CUSTODIAN OF RECORDS FOR:

### AUSTIN HAND GROUP

or at another agreed upon time and/or place before a Notary Public, an Officer of the State of Texas and employee of LegalPartners LP, 13915 N Mopac Expy, Ste 303, Austin, TX 78728-6517, or their designated agent. Which deposition with attached questions may be used in evidence upon the trial of the above styled and numbered cause pending in the above named court. Notice is further given that request is hereby made as authorized under Rules 200 and 205, Texas Rules of Civil Procedure, to the Officer authorized to take this deposition to have a SUBPOENA issued and cause it to be served on the witness to produce for inspection and photocopying the original(s) or a true and correct copy of

ANY AND ALL MEDICAL RECORDS, INSURANCE RECORDS, RADIOLOGY REPORTS, OFFICE NOTES, REPORTS, PATIENT SIGN-IN SHEETS AND/OR INTAKE FORMS, AND ANY TYPE OF CORRESPONDENCE WHETHER IN ELECTRONIC FORM OR REDUCED TO WRITING, INCLUDING RECORDS CONTAINED IN YOUR FILES FROM OTHER SOURCES PERTAINING TO GUILLERMO OCHOA-CRONFEL, DATE OF BIRTH: 05/14/1958, SOCIAL SECURITY #: ***-**-1098, FROM 05/14/1958 TO THE PRESENT

in the possession, custody or control of the said witness, and every such record to which the witness may have

P-EX. AFF-3  4 of 12

400

access and to turn all such records over to the officer authorized to take this deposition so that photographic reproduction of same may be made and attached to said deposition.

Respectfully submitted,

_/S/ Brett H. Payne_
Brett H. Payne
Texas Bar #: 00791417
WALTERS, BALIDO & CRAIN LLP
9020 N. Capital of Texas Highway
Building 2, Suite 225
Austin, TX 78759
Phone: (512) 472-9000
Fax: (512) 472-9002
ATTORNEY FOR DEFENDANT
PATRICK C. MURRAY

I certify that a true and exact copy of the foregoing Notice of Intention To Take Deposition by Written Questions was provided to all counsel of record by Commercial Delivery Service, Certified Mail Return Receipt or Facsimile pursuant to Texas Rules of Civil Procedure 21(a).

Date: 10/01/14                      By:

Arianna Durham with LegalPartners LP,
as acting agent on behalf of Brett H. Payne

P-Ex.Aff-3   5 of 12

401

## SUBPOENA

### THE STATE OF TEXAS
### TRAVIS COUNTY

To the sheriff, constable, or any other person authorized to serve and execute subpoenas as provided in Rule 176.5(a), TRCP. You are hereby commanded to subpoena and summon the following witness: CUSTODIAN OF RECORDS for: AUSTIN HAND GROUP 3345 Bee Cave Road, Suite 101, Austin, Texas 78746 to be and appear before a Notary Public with LEGALPARTNERS LP, 13915 N Mopac Expy, Ste 303, Austin, TX 78728-6517 or their designated agent for a deposition by written questions to be held at 10:00 o'clock a.m. on the twentieth day after receipt hereof at the office of THE CUSTODIAN OF RECORDS, or at another agreed upon place on the day of 10/27/14. To produce for inspection and photocopying the original(s) or a true and correct copy of:

ANY AND ALL MEDICAL RECORDS, INSURANCE RECORDS, RADIOLOGY REPORTS, OFFICE NOTES, REPORTS, PATIENT SIGN-IN SHEETS AND/OR INTAKE FORMS, AND ANY TYPE OF CORRESPONDENCE WHETHER IN ELECTRONIC FORM OR REDUCED TO WRITING, INCLUDING RECORDS CONTAINED IN YOUR FILES FROM OTHER SOURCES PERTAINING TO GUILLERMO OCHOA-CRONFEL, DATE OF BIRTH: 05/14/1958, SOCIAL SECURITY #: ***-**-1098, FROM 05/14/1958 TO THE PRESENT-

in the possession, custody or control of the said witness, and every such record to which the witness may have access, then and there to give evidence, at the instance of the Defendant, represented by Brett H. Payne in that certain Cause No. D-1-GN-11-002136 pending on the docket of the 345th District Court, Travis County, Texas, styled: GUILLERMO OCHOA-CRONFEL VS. PATRICK C. MURRAY and there remain from day to day and time to time until discharged by me according to law. This subpoena is issued in accordance to Rules 200 and 205, TRCP. This subpoena is being issued at the request of Defendant, represented by Brett H. Payne.

*Contempt.* Failure by any person without adequate excuse to obey a subpoena served upon that person may be deemed a contempt of the court from which the subpoena is issued or a district court in the county in which the subpoena is served, and may be punished by fine or confinement, or both.

*Proof of payment of fees required for fine or attachment.* A fine may not be imposed, nor a person served with a subpoena attached, for failure to comply with a subpoena without proof by affidavit of the party requesting the subpoena or the party's attorney of record that all fees due the witness by law were paid or tendered.

*HIPAA COMPLIANCE.* The party seeking the healthcare information described above has provided written notice to the individual/patient by serving same upon such individual's attorney. The notice included sufficient information about the litigation or proceeding in which the protected health information is requested to permit the individual to raise an objection to the court. The time for the individual to raise objections to the court will lapse on 10/27/14. No objections have been filed to date. If a waiver to objections is obtained from the individual's attorney, you will be notified of same. If objections are filed by the individual's attorney, you will be immediately notified. The absence of any notification by the lapse date indicates that no objections were filed. A copy of the notice for issuance of this subpoena is attached as documentation.



Witness my hand, this day, 10/01/14.

Notary Public in and for the State of Texas

——————————— Officer's Return ———————————

CAME TO HAND, and executed by delivering same to the Custodian of Records or an authorized person for service for AUSTIN HAND GROUP, and tendering all lawful fees as required.

By:

/SS//AD/SB 198529

P. EX. Aff-3 6of 12

*sent with request*

## AUTHORIZATION TO DISCLOSE PROTECTED HEALTH INFORMATION (IN COMPLIANCE WITH ALL CORE ELEMENTS AND REQUIRED STATEMENTS PURSUANT TO 45 CFR § 164.508)

Directed To: ___AUSTIN HAND GROUP / DR. IRA LOWN___

Patient: ___GUILLERMO OCHOA-CRONFEL___  Date of Birth: ___05-14-1958___

Re: ___OCHOA-CRONFEL V MURRAY___ (*Style of case OR reason for request*).

I hereby Authorize and request, you furnish to the law firm of Walters, Balido & Crain, L.L.P. and/or their designee the following:

*Please also redact information relating to any medication I am taking that was not prescribed by Dr. Lown.*

- ☑ History / Physical
- ☑ Doctor's Notes / Office Notes
- ☑ Admissions / Initial Visits
- ☑ Consultations
- ☑ Discharge Summaries
- ☑ Copy of Entire Health Record OR from _____ to _____
- ☑ Itemized Billing Statements / Billing Records
- ☑ Records from other health care providers which are maintained as part of your file.
- ☑ Other ___ALL AT THE EXPENSE OF WALTERS BALIDO & CRAIN, ESP.___

*To the extent any information exists related to this matter, please redact same.*

I understand that the information in my health record may include information relating to sexually transmitted disease, acquired immune deficiency syndrome (AIDS) or human deficiency virus (HIV), communicable or non-communicable diseases. It may also include information about behavioral or mental health services, information concerning alcohol or drug abuse and social and family matters.

A photostatic copy of this authorization is considered as effective as the original and will expire 180 days from date signed OR at the conclusion of this litigation.

This release of the aforementioned records is only for evaluation and use in connection with civil litigation or other cause as referenced above.

I understand that authorizing the disclosure of this health information is voluntary. I understand that I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand that any disclosure of information, carries with it the potential for unauthorized re-disclosure and the information may not be protected by Federal confidentiality rules.

I understand that my refusal to sign this form does not affect my health care treatment or the payments of my health care treatment. Medical providers may not condition treatment or payment on execution of this authorization.

Signature of Patient or Patient Representative

_____

(If not the patient, please state your relationship to the patient)

_____    Date: ___8/19/14___

*P-EX. AFF-3  7 of 12*



NO. D-1-GN-11-002136

| GUILLERMO OCHOA-CRONFEL | § | IN THE DISTRICT COURT |
|---|---|---|
| VS. | § | 345TH JUDICIAL DISTRICT |
| PATRICK C. MURRAY | § | TRAVIS COUNTY, TEXAS |

DEPOSITION BY WRITTEN QUESTIONS PROPOUNDED
TO THE WITNESS, CUSTODIAN OF RECORDS FOR:

AUSTIN HAND GROUP
3345 Bee Cave Road, Suite 101
Austin, Texas 78746
(512) 327-4263

1. NAME: _Erika Shepherd_

   TITLE: _Custodian of Records_

   BUSINESS ADDRESS: _3345 Beecave Rd., Ste. 101, Austin, TX 78746_

   BUSINESS PHONE NUMBER: _512-327-4263_

2. Did you receive a subpoena for the production of MEDICAL RECORDS and other documents pertaining to GUILLERMO OCHOA-CRONFEL?

   ANSWER: _Yes._

3. Has GUILLERMO OCHOA-CRONFEL been treated or examined by or received services from AUSTIN HAND GROUP?

   ANSWER: _Yes._

4. Has AUSTIN HAND GROUP made or caused to be made any memorandum, reports, records, notes, photographs or data compilations, in any form, regarding GUILLERMO OCHOA-CRONFEL?

   ANSWER: _Yes._

5. Were the entries made on these memorandum, reports, records, notes, photographs or data compilations made at the time or shortly after the time of the transaction recorded by these entries?

   ANSWER: _Yes._

P-EX.AFF-3 8 of 12

404

6. Were these memorandums, reports, records, notes, photographs or data compilations under your care, supervision, direction, custody and/or control?

ANSWER: _Yes._

7. Please state whether or not it was in the regular course of business of **AUSTIN HAND GROUP** for an employee, representative, or person with knowledge of the acts or events recorded to make the record or transmit information thereof to be included in such record.

ANSWER: _Yes._

8. Does the source of the information or the method of preparing these MEDICAL RECORDS indicate the records are of a trustworthy nature?

ANSWER: _Yes._

9. Are the originals of such records a permanent part of the MEDICAL RECORDS of AUSTIN HAND GROUP?

ANSWER: _Yes._

10. Please hand exact duplicates of all MEDICAL RECORDS pertaining to GUILLERMO OCHOA-CRONFEL or the originals thereof for attachment to this deposition. Have you now provided the records and documents requested, including those that may be on microfilm or in any other storage medium? If not, identify for the Notary Public the records and documents you did not produce and explain why you did not produce them.

ANSWER: _Yes._

11. Are there any other locations where records or documents pertaining to GUILLERMO OCHOA-CRONFEL would be kept by AUSTIN HAND GROUP? If yes, please identify the name and address of that location, if known.

ANSWER: _No._

12. How long does AUSTIN HAND GROUP keep their records before they are destroyed?

ANSWER: _N|A_

13. Are the records attached clear, legible and the best possible copies available? If any of the copies of the attached records are of poor quality please explain why.

ANSWER: _Yes._

P-Ex.Aff-3 9of12

14. Are you the custodian of records for AUSTIN HAND GROUP?

ANSWER: Yes

15. Have you provided any tangible items other than paper copies of the records requested such as radiology films, CDs of any kind, pathology blocks or slides, photographs, etc.
If so, please state what items have been provided.

ANSWER: Yes. Xray - CD

16. Have you been requested, directed, or has it ever been suggested by any person (whether doctor, lawyer, patient, or anyone else) that any part of the records subject to this deposition be withheld or protected from discovery for any reason? If so, please state the name and address of the person who conveyed this information to you and when such event occurred.

ANSWER: Original authorization dated 9.19.14 had restrictions re-vised authorization dated 9.20.14 without any changes (attached)

                                        WITNESS, CUSTODIAN OF RECORDS

I, Sondra Cutrer, a Notary Public in and for the State of Texas do hereby certify that the foregoing answers of the witness were made by the said witness and sworn to and subscribed before me. The records attached hereto are exact duplicates of the original records.

GIVEN UNDER MY HAND AND SEAL OF OFFICE on this the 13th day of October, 20 14.

                                        Sondra Cutrer
                                        Notary Public in and for The State of Texas

SONDRA CUTRER
Notary Public, State of Texas
My Commission Expires
October 20, 2015

P-Ex.Aff-3-10012

406

*received this release*

## AUTHORIZATION TO DISCLOSE PROTECTED HEALTH INFORMATION (IN COMPLIANCE WITH ALL CORE ELEMENTS AND REQUIRED STATEMENTS PURSUANT TO 45 CFR § 164.508)

Directed To:____AUSTIN HAND GROUP / DR. IRA LOWN_____

Patient:__GUILLERMO OCHOA-CRONFEL_____ Date of Birth:__05-14-1958_____

Re:____OCHOA-CRONFEL V MURRAY_____ *(Style of case OR reason for request)*

      I hereby Authorize and request, you furnish to the law firm of Walters, Balido & Crain, L.L.P. and/or their designee the following:

- ❑ History / Physical
- ❑ Doctor's Notes / Office Notes
- ❑ Admissions / Initial Visits
- ❑ Consultations
- ❑ Discharge Summaries
- ❑ Copy of Entire Health Record OR from _____ to _____.
- ❑ Itemized Billing Statements / Billing Records
- ❑ Records from other health care providers which are maintained as part of your file
- ❑ Other _____

I understand that the information in my health record *may* include information relating to sexually transmitted disease, acquired immune deficiency syndrome (AIDS) or human deficiency virus (HIV), communicable or non-communicable diseases. It may also include information about behavioral or mental health services, information concerning alcohol or drug abuse and social and family matters.

A photostatic copy of this authorization is considered as effective as the original and will expire 180 days from date signed _OR_ at the conclusion of this litigation.

This release of the aforementioned records is only for evaluation and use in connection with civil litigation or other cause as referenced above.

I understand that authorizing the disclosure of this health information is voluntary. I understand that I may inspect or copy the information to be used or disclosed, as provided in CFR 164.524. I understand that any disclosure of information, carries with it the potential for unauthorized re-disclosure and the information may not be protected by Federal confidentiality rules.

I understand that my refusal to sign this form does not affect my health care treatment or the payments of my health care treatment. Medical providers may not condition treatment or payment on execution of this authorization.

Signature of Patient or Patient Representative

_____

(If not the patient, please state your relationship to the patient)

_____ Date: _9/20/14_

P-EX.Aff-3 11 of 12

| | |
|---|---|
| From: | Sondra Cutrer [scutrer@austinhandgroup.com] |
| Sent: | Wednesday, October 29, 2014 12:01 PM |
| To: | Guillermo Ochoa-Cronfel; PMorin@austin.rr.com; Chris Cagle; Michael Graham |
| Subject: | Re: Recount of Medical Record Request by Legal Partners |

Clarification of Recount of Medical Record Request by Legal Partners

Prior to the 10.23.14 confirmation by Legal Partners to pick up records, multiple calls and VM were left for Sarah Bishop @ contact # 512 693-3890 regarding status of picking up records.
Sarah Bishop confirmed the request for pick-up on 10.23.14 stating that she had made arrangements for picking up the records.

Issue: Authorization to disclose protected health information. I did not at any time receive from Legal Partners an unmodified Authorization to disclose protected health information. I did receive from Guillermo Ochoa-Cronfel an unrestricted authorization.

On Oct 29, 2014, at 11:29 AM, Sondra Cutrer <scutrer@austinhandgroup.com> wrote:

Recount of Medical Record Request by Legal Partners.

Representative from Legal Partners picked up the records on 10.28.14 at 12:51 PM.
Almost daily communication with Legal Partners regarding their record request. (i.e. Valid authorization to disclose protected health information with changes; receipt of valid authorization, completion of records to include recent operative report, large file for pick up vs mail.) Records completed and Legal Partners notified of completion.
Contact person at Legal Partners was Sarah Bishop @ 512 852-4499
On 10.23.14 Austin Hand Group was informed by Legal Partners via VM that the records had been scheduled for pickup and was confirming our hours of operation.
Returned calls to verify days/times of daily operation for the pickup.
Additional calls made to Legal Partners following due to records not being picked up timely.

P-Ex, Aff-3 12 of 12

408